GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>GLOBAL PREMIER REGENCY PALMS PALMDALE, LP, a California limited partnership,<br><br>        Debtor and<br>        Debtor-in-Possession | Case No. 9:23-bk-10454-RC<br><br>Chapter 11 Proceeding<br><br>**DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S JOINT CHAPTER 11 PLAN OF REORGANIZATION**<br><br>DATE:    June 18, 2025<br>TIME:    1:00 p.m.<br>PLACE:  Courtroom 201<br>           1415 State Street<br>           Santa Barbara, CA 93101 |

277575

# TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ................................................................... 2

    A.      Purpose of Disclosure Statement.................................... 2
    B.      The Plan........................................................ 2
    C.      Voting, Objections to Plan and Confirmation ................. 2
    D.      Disclaimers.................................................... 3

II.     DEFINITIONS AND RULES OF INTERPRETATION ........................... 6

III.    BACKGROUND OF THE DEBTORS ........................................ 6

    A.      Description of the Debtor........................................ 6
    B.      Events Participating Chapter 11 Filing ......................... 7
    C.      Exit Financing.................................................. 7
    D.      Debtor's Assets ................................................ 8
    E.      Debtor's Liabilities ........................................... 8

IV.     THE DEBTORS' CHAPTER 11 PROCEEDINGS ................................. 10

    A.      Commencement of Case ...................................... 10
    B.      Income and Payment of Expenses and Debts During Bankruptcy ............... 10
    C.      Employment of Professionals ................................. 10
    D.      Analysis of Preferential, Fraudulent and Unauthorized Transfers.......... 11
    E.      Projected Objections to Claims Filed Against the Estate ..................... 11

V.      FINANCIAL INFORMATION ............................................. 11
    A.      Historical Financial Information for the Debtor ..................... 11
    B.      Financial Information Provided During the Case ..................... 11
    C.      Financial Projections for the Joint Plan of Reorganization ............. 12

VI.     DESCRIPTION OF PLAN OF REORGANIZATION ......................... 13

    A.      Summary of the Plan........................................... 13
    B.      Proposed Treatment of Claims.................................. 13
    C.      Executory and Assumed Contracts and Leases ..................... 20

VII.    IMPLEMENTATION OF THE PLAN ....................................... 20

    A.      Exit Financing.................................................. 20
    B.      Causes of Actions ............................................. 20
    C.      Sale of Property................................................ 20

VIII.   TAX CONSEQUENCES OF THE PLAN ..................................... 21

    A.      Introduction.................................................... 21
    B.      Federal Income Tax Consequences to the Debtors..................... 22

## TABLE OF CONTENTS

### (Continued)

|  |  | **PAGE** |
|---|---|---|
| C. | Tax Consequences to Creditors | 23 |
| IX. | LIQUIDATION ANALYSIS | 23 |
| A. | Class 1 | 26 |
| B. | Class 2 | 26 |
| C. | Class 3.1-3.8 | 26 |
| D. | Class 4 | 26 |
| E. | Class 5 | 26 |
| F. | Class 6 | 26 |
| G. | Class 7 | 27 |
| H. | Class 8 | 27 |
| I. | Class 9 | 27 |
| X. | VOTING | 27 |
| A. | Who May Vote | 27 |
| B. | How to Vote | 28 |
| C. | Effect of Vote | 28 |
| XI. | CONCLUSION | 28 |
| A. | Rules of Construction | 29 |
| B. | Schedules | 29 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

**STATUTES**

11 U.S.C. § 102 ................................................................................................ 30

11 U.S.C. § 544(b) ........................................................................................... 11

11 U.S.C. § 547 ................................................................................................ 11

11 U.S.C. § 548 ................................................................................................ 11

11 U.S.C. § 549 ................................................................................................ 11

11 U.S.C. § 552(a) ............................................................................................. 9

11 U.S.C. § 1008 .............................................................................................. 10

11 U.S.C. § 1107 .............................................................................................. 10

11 U.S.C. § 1129 ................................................................................................ 3

11 U.S.C. § 1129(a)(7) ..................................................................................... 24

11 U.S.C. § 1129(a)(11) ................................................................................... 12

11 U.S.C. § 1129(b) ......................................................................................... 28

11 U.S.C. § 1141 ........................................................................................ 3, 23

Cal Civil Code 3144 ........................................................................................ 17

# I.

# __INTRODUCTION__

### A.    __Purpose of Disclosure Statement__

The purpose of a disclosure statement is to provide information to enable a creditor to make an informed judgment about a plan of reorganization and to enable such creditor to determine whether it is in its best interest to vote for (accept) or against (reject) such plan.  The Bankruptcy Court has already approved the Disclosure Statement [Docket no. _] in this case.  The Debtor now seeks approval of its Plan.  This Disclosure Statement is in support of the joint Plan.

### B.    __The Plan__

Included on the thumb drive containing this Disclosure Statement is a copy of the joint Plan [FOR PURPOSES OF APPROVAL OF THIS DISCLOSURE STATEMENT, ATTACHED AS **EXHIBIT 4** IS A COPY OF THE PLAN – THIS PARENTHETICAL WILL NOT BE INCLUDED IN THE ACTUAL DISCLOSURE STATEMENT SERVED ON PARTIES AS THEY WILL BE RECEIVING A COPY OF THE PLAN AS PART OF THE MAILING].  The Plan provides for payments to Creditors through a reorganization, which may provide for refinancing and/or debt and equity recapitalization. Under the Plan, General Unsecured Creditors will receive their Pro Rata share of the Plan Fund based on each of their respective Allowed Claims.  The reorganization of the Debtor will generate a greater distribution to Creditors than what would be realized in a Chapter 7 liquidation.

The Debtor attests that the information stated in this Disclosure Statement and the Plan is accurate to the best of its knowledge.  All Creditors should refer to Articles III-V of the Plan for the precise treatment of their claims. This Disclosure Statement is explanatory only; the language used in the Plan is binding. **Your rights may be affected.  You should read the Plan and Disclosure Statement carefully and discuss them with your attorney, if you have one.**

### C.    __Voting, Objections to Plan and Confirmation__

To vote to accept or reject the joint Plan, a Creditor must indicate its acceptance or rejection thereof on the ballot which accompanies this Disclosure Statement and return it to Winthrop Golubow Hollander, LLP ("WGH"), such that the ballot is actually received by WGH

on or before _____ at 5:00 p.m. (the "Ballot Deadline").  Each Class of Creditors allowed to vote on the Plan will be deemed to have accepted the Plan if the Plan is accepted by valid ballots cast by Creditors in that Class holding at least two-thirds (2/3) in dollar amount and more than one half (1/2) in number of the Allowed Claims of Creditors in that Class actually voting on the Plan.  **ONLY PROPERLY EXECUTED BALLOTS TIMELY RECEIVED BY COUNSEL FOR THE DEBTOR WILL BE COUNTED AS HAVING VOTED ON THE PLAN.**

Since mail delays may occur, and because time is of the essence, it is important that ballots be mailed well in advance of the Ballot Deadline.  Any ballots received after the Ballot Deadline will <u>not</u> be included in any calculation to determine whether the Debtor's Creditors have accepted or rejected the Plan.

Any party-in-interest may object to confirmation of the Plan.  The Bankruptcy Court has fixed _____ as the deadline for filing an objection to the Plan and for serving a copy of the objection on the Debtor's attorneys, WGH, at the address set forth above (Attn: Garrick A. Hollander, Esq.); and upon the United States Trustee, located at 1415 State Street, Santa Barbara, CA 93101 (Attn:  Brian Fittipaldi, Esq.).

At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to § 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary Classes of Claims created under the Plan, and, if not, whether the Bankruptcy Court should, nevertheless, confirm the Plan.  If at such hearing the Bankruptcy Court should determine that the Plan meets all the requirements for confirmation prescribed by the Bankruptcy Code, the Bankruptcy Court will enter a Confirmation Order.  Pursuant to §  1141 of the Bankruptcy Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding upon the Debtor and each of its Creditors, regardless whether the Creditor voted to accept the Plan.

**D.    <u>Disclaimers</u>**

**THIS IS A SOLICITATION BY THE DEBTOR.  ALL REPRESENTATIONS MADE ARE THOSE OF THE DEBTOR AND NOT OF ITS ATTORNEYS OR OTHER PROFESSIONALS.  NO REPRESENTATIONS CONCERNING THE DEBTOR,**

1    INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO THE DEBTOR'S

2    FUTURE BUSINESS OPERATIONS, CASH FLOW PROJECTIONS, THE VALUE OF

3    ITS PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE ESTATE, OR ANY TAX

4    EFFECT OF THE TRANSACTIONS PROPOSED UNDER THE PLAN, ARE

5    AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS

6    DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE

7    TO SECURE ACCEPTANCE OF THE PLAN THAT ARE IN ADDITION TO OR

8    DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS DISCLOSURE

9    STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY-IN-INTEREST.  ANY

10    SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE

11    REPORTED TO THE DEBTOR'S ATTORNEYS WHO, IN TURN, WILL DELIVER THE

12    INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS THE

13    BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.

14        THE DISCUSSION IN THIS DISCLOSURE STATEMENT REGARDING THE

15    DEBTOR MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE

16    MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.

17    SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A

18    RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF

19    FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT,"

20    "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF OR

21    OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE

22    READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE

23    NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND

24    UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO

25    DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD

26    LOOKING STATEMENTS.  THE LIQUIDATION ANALYSES, DISTRIBUTION

27    PROJECTIONS, PROJECTIONS OF FINANCIAL PERFORMANCE AND OTHER

28    INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING,

1    AMOUNT AND VALUE OF ACTUAL DISTRIBUTIONS TO CREDITORS MAY BE

2    AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE,

3    ANY ANALYSES, ESTIMATES, OR PROJECTIONS MAY OR MAY NOT PROVE TO

4    BE ACCURATE.

5        UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE

6    INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE

7    STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT.  RECORDS KEPT BY THE

8    DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED

9    INTERNALLY BY THE DEBTOR.  THE DEBTOR BELIEVES THAT EVERY

10   REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION

11   AS ACCURATE AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND

12   HISTORY OF THE DEBTOR'S BUSINESS AND THE CONDITION OF THE DEBTOR'S

13   BOOKS AND RECORDS.  HOWEVER, THE RECORDS KEPT BY THE DEBTOR ARE

14   NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY.

15   NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL VERIFIED

16   INDEPENDENTLY THE INFORMATION CONTAINED HEREIN, OR MAKE ANY

17   REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ACCURACY

18   THEREOF.

19       THE DEBTOR AND ITS PROFESSIONALS HAVE MADE A DILIGENT EFFORT

20   TO IDENTIFY IN THIS DISCLOSURE STATEMENT ALL LITIGATION CLAIMS,

21   INCLUDING CLAIMS FOR RELIEF, COUNTERCLAIMS, AND OBJECTIONS TO

22   CLAIMS.  HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A

23   PARTICULAR LITIGATION CLAIM IS OR IS NOT IDENTIFIED IN THIS

24   DISCLOSURE STATEMENT.  THE DEBTOR OR OTHER PARTIES-IN-INTEREST MAY

25   SEEK TO INVESTIGATE, FILE AND PROSECUTE CAUSES OF ACTION WHETHER

26   OR NOT SUCH CLAIMS ARE IDENTIFIED IN THIS DISCLOSURE STATEMENT.

27       ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO

28   CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR TO

1  **VOTING ON THE PLAN.  THE CONTENTS OF THIS DISCLOSURE STATEMENT**

2  **SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS OR**

3  **TAX ADVICE.  EACH CREDITOR AND OTHER PARTY-IN-INTEREST SHOULD**

4  **CONSULT WITH ITS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT**

5  **OR ACCOUNTANT PRIOR TO VOTING ON THE PLAN IN ORDER TO ENSURE A**

6  **COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN.  THIS DISCLOSURE**

7  **STATEMENT IS INTENDED FOR THE SOLE USE OF THE CREDITORS OF THE**

8  **DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION REGARDING**

9  **THE PLAN.**

10         **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE**

11  **STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT CONTAINS**

12  **ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION BY THE**

13  **DEBTOR OF ACCEPTANCES TO THE PLAN, ASSUMING THE ACCURACY OF THE**

14  **CONTENTS OF THIS DISCLOSURE STATEMENT.  THE BANKRUPTCY COURT HAS**

15  **NOT YET DETERMINED SUCH ACCURACY, BUT MAY DO SO AT THE HEARING**

16  **REGARDING CONFIRMATION OF THE PLAN.**

17                      **II.**

18      **DEFINITIONS AND RULES OF INTERPRETATION**

19      <u>See</u> Appendix appended hereto.

20                      **III.**

21        **BACKGROUND OF THE DEBTOR**

22      **A.**    **<u>Description of the Debtor</u>**

23      The Debtor was formed in 2014 to purchase land and develop and operate an assisted

24  living/memory care facility located at 38722 Orchid View Place, Palmdale, California.  The

25  Debtor was initially funded by foreign investors, who invested in the Debtor pursuant to a

26  program of the United States government to allow foreign investors to make investments in the

27  United States in order to obtain residency status.  This program is designed to stimulate the U.S.

28  economy through job creation and capital investment.  The Debtor's successful completion and

1    operation of this project will preserve jobs, protect the investment of these foreign investors, and

2    ensure their continued residency in the United States.

3        In late 2019, the Debtor began its development of an 80-unit 58,900 square foot assisted

4    living/memory care facility located at 38722 Orchid View Place, Palmdale, California ("Facility"),

5    which is 98% complete.  The Debtor estimates that it needs $2.5 million to complete its

6    construction.  The Debtor owns and on or about May 31, 2019, formed its wholly owned non-

7    debtor subsidiary Global Regency Palmdale Senior Care Services, LLC dba Regency Palms

8    Senior Living ("Regency Palms Senior Living"), to operate the Facility.  The Debtor will be

9    leasing the Facility to Regency Palms Senior Living.

10        Regency Palms Senior Living will provide housing and a full spectrum of care and

11    services to fragile seniors in need of a moderate level of medical assistance, including specialized

12    memory care for seniors who suffer from Alzheimer's Disease and other forms of dementia.

13    Details for all expenses to complete development of and stabilize the Property are provided in the

14    Plan projections attached as **Exhibit 1**.

15        **B.    Events Precipitating Chapter 11 Filing**

16        Similar to many other companies, in 2020, the Debtor experienced significant financial

17    and operational challenges as a result of the COVID-19 pandemic.  In the course of building its

18    Facility, the Debtor was materially impacted by the outbreak of COVID-19, and the subsequent

19    shutdown and imposition of restrictions, caused construction delays and cost overruns at the

20    Facility.  Accordingly, in December 2023, the Debtor was unable to make its interest payment. As

21    a result, Lender stopped funding the project, and on January 6, 2023, the Debtor received a Notice

22    of Default and Election to Sell Under Deed of Trust recorded in the Official Records, County of

23    San Bernardino.  Pursuant to this notice, a Trustee Sale was rescheduled and continued from time

24    to time, but was ultimately scheduled for June 2, 2023.  On June 22, 2023, the Debtor filed a

25    voluntary petition for relief under Chapter 11 of the Bankruptcy Code in order to stave off

26    Shaughnessy's scheduled foreclosure of the Property.

27        **C.    Exit Financing**

28        Shaughnessy has agreed to provide Exit Financing in an amount necessary to enable the

Reorganized Debtor to complete the development of the Property, including the Facility, and otherwise facilitate the effectuation of the terms of the Plan. For sake of clarification, the Exit Financing represents new value[1] of the Debtor and shall be construed accordingly.

###### D.    Debtor's Assets

The Debtor's primary asset is the Property.  For more details on the Debtor's assets, see the Debtor's bankruptcy schedules [Docket No. 20].  Based on an appraisal dated July 27, 2023, the Property was estimated to have an as-is – liquidation value of $15,000,000 for the date June 2, 2023; an as-is – going concern value of $24,300,000 for the date June 2, 2023; prospective going concern value at completion of $23,500,000 for the date December 2, 2023; and a prospective stabilization value of $of $30,800,000 for the date December 2, 2025.

###### E.    Debtor's Liabilities

The following is a summary description of the claims asserted against the estate.

######       1.    Secured Claims

On or about October 28, 2021, the Debtor obtained a construction loan from Shaughnessy, which was evidenced by, among other things, a Promissory Note dated October 28, 2021, as well as that certain Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement, and Fixture Filing dated October 29, 2021.  Pursuant to the note, the Debtor drew down and used $17,617,092 for construction of the Facility. According to Shaughnessy's proof of claim, Shaughnessy asserts a secured claim in the amount of $19,353,622 as of the Petition Date.

Several parties recorded mechanics liens and/or assert secured claims against the Property, all of which, if allowed, would be junior to Shaughnessy's Secured Claim.  Based on deficiencies with many of these liens and/or claims, the Debtor filed a motion to disallow many of these claims and expunge the liens. Based on the Court's order disallowing and expunging liens, the only mechanics lien creditor holding an Allowed Secured Claims is Value Painting in the amount of $58,563.

---

[1] Shaughnessy's new value is in addition to the Debtor's $600,000 of new value contributed by EB5 investors post-petition.

1        RCB asserts that it holds a secured claim against the estate based on an agreement granting

2    a security interest in the Debtor's right, title, and/or interest in and/or to Accounts, General

3    Intangibles, and Instruments, specifically, and including without limitation any funds received by,

4    or credited to the account of, Assignor in connection with the approval and release of EB-5 funds

5    relating to Assignor's EB-5 program.

6        The Debtor disputes that RCB has a lien against any assets because the Debtor did not own,

7    as of the petition date, any of the assets sought to be collateralized, and section 552(a) prevents

8    liens from attaching or being perfected on after-acquired property.  The Debtor acknowledges that

9    the Debtor granted pre-petition a lien against accounts and general intangibles.  The Debtor,

10   however, does not generate any revenue and as a result, as of the petition date, had no accounts

11   receivable, nor did it have any general intangibles or instruments.  Moreover, the Debtor does not

12   own any interest in EB-5 funds (as they are owned by the EB-5 investors) as of the petition date.

13   The Debtor merely holds such funds in trust for the benefit of EB-5 investors, who may withdraw

14   such funds at any time without the consent of the Debtor.  Section 552(a) provides that "property

15   acquired by the estate or by the debtor after the commencement of the case is **not subject to any**

16   **lien resulting from any security agreement** entered into by the debtor before the commencement

17   of the case."  11 U.S.C. § 552(a) (emphasis added).  As a result, no lien can attach to the EB-5

18   funds after the petition date, and thus RCB has no lien against property of the estate.

19       The County of Los Angeles holds a claim in the amount of $165,203, which is secured

20   against the Debtor's Property.

21                     2.      Administrative, Priority and General Unsecured Claims

22       The following is a summary of estimated administrative claims asserted against the date as

23   of the date of the filing of this Disclosure Statement, which will be paid from the Estate funds or

24   Exit Financing.

25

26

27

28

| Firm | Nature of Service | Claim[2] |
|---|---|---|
| WGH | General Insolvency Counsel | $225,000 |
| Wilshire Pacific Capital Advisors | Financial Advisor | $40,000 |
| Smart CPAs | Accountants | $15,000 |

The Franchise Tax Board asserts a priority unsecured claim in the amount of $1,600 against the estate. The Debtor estimates that there are approximately $5.6 million of General Unsecured Claims asserted in the Debtor's Estate.

## IV.

## THE DEBTOR'S CHAPTER 11 PROCEEDING

### A. Commencement of Case

On June 2, 2023, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor has managed its financial affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1008.

### B. Income and Payment of Expenses and Debts During Bankruptcy

Based on the Debtor's lack of funds, the Debtor has not been able to resume development. The only expenses paid during this case were for insurance, which was funded with equity infused post-petition. The Debtor has accrued post-petition obligations to its security guard company and professionals employed in this case.

### C. Employment of Professionals

The Court has entered orders authorizing the employment of the following professionals in the Case:

| Professional | Type of Professional | Date Order Entered |
|---|---|---|
| WGH | Debtor's General Insolvency Counsel | November 15, 2023 |
| Wilshire Pacific Capital Advisors | Financial Advisor | Not yet entered[3] |
| Smart CPAs | Debtor's Accountant | March 28, 2024 |

---

[2] Claim represents total services rendered by each of the respective firms through June 30, 2024. This does not include all fees to be incurred in the case. All fees and expenses incurred by the firms are subject to Bankruptcy Court approval.
[3] The Debtor thought that an order had already been entered, but in the course of finalizing this Disclosure Statement, it was discovered that an application had not yet been filed. The Debtor will promptly file an application.

### D.    Analysis of Preferential, Fraudulent and Unauthorized Transfers

The Debtor has completed its analysis of the Debtor's books and records to determine whether any payments made prior to the Petition Date constitute preferential transfers avoidable pursuant to § 547 of the Bankruptcy Code, or whether any transfers made by the Debtor are avoidable as fraudulent transfers under §§ 544(b) or 548 of the Bankruptcy Code, or avoidable pursuant to § 549 of the Bankruptcy Code.  Based on the Debtor's preliminary review and analysis, the Debtor is not aware of any potential causes of action against third parties.  The Debtor does not believe that any Creditor should rely on any recovery on the prosecution of any Avoidance Actions.  That being said, any recovery received, net of attorney's fees and costs, would increase the recovery to General Unsecured Creditors.  It is worth noting that based on the 100% Plan, there would not be any legal or practical basis to bring any such action.

### E.    Projected Objections to Claims Filed Against the Estate

Based on the Debtor's books and records, attached as **Exhibit 2** is a schedule of projected Claims in the Debtor's Case.

### V.

### FINANCIAL INFORMATION

### A.    Historical Financial Information for the Debtor

The Debtor is not an operating business.  Rather, the Debtor has spent years developing real property to be used and operated as an assisted living facility.  The Appraisal and the sale efforts described in section III.D. represents the most detailed information about the current value of the Property.

### B.    Financial Information Provided During the Case

The Debtor has filed Schedules in the Case.  The Schedules provide financial information regarding the assets and liabilities of the Estate as of the Petition Date.  The Schedules are available for inspection, during normal business hours, at the Clerk's Office of the Bankruptcy Court, located at 1415 State Street, Santa Barbara, CA 93101.  In addition to the Schedules, the Debtor has prepared throughout the Monthly Operating Reports in accordance with the requirements of the United States Trustee.  Copies of the Monthly Operating Reports are available

1  for inspection on the docket and during normal business hours, at the Clerk's Office of the

2  Bankruptcy Court, located at 1415 State Street, Santa Barbara, CA 93101.

3      **C.**    **Financial Projections for the Joint Plan of Reorganization**

4      The Debtor has prepared Projections, which includes cash flow projections for the

5  Property, along with assumptions on which such projections are based.  The Projections are

6  intended to assess the future cash flow available to the Debtor for making the Distributions

7  required by the Plan, and thus provide support for the feasibility of the Plan, pursuant to

8  § 1129(a)(11) of the Bankruptcy Code.  The Projections are attached hereto as **Exhibit 1**.  The

9  Projections present the entire financial template for the Debtor's reorganization effort.  The

10  Projections assume that the Debtor will complete its development, and thereafter, operate,

11  manage, and ultimately sell the Facility.  As the Projections indicate, the Debtor projects that the

12  net cash flow from the operations generated from the Property, financing proceeds and, if

13  necessary, net sales proceeds, will be sufficient to pay all Allowed Claims in accordance with the

14  treatment of such Allowed Claims as described herein.

15      The Projections set forth the Debtor's estimate of the anticipated cash flow of the

16  Reorganized Debtor for the term of the Plan, which is based on the anticipated cash flow from the

17  operations of the planned Facility.  Projections of the anticipated cash flow of the Reorganized

18  Debtor are based on estimated revenue and expenses for the operation of the Facility.  The

19  Projections also contain a description of material assumptions underlying the Projections.  The

20  Projections are based, in large part, upon the historical earnings and expenses of similar assisted

21  living facilities owned and operated by affiliates of the Debtor.

22      Although the Debtor has devoted considerable effort to the development of the

23  Projections and believes that the Projections represent fairly the projected future cash flow of the

24  Debtor, care should be taken in analyzing the Projections as no guarantee exists that the

25  Projections can be met by the Debtor.

26      THE FINANCIAL PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT

27  REPRESENT AN ESTIMATE OF FUTURE PERFORMANCE BASED UPON CERTAIN

28  ASSUMPTIONS SET FORTH IN THE FINANCIAL PROJECTIONS.  THESE FUTURE

1   EVENTS MAY OR MAY NOT OCCUR, AND THE FINANCIAL PROJECTIONS MAY NOT

2   BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL

3   RESULTS THAT WILL OCCUR.  BECAUSE OF THE UNCERTAINTIES INHERENT IN

4   PREDICTIONS OF FUTURE EVENTS AND EVENTS OUTSIDE OF THE DEBTOR'S

5   CONTROL, THE DEBTOR'S ACTUAL CASH FLOW MAY BE DIFFERENT FROM THAT

6   PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE

7   INTERESTS OF CREDITORS.

8                                    **VI.**

9                    **DESCRIPTION OF PLAN OF REORGANIZATION**

10      **A.**      **Summary of the Plan**

11          The following is a brief summary of the Plan and is qualified in its entirety by the full text

12  of the Plan.  The terms of the Plan are comprehensive and will be controlling on the Creditors and

13  the Debtors in the event that the Plan is confirmed.  **Therefore, all Creditors are urged to read**

14  **the Plan carefully in its entirety rather than relying on this summary.**

15          The Plan provides that General Unsecured Creditors will receive one hundred percent

16  (100%) on account of their Allowed General Unsecured Claim from income generated from the

17  business operations over five years and/or the refinancing or sale of the Assets.  For details about

18  Plan treatment, <u>see</u> Article V of the Plan; for details about implementation of the Plan, <u>see</u>

19  Article VI of the Plan.

20      **B.**      **Proposed Treatment of Claims**

21          1.      <u>Creditors Asserting Secured Claims</u>.  For full treatment, see Section 5.1-5.3

22  of the Plan.  The following is a summary of the proposed treatment of Claims of Secured

23  creditors:

24              a.      <u>Class 1</u>:  The members of Class 1 consists of any Allowed Secured

25              Claim held by Shaughnessy.  Shaughnessy's rights are impaired under the

26              Plan, and thus the member of this Class is entitled to vote.

27                  (1)      <u>Allowance of Secured Claim</u>.  The member of Class 1 shall

28              be allowed a Secured Claim in an amount equal to $19,353,622.97 as of

the Effective Date.

(2)    Treatment of Allowed Secured Claims.  Except to the extent that Shaughnessy agrees to a less favorable treatment, the holder of an Allowed Secured Claim in Class 1 will receive on account of, and in exchange for, such Allowed Secured Claim, ninety-nine percent (99%) of the Interests in the Reorganized Debtor, which shall comprise of one hundred percent (100%) of the General Partner's equity interest in the Reorganized Debtor, with all of the rights and powers afforded to the General Partner under the ALPA attached as **Exhibit 1** to the Plan and incorporated herein by this reference,[4] including the dilution of the Limited Partners' Interests as provided in the ALPA and this Plan.

(3)    Covenants.  The member of this Class agrees that upon the Effective Date, as General Partner of the Reorganized Debtor, it shall: (a) diligently complete the development of the Facility; (b) pay all costs of developing and operating the Property, including, but not limited to, all insurance, property taxes, utilities, and all other expenses incurred in the development and completion of the Facility,  as well as the EB 5 expenses reflected in the Projections; (c) use its best efforts, skill, and judgment (or use those persons who possess such skill and judgment) to promptly commence operations of the Facility, and thereafter operate the Facility in a commercially reasonable manner and to take all actions necessary or advisable to maximize the profitability of the business; (d) provide K-1s for all EB-5 investors, prepare and file all applicable tax returns for the Reorganized Debtor and its Subsidiary, pay all resulting tax obligations, and, upon reasonable written request, provide the Regional Center, on an annual basis, evidence of same; (e) retain through the Holding Period

---

[4] It is expected that Shaughnessy, the member of this Class, will transfer 100% of its rights under the Loan Agreement, including the treatment provided under this Plan, to a special purpose entity, which shall assume all obligations due and arising under this Plan.

1  100% ownership of the Property through the Reorganized Debtor, employ

2  all employees of the Facility and operate the Facility through the

3  Subsidiary,[5] coordinate with the Regional Center all communication

4  requests and legal and United States Citizenship and Immigration Services

5  compliance requests, and otherwise use its best efforts, skill, and judgment

6  (or use those persons who possess such skill and judgment) to comply with

7  all requirements of the EB-5 Program during the Holding Period;[6] and (4)

8  refrain from selling the Property or equity Interests in the Reorganized

9  Debtor during the Holding Period.  In addition, Shaughnessy shall, upon

10  reasonable written request, provide the Regional Center for the Regional

11  Center's processing of I829 applications, the following: (a) Certificate of

12  Occupancy, (b) Department of Social Services Operating License, (c) lease

13  and management agreements, (d) actual W-2s for at least 30 full-time

14  employees during the Holding Period, (e) marketing materials (brochures,

15  website, etc.), (f) employee human resource files, (g) local business

16  licenses, any other required licenses, (h) photos (interior and exterior) of

17  the Facility, (i) financial statements for the Reorganized Debtor and

18  Subsidiary, and (j) any other request required for EB-5 compliance

19  applications.  Shaughnessy cannot change the use of the project without

20  EB-5 Legal approval, and cannot change the Regional Center listed on the

21  project.

22  (4)  General Releases.  Shaughnessy and Debtor parties agree to

23  mutually release each other from all claims.  For more details of the

24  release, see section 5.1.4 of the Plan.

25

26

27

28

---

[5] The Subsidiary must be the employer of record for all jobs created.
[6] The Reorganized Debtor shall retain a vendor expert in EB-5 compliance to ensure statutory compliance.

b.      Class 2:  Members of this Class consist of any Allowed Secured Claim held by a Mechanics Lien Creditor.  Creditor's rights are impaired under the Plan, and thus members of this Class are entitled to vote.

(1)      Allowance of Secured Claim.  The members of Class 2 shall be allowed a Secured Claim in the amount of its non-contingent liquidated Claim as of the Petition Date to the extent of the value of such Creditor's Claim against the Estate's interest in such property, which shall be based on the Fair Market Value, as of the Effective Date, of such Creditor's interest in the Estate's interest in such property securing such creditor's claim (or such other value as agreed to between the Debtor and any member of Class 2), securing such Creditor's Claim in this Class.  If the member of this Class objects to the Debtor's asserted value of the property securing the Creditor's Claim or otherwise asserts a value of the property lower than that which is asserted by the Debtor, then, the Debtor may elect, in its sole discretion, to fix the amount of such objecting Creditor's Allowed Secured Claim based on the lower of the objection value(s).

(2)      Treatment of Allowed Secured Claims.  Except to the extent that a member of this Class agrees to a less favorable treatment, each member of this Class shall receive a cash payment in the amount of its Allowed Secured Claim as of the Petition Date, equal to the Fair Market Value of such Creditor's interest in the Estate's interest in such property, as may be modified pursuant to Section 5.2.1.  Payment shall be made on or before the later of (i) the first Business Day of the first full month following the Effective Date, or (ii) the tenth (10th) Business Day after such Secured Claim becomes an Allowed Secured Claim.

c.      Classes 3.1-3.8:  Disallowed Claims of Invalid Mechanics Lien Parties.  Classes 3.1-3.8 consists of parties who do not hold claims against the

-16-

estate, but who recorded liens against the Debtor's Property without commencing

litigation within ninety days of the recording.  Classes 3.1-3.8 are unimpaired by

the Plan.

(1)    <u>Disallowance of Secured Claim</u>.  The members of Classes

3.1-3.8 have no claim nor valid lien against the Debtor's estate.  They have

no claim because the asserted claim did not arise from any obligation

contracted for by the Debtor, the claim was scheduled by the Debtor as

contingent, and the members of these Classes failed to file a proof of

claim.  Moreover, members of these classes have no valid lien because

their lien was automatically void under California law (Cal Civil Code

3144) based on their failure to timely commence a lawsuit against the

Debtor within ninety days of the recording of their lien.

(2)    <u>Treatment of Claim.</u>  The members of these Classes shall

receive nothing from the Debtor.  Since the members of this Class have no

valid lien, yet are clouding the Debtor's title, they must release their lien

within five (5) days of the Effective Date.

d.    <u>Class 4 - Allowed Claim of RCB</u>[7].  Creditor's rights are impaired

by the Plan, and thus the member of this Class is entitled to vote. The Member of

this Class shall be allowed a General Unsecured Claim in the amount of

$3,385,095. The member of this Class shall receive a cash payment in an amount

equal to its Pro Rata share of the Plan Fund, which shall be based on the total

amount of its Allowed Claim relative to the total amount of Allowed Claims in

Class 4 and Class 8.  Payment shall be made on or before the first Business Day of

the first full month following the Effective Date..

e.    <u>Class 5 - Allowed Secured Claim of Governmental Units</u>.

Creditor's rights are impaired by the Plan, and thus members of this Class are

---

[7] The Debtor believes that no property of the estate constituted collateral of RCB as of the Petition Date.  RCB contends that it holds a valid lien against property of the estate.

1    entitled to vote. Each member of this Class shall receive cash payments until their

2    Allowed Claim is Paid in Full.

3        Any Allowed Secured Claim of Governmental Units against the Estate will

4    receive payments from the Estate pursuant to the same timing and subject to the

5    same interest, if any, as set forth in § 4.2 of the Plan. Members of this Class shall

6    retain their Lien until their Allowed Secured Claim against the respective Estate is

7    Paid in Full.  A failure by the Reorganized Debtor to make a payment when due to

8    a holder of an Allowed Secured Tax Claim of a Governmental Unit pursuant to

9    the terms of the Plan shall constitute an Event of Default.  If the Reorganized

10   Debtor fails to cure such Event of Default within thirty (30) days after receipt of

11   written notice of default, then such taxing authority may seek to assert an uncured

12   Event of Default to seek to enforce the balance due on its claim, plus interest

13   accrued, if any, under state law, against the Reorganized Debtor in accordance

14   with applicable state law remedies. See § 5.5 of the Plan.

15   2.    Unsecured Creditors:  For full treatment, see Sections 5.6-5.8 of the Plan.

16   The following is a summary of the proposed treatment of Claims of Unsecured creditors:

17       a.    Class 6 – Allowed Claim of Philadelphia Insurance Company.

18   Creditor's rights are impaired and thus Creditor is entitled to vote.  Creditor shall

19   be allowed a Claim in the amount of $24,504.  Creditor shall receive three equal

20   monthly cash payments in the amount of $8,168, commencing on the first

21   Business Day of the first full month following the Effective Date, and continuing

22   each month thereafter until paid in full.

23       b.    Class 7 – Unsecured Non-Tax Priority Claims.  Creditor's rights

24   are unimpaired by the Plan, and thus members of this Class are not entitled to

25   vote.  This Creditor shall receive Cash in the full amount of the Allowed

26   Unsecured Non-Tax Priority Claim on the later of (i) the Effective Date, and

27   (ii) the tenth (10th) Business Day after such Non-Tax Priority Claim becomes an

28   Allowed Unsecured Non-Tax Priority Claim.

1    c.    <u>Class 8 - Allowed General Unsecured Claims</u>.  Creditor's rights

2    are impaired under the Plan, and thus members of this Class are entitled to vote.

3    Except to the extent that a member of this Class agrees to a less favorable

4    treatment, each member of this Class shall receive its Pro Rata share of the Plan

5    Fund based on each member's Allowed General Unsecured Claim relative to all

6    Allowed General Unsecured Claims and the Allowed Claim of RCB.  Payment

7    shall be made within later of (i) the first Business Day of the first full month

8    following the Effective Date, or (ii) the tenth (10th) Business Day after such Claim

9    becomes an Allowed Claim.

10    3.    <u>Class 9 - Allowed Interests</u>. The Interest holders' rights are impaired by the

11    Plan, and thus entitled to vote.

12    a.    *Limited Partners*.  The holders of Allowed Interests that are

13    Limited Partners of the Debtor shall retain an Interest in the Reorganized Debtor,

14    subject to a modification of the rights and powers of the limited and general

15    partners, as reflected in the revised red-lined ALPA attached as **Exhibit 1** to the

16    Plan, and which modifications are incorporated herein by this reference; but, as

17    reflected in the ALPA, such Limited Partnership Interests shall be diluted from

18    seventy four and ninety-five one hundredths of a percent (74.95%) Interest in the

19    Debtor to an aggregate of one percent (1%) Interest in the Reorganized Debtor.

20    The capital accounts of the Limited Partners shall be reduced to $0.

21    b.    <u>General Partner</u>.  The interests of GPA #5 shall be extinguished

22    and replaced with Shaughnessy as the sole General Partner of the Reorganized

23    Debtor, which General Partner shall own and control ninety-nine percent (99%) of

24    the Reorganized Debtor, pursuant to all rights, powers and limitations set forth in

25    the ALPA.

26

27

28

### C.    Executory and Assumed Contracts and Leases

The Debtor seeks to assume and/or assign a variety of executory contracts, as reflected in Schedule 9.1 to the Plan.  The Debtor rejects all existing executory contracts and unexpired leases identified on Schedule 9.3 and otherwise not identified on Schedule 9.1. See Article IX of the Plan.

### VII.

### IMPLEMENTATION OF THE PLAN

The Reorganized Debtor shall make all payments due under the Plan to holders of Allowed Claims and Allowed Interests from one or more of the following:  (a)  funds from the Exit Financing provided by Shaughnessy; (b) any proceeds from the prosecution and/or settlement of Causes of Action, including Avoidance Actions; and (c) proceeds from the sale or financing of the Reorganized Debtor's business or real property.

The following is a summary of the potential sources of funding of payments to Creditors as reflected in the Debtor's Plan Projections attached as **Exhibit 1**:

### A.    Exit Financing

Shaughnessy shall provide Exit Financing in an amount necessary to enable the Reorganized Debtor to complete the development of the Facility on the Property, including, but not limited to, all necessary construction, improvements, and related expenses required for the establishment of the Facility, and fund all obligations arising from the terms of the Plan. The Exit Financing shall be used to ensure the timely completion of the development and the commencement of operations for the Facility. The Reorganized Debtor shall take all reasonable steps to move forward with completion of the development of the Property and begin operations of the Facility, subject to applicable laws, regulations, and permits.  The Reorganized Debtor shall be bound by and comply with all obligations arising from the Plan.

### B.    Causes of Actions

The Debtor has completed its evaluation of Causes of Actions, and has concluded that there are no actions to pursue.

### C.    Sale of Property

It is anticipated that the Debtor will sell the Property and/or its business in furtherance of

satisfaction of its obligations under the Plan.  Pursuant to the terms of the Plan, Shaughnessy has agreed to forbear from selling the Property during the Holding Period.

**VIII.**

**TAX CONSEQUENCES OF THE PLAN**

**A.**    **Introduction**

The implementation of the Plan may have federal, state and local tax consequences to the Debtor and the Debtor's Creditors and Interest Holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan.  This Disclosure Statement does not constitute, and is not intended to constitute, either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

The discussion below summarizes only certain of the federal income tax consequences associated with the Plan's implementation.  This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Creditor or Interest Holder which may modify or alter the consequences described herein.  A Creditor or Interest Holder may find that the tax consequences of the Plan to such Creditor or Interest Holder differ materially from the tax consequences discussed below because of such Creditor's or Interest Holder's facts and circumstances.  This discussion does not address state, local or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

The following discussion is based upon the provisions of the Internal Revenue Code, the regulations promulgated thereunder, and existing judicial decisions and administrative rulings.  In light of the rapidly-changing nature of tax law, no assurance can be given that legislative, judicial or administrative changes will not be forthcoming that would affect the accuracy of the discussion below.  Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof.  The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

1    CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH

2    THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND

3    TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN,

4    INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

5        **B.    <u>Federal Income Tax Consequences to the Debtor</u>**

6        Consummation of the Plan may reduce substantially the amount of the Debtor's aggregate

7    outstanding indebtedness.  In general, the Internal Revenue Code provides that a taxpayer who

8    realizes a discharge of indebtedness must include the Debt Discharge Amount in its gross income

9    in the taxable year of discharge to the extent that the Debt Discharge Amount exceeds any

10   consideration given for such discharge.[8]  However, if a taxpayer is in a title 11 case and the

11   discharge of indebtedness occurs pursuant to a plan approved by the bankruptcy court, as in these

12   Case, then such discharge of indebtedness is specifically excluded from gross income.

13   Accordingly, the Debtor will not be required to include in income any Debt Discharge Amount as

14   a result of the Plan transactions.

15       Although the Debtor will not have to include the Debt Discharge Amount resulting from

16   the Plan transactions in his gross income, there will be a tax effect.  The Internal Revenue Code

17   requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount excluded

18   from income.  Tax attributes are reduced in the following order of priority:  net operating losses

19   and net operating loss carryovers; general business credits; minimum tax credits; capital loss

20   carryovers; basis of property of the taxpayer; passive activity loss or credit carryovers; and foreign

21   tax credit carryovers.  Tax attributes are generally reduced by one dollar for each dollar excluded

22   from gross income, except that general tax credits, minimum tax credits and foreign tax credits are

23   reduced by 33.3 cents for each dollar excluded from gross income.

24       An election can be made to alter the order of priority of attribute reduction by first applying

25   the reduction against depreciable property held by the taxpayer in an amount not to exceed the

26   aggregate adjusted basis of such property.  The Debtor has not yet decided whether to make such

27

28   _____
     [8] No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged
     would have given rise to a deduction.

1    election.    The deadline for making such election is the due date (including extensions) of the

2    Debtor's federal income tax return for the taxable year in which such debt is discharged pursuant

3    to the Plan.

4        Any Claim against the Debtor (except a Claim that would give rise to a deduction if paid)

5    that is discharged by payment to a Creditor of Cash and/or property will result in the creation of a

6    Debt Discharge Amount reducing tax attributes to the extent that the adjusted issue price of the

7    debt discharged (plus accrued interest) exceeds the fair market value of the payment made in

8    cancellation thereof.

9        The Debtor's Debt Discharge Amount may be increased to the extent that General

10    Unsecured Creditors holding unscheduled Claims fail to timely file a Proof of Claim and have

11    their Claims discharged on the Confirmation Date pursuant to Bankruptcy Code § 1141.

12        **C.    <u>Tax Consequences to Creditors</u>**

13        A Creditor who receives a Distribution on his or her Claim that is less than the Creditor's

14    adjusted basis in such Claim may be entitled to claim a bad debt deduction for this difference.  A

15    bad debt deduction is allowed in the taxable year of the Creditor in which a debt becomes wholly

16    worthless.  The discharge of a Claim pursuant to the Plan establishes that such Claim is wholly

17    worthless as of the date of discharge (assuming the holder of the Claim receives no consideration

18    under the Plan with respect to such Claim).  It is possible, however, that such Claim may have

19    become wholly worthless on an earlier date, depending upon all the facts and circumstances.  The

20    Debtor expresses no opinion regarding the date or dates on which Claims discharged under the

21    Plan became worthless.

22                                    **IX.**

23                        **<u>LIQUIDATION ANALYSIS</u>**

24        Pursuant to § 1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless the

25    bankruptcy court determines that distributions under the plan to all holders of claims and interests

26    who have not accepted the plan, and whose claims and interests are classified in classes that are

27    impaired under the plan, are no less than those which they would receive in a liquidation

28    proceeding under Chapter 7.  This test must be satisfied even if a plan is accepted by each

1    impaired class of claims and interests.   This test, which is often referred to as the "best interests"

2    test, requires the bankruptcy court to find either that (i) all holders of claims and interests in an

3    impaired class of claims or interests have accepted the plan, or (ii) the plan will provide each

4    holder of claims and interests in an impaired class who has not accepted the plan with a recovery

5    of property of a value, as of the effective date of the plan, that is not less than the amount that such

6    holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

7          To satisfy the "best interest" test, the bankruptcy court must reach a conclusion regarding

8    the probable distribution to the holders in each impaired class of claims and interests if the debtor

9    was liquidated in a Chapter 7.  The first step in this process is to determine the "liquidation value"

10   that would be generated from a forced sale of the debtor's assets by a Chapter 7 trustee. The

11   second step requires the application of the projected liquidation proceeds in accordance with the

12   various rights of creditors holding liens on the property.  For example, if a claimant holds a lien on

13   corporate equipment but not inventory, the proceeds of the liquidation derived from this asset

14   would have to be applied against this claimant's debt.  If the proceeds were sufficient to retire the

15   claimant's secured claim, then the claimant's claim would be paid in full.  However, if the

16   liquidation proceeds are not sufficient, then that portion of the claim which is not satisfied from

17   the sale proceeds is treated as an unsecured claim and shares pro rata at that distribution level.

18   This process must then be repeated as to each collateral category to ensure that the claims secured

19   by collateral are paid from their collateral and only from their collateral.

20         Once all of the claims secured by liens on assets of a debtor's estate are deducted from the

21   projected liquidation proceeds of the sale of the claimant's collateral, then the costs and expenses

22   associated with the liquidation of the estate incurred by the Chapter 7 trustee must be paid.  These

23   costs would include the compensation of the trustee, as well as compensation of counsel and other

24   professionals retained by the trustee, and asset disposition expenses.

25         After payment of the costs and expenses associated with the Chapter 7 liquidation are paid,

26   all unpaid administrative expenses incurred by the debtor in its Chapter 11 case (such as

27   compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in

28

1    the Chapter 7 case, and all unpaid claims arising from the operations of the debtor during the

2    pendency of the Chapter 11 case, must be paid.

3        After the payment of Chapter 11 administrative expenses, the remaining liquidation

4    proceeds would be used to pay priority claims, such as tax and wage claims that are entitled to

5    priority under the Bankruptcy Code. Thereafter the remaining liquidation proceeds would be made

6    available to pay general unsecured claims.  Finally, to the extent that any proceeds remain after

7    paying all allowed claims, they would be distributed to interest holders in accordance with their

8    liquidation priorities.

9        Attached hereto as **Exhibit 3** is a liquidation analysis prepared by the Debtor that estimate

10   the probable liquidation value of the Debtor's assets, and applies the foregoing liquidation

11   methodology to the estimated Claims against the Estate in a Chapter 7 liquidation in an effort to

12   quantify what each Class of Creditors and Interest Holders would receive in a Chapter 7

13   liquidation.  Any liquidation analysis of this nature entails a significant degree of estimation and

14   projection regarding both probable asset value and probable Allowed Claim totals.  For example,

15   in preparing **Exhibit 3**, the Debtor has necessarily quantified what the Debtor believes will be the

16   Allowed Claims after claim objections within each Class, including projected Allowed

17   Administrative Claims, which are included in **Exhibit 3**.  The administrative claims described

18   herein are based on fees for professional services, which have not been completed in this Case and

19   are subject to final Court approval.  These and other factors may significantly increase or reduce

20   the Distributions to holders of Allowed Claims.

21       On the valuation side, the Debtor, with the use of the appraisal of the Property, has

22   estimated the liquidation value of its assets.

23       Although there are inherent difficulties in quantifying with exactitude the potential

24   recoveries that Creditors would receive in a Chapter 7 liquidation scenario, the Debtor believes

25   that the liquidation analysis attached hereto as **Exhibit 3** provides a fair estimated result that

26   would occur in a Chapter 7 liquidation.  As this analysis indicates, the Debtor's assets are

27   currently encumbered by Liens in favor of secured creditors.  Based upon the foregoing valuation

28   assumptions, and given the amount of the existing secured and unsecured claims against the assets

1    owned by the Debtor, the Debtor believes that, in a Chapter 7 liquidation, Creditors holding

2    General Unsecured Claims would receive 0% on account of their Claims in the Debtor's Case.

3        In contrast, the Debtor believes that more value will be available for Creditors under the

4    terms of the Plan.  More specifically, instead of being paid nothing, the Debtor firmly believes

5    General Unsecured Claims will be paid in full.  Consider the following class by class comparative

6    analysis:

7        **A.    Class 1**

8        The holder of Claims in this Class is impaired by the Plan.  Under a Chapter 7 liquidation,

9    the member of this Class will obtain relief from the automatic stay, and thus would receive nothing

10   in a chapter 7 liquidation as there would be no property to sell.  Accordingly, the member of this

11   Class will receive as much as, and in fact more than, it would in a Chapter 7.

12       **B.    Class 2**

13       The holder of Claims in this Class is impaired by the Plan.  Under a Chapter 7 liquidation,

14   the members of this Class are projected to receive no distribution.  Accordingly, the member of

15   this Class will receive as much as it would in a Chapter 7.

16       **C.    Classes 3.1-3.8**

17       The holders of Claims in these Classes are unimpaired by the Plan, so they are not entitled

18   to vote.

19       **D.    Class 4**

20       The holder of Claims in this Class are impaired by the Plan.  Under a Chapter 7

21   liquidation, the members of this Class is projected to receive no distribution.  Accordingly,

22   members of this Class will receive as much as, and in fact more than, it would in a Chapter 7.

23       **E.    Class 5**

24       The holders of Claims in this Class are impaired by the Plan. Under a Chapter 7

25   liquidation, the members of this Class are projected to receive no distribution.  Accordingly,

26   members of this Class will receive as much as they would in a Chapter 7.

27       **F.    Class 6**

28       The holder of Claims in this Class is impaired by the Plan. Under a Chapter 7 liquidation,

1  the member of this Class is projected to receive no distribution.  Accordingly, the member of this

2  Class will receive as much as, and in fact more than, it would in a Chapter 7.

3       **G.**    **Class 7**

4       The holders of Claims in this Class are unimpaired by the Plan, and thus not entitled to

5  vote.

6       **H.**    **Class 8**

7       The holders of Claims in this Class are impaired by the Plan. Under a Chapter 7 liquidation,

8  the members of this Class are projected to receive no distribution.  Accordingly, the members of

9  this Class will receive as much as, and in fact more than, they would in a Chapter 7.

10       **I.**    **Class 9**

11       The holders of Interests in this Class are impaired by the Plan. Under a Chapter 7

12  liquidation, Interest Holders in this Class are projected to receive no Distributions.  In contrast,

13  under the Plan, these Interest Holders will retain their interest in the Debtor, and thus, will receive

14  as much as, and in fact more than, they would receive in a liquidation.

15  **X.**

16  **VOTING**

17       **A.**    **Who May Vote**

18       Creditors are entitled to vote on confirmation of the Plan unless (i) their class is

19  unimpaired (presumed to accept) or is to receive no distribution (presumed to reject); (ii) an

20  objection has been filed to that creditor's claim, (iii) that creditor's claim is scheduled by the

21  Debtor as contingent, disputed, unliquidated or unknown and the creditor has not filed a proof of

22  claim; or (iv) the claim is unclassified (and thus required by law to be paid in full).  A creditor

23  whose claim has either been objected to or been scheduled by the Debtor as contingent, disputed,

24  unliquidated or unknown and the creditor has not filed a proof of claim, and who wishes to vote,

25  must move to have its claim allowed for voting purposes by filing a motion for such relief in time

26  for that motion to be heard at or before the Confirmation Hearing.

27

28

**B.** **How to Vote**

Fill out and return the attached ballot so that it is received by the Debtor's counsel no later than 14 days before the Confirmation Hearing.

**C.** **Effect of Vote**

The Plan will be confirmed only if (i) it is accepted by each impaired class, or (ii) it is accepted by at least one impaired class (exclusive of insiders) and the Court determines that it is "fair and equitable" (as defined by § 1129(b) of the Bankruptcy Code) to all dissenting classes of creditors. A class of creditors accepts the Plan if it is accepted by a majority in number and two-thirds in dollar amount of creditors who cast timely ballots voting on the Plan.

## XI.

### CONCLUSION

The materials provided in this Disclosure Statement are intended to assist Creditors in voting on the Plan. If the Plan is confirmed, Creditors will be bound by the terms of the Plan. Therefore, all Creditors are urged to review this material and to make such further inquiries as they deem appropriate, and then cast an informed vote on the Plan.

Date: May 6, 2025                    **GLOBAL PREMIER REGENCY PALMS PALMDALE, LP, a California limited partnership**

**GLOBAL PREMIER AMERICA #5, LLC, a California limited liability company, its General Partner**

By:_____

Name: Christine Hanna
Its:    Manager

## A.    <u>Rules of Construction</u>

For the purpose of the Plan, unless otherwise provided in the Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter; (iii) any reference in the Plan to an existing document, exhibit or schedule filed or to be filed means such document or schedule as it may have been or may be amended, modified or supplemented pursuant to the Plan; (iv) any reference to an entity as a holder of a Claim includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in the Plan to § s, articles and exhibits are references to § s, Articles and Exhibits of or to the Plan; (vi) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vii) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in § 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or any other provision in this Appendix.

## B.    <u>Schedules</u>

All exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

# EXHIBIT 1

**Regency Palms Palmdale**
**Plan of Reorganization Projections**
As of 5/5/2025

*BK Petition Date 6/2/2023*
*Target Effective Date 7/31/2025*

| | At Closing | Month 1 Jul-25 | Month 2 Aug-25 | Month 3 Sep-25 | Month 4 Oct-25 | Month 5 Nov-25 | Month 6 Dec-25 | Month 7 Jan-26 | Month 8 Feb-26 | Month 9 Mar-26 | Month 10 Apr-26 | Month 11 May-26 | Month 12 Jun-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOURCES OF CASH** | | | | | | | | | | | | | |
| Plan Fund provided by Shaughnessy | 225,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| Additional Exit Financing by Shaughnessy | 699,871 | - | - | - | - | - | - | - | - | - | - | - | - |
| | 924,871 | - | - | - | - | - | - | - | - | - | - | - | - |
| **USES OF CASH** | | | | | | | | | | | | | |
| *Professional and UST Fees* | | | | | | | | | | | | | |
| Debtor's Legal Counsel | 400,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| Debtor's Financial Advisor | 50,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| Reserve to Resolve Disputed Claims | 25,000 | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee | - | 250 | - | - | 13,071 | - | - | - | - | - | - | - | - |
| | 475,000 | 250 | - | - | 13,071 | - | - | - | - | - | - | - | - |
| *Claimants by Class* | | | | | | | | | | | | | |
| Class 1 - Secured Claim of Shaughnessy | - | | | | | | | | | | | | |
| Class 2 - Mechanic's Lien - Value Painting | | 58,563 | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.1 - Mechanic's Lien - Gall Brothers | | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.2 - Mechanic's Lien - Resource 4 Signs | | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.3 - Mechanic's Lien - SC Design / Pacific Western Millworks | | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.4 - Mechanic's Lien - Walker Windows | | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.5 - Mechanic's Lien - Christianbelle Electric | | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.6 - Mechanic's Lien - California Fencing | | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.7 - Mechanic's Lien - LM Bros & Assoc | | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.8 - Mechanic's Lien - High Desert Contractors | | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 - Secured Claim of RCB | | 161,349 | - | - | - | - | - | - | - | - | - | - | - |
| Class 5 - Secured Claim of Gov Units | | 500,259 | - | - | - | - | - | - | - | - | - | - | - |
| Class 6 - Surety Bond Claim of Philadelphia Insurance Co | | 8,168 | 8,168 | 8,168 | - | - | - | - | - | - | - | - | - |
| Class 7 - Unsecured Priority Claims | | 1,600 | - | - | - | - | - | - | - | - | - | - | - |
| Class 8 - General Unsecured Claims | | 63,651 | - | - | - | - | - | - | - | - | - | - | - |
| Class 9 - Allowed Interests | | - | - | - | - | - | - | - | - | - | - | - | - |
| | | 793,590 | 8,168 | 8,168 | - | - | - | - | - | - | - | - | - |
| *EB-5 Compliance* | | | | | | | | | | | | | |
| JTC Funds Administration (including cure claim) | 16,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| EB-5 Annual Integrity Fund Fee (regional center) | | | | | 20,000 | | | | | | | | |
| Form I-956G Annual Reporting (prep and filing) | - | - | - | - | - | - | 15,000 | - | - | - | - | - | - |
| | 16,000 | 1,000 | 1,000 | 1,000 | 21,000 | 1,000 | 16,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| *Project Completion* | | | | | | | | | | | | | |
| *(a) Hard Costs* | | | | | | | | | | | | | |
| Hard Costs to Complete (Exterior) | - | 290,602 | 290,602 | 290,602 | 290,602 | 290,602 | 290,602 | - | - | - | - | - | - |
| Hard Costs - Contingency (15%) | - | 43,590 | 43,590 | 43,590 | 43,590 | 43,590 | 43,590 | - | - | - | - | - | - |
| FF&E, Signage, Other Personal Property | - | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | - | - | - | - | - | - |
| | - | 384,192 | 384,192 | 384,192 | 384,192 | 384,192 | 384,192 | - | - | - | - | - | - |
| *(b) Soft Costs* | | | | | | | | | | | | | |
| Architects and Engineering | - | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | - | - | - | - | - | - |
| Permits and Inspections | - | 22,966 | 22,966 | 22,966 | 22,966 | 22,966 | 22,966 | - | - | - | - | - | - |
| Security | - | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | - | - | - | - | - | - |
| Utilities | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | - | - | - | - | - | - |
| Telecom | | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | 1,600 | - | - | - | - | - | - |
| Portable Wash Stations/Restrooms | | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | - | - | - | - | - | - |
| Trash | | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | 1,667 | - | - | - | - | - | - |
| Fencing | | 833 | 833 | 833 | 833 | 833 | 833 | - | - | - | - | - | - |
| | - | 56,066 | 56,066 | 56,066 | 56,066 | 56,066 | 56,066 | - | - | - | - | - | - |
| *Property Carrying Costs* | | | | | | | | | | | | | |
| Future Property Taxes | - | - | - | - | - | - | 72,693 | - | - | - | 72,693 | - | - |
| | - | - | - | - | - | - | 72,693 | - | - | - | 72,693 | - | - |
| **TOTAL USES OF CASH** | 491,000 | 1,235,098 | 449,426 | 449,426 | 474,329 | 441,258 | 528,951 | 1,000 | 1,000 | 1,000 | 73,693 | 1,000 | 1,000 |

EXHIBIT 1 - PAGE 1

**Regency Palms Palmdale**
**Plan of Reorganization Projections**
As of 5/5/2025

*BK Petition Date 6/2/2023*
*Target Effective Date 7/31/2025*

| | Month 13 Jul-26 | Month 14 Aug-26 | Month 15 Sep-26 | Month 16 Oct-26 | Month 17 Nov-26 | Month 18 Dec-26 | Month 19 Jan-27 | Month 20 Feb-27 | Month 21 Mar-27 | Month 22 Apr-27 | Month 23 May-27 | Month 24 Jun-27 | 2-Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOURCES OF CASH** | | | | | | | | | | | | | |
| Plan Fund provided by Shaughnessy | - | - | - | - | - | - | - | - | - | - | - | - | 225,000 |
| Additional Exit Financing by Shaughnessy | - | - | - | - | - | - | - | - | - | - | - | - | 699,871 |
| | - | - | - | - | - | - | - | - | - | - | - | - | 924,871 |
| **USES OF CASH** | | | | | | | | | | | | | |
| *Professional and UST Fees* | | | | | | | | | | | | | |
| Debtor's Legal Counsel | - | - | - | - | - | - | - | - | - | - | - | - | 400,000 |
| Debtor's Financial Advisor | - | - | - | - | - | - | - | - | - | - | - | - | 50,000 |
| Reserve to Resolve Disputed Claims | - | - | - | - | - | - | - | - | - | - | - | - | 25,000 |
| US Trustee | - | - | - | - | - | - | - | - | - | - | - | - | 13,321 |
| | - | - | - | - | - | - | - | - | - | - | - | - | 488,321 |
| *Claimants by Class* | | | | | | | | | | | | | |
| Class 1 - Secured Claim of Shaughnessy | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 2 - Mechanic's Lien - Value Painting | - | - | - | - | - | - | - | - | - | - | - | - | 58,563 |
| Class 3.1 - Mechanic's Lien - Gall Brothers | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.2 - Mechanic's Lien - Resource 4 Signs | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.3 - Mechanic's Lien - SC Design / Pacific Western Millworks | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.4 - Mechanic's Lien - Walker Windows | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.5 - Mechanic's Lien - Christianbelle Electric | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.6 - Mechanic's Lien - California Fencing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.7 - Mechanic's Lien - LM Bros & Assoc | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 3.8 - Mechanic's Lien - High Desert Contractors | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Class 4 - Secured Claim of RCB | - | - | - | - | - | - | - | - | - | - | - | - | 161,349 |
| Class 5 - Secured Claim of Gov Units | - | - | - | - | - | - | - | - | - | - | - | - | 500,259 |
| Class 6 - Surety Bond Claim of Philadelphia Insurance Co | - | - | - | - | - | - | - | - | - | - | - | - | 24,505 |
| Class 7 - Unsecured Priority Claims | - | - | - | - | - | - | - | - | - | - | - | - | 1,600 |
| Class 8 - General Unsecured Claims | - | - | - | - | - | - | - | - | - | - | - | - | 63,651 |
| Class 9 - Allowed Interests | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | - | - | - | - | - | - | 809,926 |
| *EB-5 Compliance* | | | | | | | | | | | | | |
| JTC Funds Administration (including cure claim) | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 40,000 |
| EB-5 Annual Integrity Fund Fee (regional center) | | | 20,000 | | | | | | | | | | 40,000 |
| Form I-956G Annual Reporting (prep and filing) | - | - | - | - | - | 15,000 | - | - | - | - | - | - | 30,000 |
| | 1,000 | 1,000 | 1,000 | 21,000 | 1,000 | 16,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 110,000 |
| *Project Completion* | | | | | | | | | | | | | |
| *(a) Hard Costs* | | | | | | | | | | | | | |
| Hard Costs to Complete (Exterior) | - | - | - | - | - | - | - | - | - | - | - | - | 1,743,611 |
| Hard Costs - Contingency (15%) | - | - | - | - | - | - | - | - | - | - | - | - | 261,542 |
| FF&E, Signage, Other Personal Property | - | - | - | - | - | - | - | - | - | - | - | - | 300,000 |
| | - | - | - | - | - | - | - | - | - | - | - | - | 2,305,153 |
| *(b) Soft Costs* | | | | | | | | | | | | | |
| Architects and Engineering | - | - | - | - | - | - | - | - | - | - | - | - | 50,000 |
| Permits and Inspections | - | - | - | - | - | - | - | - | - | - | - | - | 137,796 |
| Security | - | - | - | - | - | - | - | - | - | - | - | - | 54,000 |
| Utilities | - | - | - | - | - | - | - | - | - | - | - | - | 60,000 |
| Telecom | - | - | - | - | - | - | - | - | - | - | - | - | 9,600 |
| Portable Wash Stations/Restrooms | - | - | - | - | - | - | - | - | - | - | - | - | 10,000 |
| Trash | - | - | - | - | - | - | - | - | - | - | - | - | 10,000 |
| Fencing | - | - | - | - | - | - | - | - | - | - | - | - | 5,000 |
| | - | - | - | - | - | - | - | - | - | - | - | - | 336,396 |
| *Property Carrying Costs* | | | | | | | | | | | | | |
| Future Property Taxes | - | - | - | - | - | 74,874 | - | - | - | 74,874 | - | - | 295,135 |
| | - | - | - | - | - | 74,874 | - | - | - | 74,874 | - | - | 295,135 |
| | | | | | | | | | | | | | |
| TOTAL USES OF CASH | 1,000 | 1,000 | 1,000 | 21,000 | 1,000 | 90,874 | 1,000 | 1,000 | 1,000 | 75,874 | 1,000 | 1,000 | 4,344,931 |

EXHIBIT 1 - PAGE 2

**High Desert Contractors, Inc.**
**Regency Palms Completion Proposal**
**Dated: 5/29/2024**

**ONSITE IMPROVEMENTS**

| | |
|---|---:|
| Trash Enclosure per plan A5-41 | 18,760 |
| Paint Trellis in courtyards, in building, and east outside | 16,800 |
| 8" RPDA & 4" RPDA concrete & supports. Missing supports under RPDA(Backflows) | 2,786 |
| Stucco walls (does not warranty any cracks in walls) | 59,840 |
| Parking Lot | 61,280 |
| Striping and signage | 5,975 |
| Fine grade site. Landscape/planter areas | 8,879 |
| Fencing | 184,435 |
| Wall Drainage through wall (L-1.1 note 9) at court yard wall per landscape plan for drainage | 7,620 |
| Garden planters (not complete L-1.0 notes) | 21,340 |
| Safety bollards for 4" water backflow and gas meter | 4,575 |
| Block wall completion | 1,985 |
| Block wall 3 side of SCE transformer 26' l.f (not installed) city standard plan | 5,200 |
| Raised planter (completion) 1 ea (L-1.0 note 4) | 3,800 |
| Storm drain – Complete | 13,848 |
| Landscape – complete work | 298,005 |
| Electrical conduit to complete power to signs and gate motors, pull boxes. 175 L.F 1" conduit | 3,025 |
| Low voltage conduit for mangates, parking lot gates 710 L.F 2" conduit with pull boxes. | 14,495 |
| Landscape main line (copper) 2" to connect from interior court yard to landscape backflow | 20,000 |
| Electrical on-site gates/signage. Labor/Materials | 22,680 |
| Security/Card Readers/Control gates | 30,000 |
| Total Onsite Improvements | 805,328 |

**OFF-SITE IMPROVEMENTS**

| | |
|---|---:|
| Concrete public works | 176,520 |
| Raise 5 sewer manhole | 15,500 |
| Rough Grade Q-2 | 16,530 |
| Street section per approved plans dated 3/7/22 Q-2 and orchid | 312,334 |
| Streetlights per approved plan Q-2, Orchid view place, 13th St East | 9,678 |
| Rule 20 TD 1728035/Rule 16 TD1728037 – Extra work to complete/re-inspect | 18,898 |
| Site Survey | 17,820 |
| Soil Inspection | 18,500 |
| Total Offsite Improvements | 585,780 |

**Offsite work to complete improvements for Desert Senior Living on 9 lots**

| | |
|---|---:|
| Dry Utilities SCE, Spectrum, ATT Rule 15 Q-2/13th East | 2,780 |
| Palmdale Water Department Water Phase 1 | 68,850 |
| Street signage at 13th East & Orchid | 2,865 |
| | 74,495 |

**Site Cost**

| | |
|---|---:|
| Construction Water, Dust control for reclaimed water off-site 1. Watertruck 200 hrs @150 = $30,000 | 33,800 |
| Porta Restroom/ with sink rental and service 1 ea (if over 6 months it will be at $700 per month) | 4,200 |
| Consulting and supervision to complete on-site/off-site work. Scheduling, Inspection, Supervision of work. Includes truck/travel | 111,360 |
| Total Site Cost | 149,360 |

| | |
|---|---:|
| **Total Cost** | **1,614,963** |

EXHIBIT 1 - PAGE 3

**Interior/Exterior of Building**

| | |
|---|---|
| Electrical | 28,000 |
| HVAC | 18,000 |
| Security Interior | 15,000 |
| Interior fire alarm | 10,000 |
| Interior paint touch up repairs (damaged areas only). Labor/Materials | 6,340 |
| Exterior paint flashing exposed | 1,680 |
| Plumbing: | 15,000 |
| Roof jack leak damage. 2nd floor from rains. *roof jack repaired by others Hallway upstairs ceiling 80 s.f | 3,680 |
| T-Bar Ceiling repair. (kitchen, laundry room, ice room, storage room, hallway misc) | 2,680 |
| Double doors replacement – 5 total | 20,208 |
| Single door repair/patch – 7 total | 1,925 |
| 1 single door hardware replacement of room door | 385 |
| 1 single door to hallway to kitchen. Replace frame/door | 2,900 |
| Replace 2 shutters missing from exterior. Paint and Install | 2,600 |
| Signage for generator installed | 250 |
| Subtotal | 128,648 |

| | |
|---|---|
| **TOTAL HARD COSTS** | **1,743,611** |

EXHIBIT 1 - PAGE 4

**ASSISTED LIVING PROJECT (18-10)**

| AMOUNT | Current Permit # | Permit Type | Engineering Plan No. | Re-Issued Permit Fees | Comments |
|---|---|---|---|---|---|
| $ 13,992 | EN 18-00174 | Street | ST 18-10 | $13,992.04 | Street rough graded, Curb/Gutter poured on Avenue Q-2 & Orchid View (No pavement improvements). |
| | | | | | Need to verify if Road Easements and drainage covenant have been recorded |
| 765 | EN 18-00177 | Sewer | PC 18-10 | $764.91 | Sewer mainline constructed complete with manholes. System needs to be cleaned, air-tested, and |
| | | | | | mirrored for 95% acceptance. |
| 3,360 | EN 18-00180 | Grading | GD 18-10 | $3,360.00 | Rough Grade Pad released. Site storm drain and underground storage system not inspected |
| | EN 18-00346 | Haul Route | - | - | Re-issuance not required unless more earthwork import is required |
| 362 | EN 19-00430 | Dry/Wet Onsite Utility | | $362.25 | Water and SCE services for project site improvements |
| 362 | EN 19-00431 | Dry/Wet Offsite Utility | | $362.25 | Water, Gas, SCE services Avenue Q-2 |
| | EN 20-00292 | Offsite SD | SD 18-10 | - | Determine off-site storm drain no longer required (see attachment letter |
| 242 | EN 21-00365 | Temp Lease Office R/W | | $241.50 | Temporary Construction Trailer within R/W |
| 10,608 | EN 21-00020 | Landscaping | LSP 18-10 | $10,607.68 | Mainline Irrigation Installed, not inspected |
| | | | | | |
| | SUBDIVISION, TR 73401 (18-09) | | | | |
| | | | | | |
| | Current Permit # | Permit Type | Engineering Plan No. | Re-Issued Permit Fees | Comments |
| | | | | | |
| 9,320 | EN 18-00178 | Street | ST 18-09 | $9,320.42 | Streets rough graded |
| 1,397 | EN 18-00179 | Sewer | PC 18-09 | $1,396.91 | Sewer mainline placed in-ground. Further inspections required |
| 2,168 | EN 18-00181 | Grading | GD 18-09 | $2,168.25 | Site grading started, no inspection requests. Drainage fees have not been paid |
| | EN 18-00345 | Haul Route | - | - | Re-issuance not required unless more earthwork import is required |
| 1,134 | EN 19-00182 | Street Lights | SL 18-09 | $1,134.00 | |
| 1,013 | EN 21-00175 | Precise GD | GD 18-09A | $1,013.25 | Precise grading improvements |
| | LS 21-00016 | LMD | | | New LMD plans will be required to submit and LMD district formation required |
| 2,447 | LS 21-00034 | LSP Front Yard | LSP 18-09 | $2,446.50 | Permit for site landscaping improvements for residential lots |
| | E22-00151 | Electrical for SL | | | Permit fees TBD |
| | | | | | |
| | | | | | |
| | Palmdale Water District Back Charges for Services: | | | | |
| 5,855 | 1.5" Irrigation Service = $ 5,855.46 | | | | |
| 24,831 | 4" Domestic Service = $ 24,830.54 | | | | |
| 6,594 | 8" Fire Protection Service = $ 6,593.78 | | | | |
| 346 | 3" Recycled Water Const. Meter = $ 345.84 | | | | |
| | All Other Charges: | | | | |
| 8,000 | Plan Check Deposit: = $ 8,000.00 | | | | |
| 15,000 | Inspection Deposit: = $ 15,000.00 | | | | |
| | | | | | |
| 30,000 | Licensing Permit (Dept of Social Services) | | | | |
| | | | | | |
| | | | | | |
| $ 137,796 | **TOTAL PERMITS AND INSPECTION FEES** | | | | |

EXHIBIT 1 - PAGE 5

| | **Property Tax - Delinquint 2023** |
|---|---|
| 330,421.47 | Mar-25 |
| 3,639.95 | Apr-25 |
| 3,639.95 | May-25 |
| 3,639.95 | Jun-25 |
| 3,639.95 | Jul-25 |
| **344,981.27** | **Total 2023** |
| | |
| | **Property Tax - Delinquint 2024** |
| 70,576.08 | Installment 1 (2024 Tax Year) |
| 7,057.60 | Penalty Installment 1 |
| 70,576.08 | Installment 2 (2024 Tax Year) |
| 7,067.60 | Penalty Installment 2 |
| **155,277.36** | **Total 2024** |
| | |
| **500,258.63** | **Total** |

EXHIBIT 1 - PAGE 6

**EXHIBIT 2**

**Global Premier Regency Palms Palmdale, L.P.**

Global Palmdale
**Claims Analysis**

| Claimant | Allowed Claim | Admin | Senior Secured | Other Secured Creditor | RCB | Surety Bond | Priority | General Unsecured |
|---|---|---|---|---|---|---|---|---|
| California Fencing, Inc. | 0.00 | | | | | | | 0.00 |
| Christianbelle Electric | 0.00 | | | | | | | 0.00 |
| Gall Brothers General Engineering | 0.00 | | | | | | | 0.00 |
| High Desert Contractors, Inc. | 0.00 | | | | | | | 0.00 |
| iBorrow REIT, LP | 0.00 | | | | | | | 0.00 |
| LM Brothers & Associates, Inc. | 0.00 | | | | | | | 0.00 |
| Pacific Western Millworks | 0.00 | | | | | | | 0.00 |
| RCB Equities #7, LLC | 3,385,095.20 | | | | 3,385,095.20 | | | |
| Shaughnessy Capital, LLC | 19,353,622.97 | | 19,353,622.97 | | | | | 0.00 |
| Value Painting, Inc. | 58,562.56 | | | 58,562.56 | | | | |
| Walker Window | 0.00 | | | | | | | 0.00 |
| Wenmar, Inc. dba Resource 4 Signs | 0.00 | | | | | | | 0.00 |
| Los Angeles County Tax Collector | 165,203.04 | | | 165,203.04 | | | | |
| Able Iron Works | 0.00 | | | | | | | 0.00 |
| Acuna Drywall | 0.00 | | | | | | | 0.00 |
| AIM Services, Inc. | 0.00 | | | | | | | 0.00 |
| Alta Finish & Stair Inc. | 0.00 | | | | | | | 0.00 |
| Antelope Valley Air Quality | 531.21 | | | | | | | 531.21 |
| ARC Document Solutions, LLC | 669.87 | | | | | | | 669.87 |
| Bacco Mechanical, Inc. | 0.00 | | | | | | | 0.00 |
| Brotherlee, Inc. | 0.00 | | | | | | | 0.00 |
| Cal-State Site Services | 0.00 | | | | | | | 0.00 |
| Capitol Carpet Company Inc. | 0.00 | | | | | | | 0.00 |
| Christine Hanna | 66,153.93 | | | | | | | 66,153.93 |
| Clear Vision Consultants, Inc | 40,000.00 | | | | | | | 40,000.00 |
| Elite Sheet Metal and Rain Gutter C | 21,490.00 | | | | | | | 21,490.00 |
| Frame It | 0.00 | | | | | | | 0.00 |
| GCW Consulting, LLC | 15,000.00 | | | | | | | 15,000.00 |
| Global Bancorp, Inc. | 48,394.56 | | | | | | | 48,394.56 |
| Global Premier America, LLC | 395,867.63 | | | | | | | 395,867.63 |
| Gyp-Fill Enterprise | 0.00 | | | | | | | 0.00 |
| Heritage Window Coverings | 0.00 | | | | | | | 0.00 |
| Independent Masonry Corporation | 0.00 | | | | | | | 0.00 |
| Insulation Labs | 0.00 | | | | | | | 0.00 |
| Isco Machinery | 84,966.99 | | | | | | | 84,966.99 |
| J&S Construction Clean Up, Inc. | 0.00 | | | | | | | 0.00 |
| JTC USA Holdings, Inc. | 6,067.04 | | | | | | | 6,067.04 |
| Kone, Inc | 0.00 | | | | | | | 0.00 |
| L2 Specialties | 0.00 | | | | | | | 0.00 |
| Legacy Global Private Security, Inc | 54,481.34 | | | | | | | 54,481.34 |
| M - United Plastering Inc. | 0.00 | | | | | | | 0.00 |
| Magdy Hanna | 110,943.06 | | | | | | | 110,943.06 |
| Milestone Retirement Communities, | 0.00 | | | | | | | 0.00 |
| National Affordable Communities, In | 13,652.76 | | | | | | | 13,652.76 |
| OPC Services | 105.00 | | | | | | | 105.00 |
| OPSEC Specialized Protection, Inc. | 0.00 | | | | | | | 0.00 |
| Palmdale Glass & Mirror Co. | 0.00 | | | | | | | 0.00 |
| Palmdale Recycled Water Authority | 971.89 | | | | | | | 971.89 |
| Precision Fire Protection | 0.00 | | | | | | | 0.00 |
| Quality Surveying Inc. | 0.00 | | | | | | | 0.00 |
| Red Pen Procurement, LLC | 0.00 | | | | | | | 0.00 |
| RedRock Technologies, Inc | 0.00 | | | | | | | 0.00 |
| RentAFence.com | 0.00 | | | | | | | 0.00 |
| Residential Design Services | 0.00 | | | | | | | 0.00 |
| Resource 4 Signs | 0.00 | | | | | | | 0.00 |
| Salem Engineering Group, Inc. | 0.00 | | | | | | | 0.00 |
| Smart Accounting and Tax | 800.00 | | | | | | | 800.00 |
| Southern California Edison | 63,581.09 | | | | | | | 63,581.09 |
| Spectrum Business | 1,986.63 | | | | | | | 1,986.63 |
| The Gas Company | 450.99 | | | | | | | 450.99 |
| TriMark Raygal, LLC | 0.00 | | | | | | | 0.00 |
| Urban Community Builders, LLC | 16,388.44 | | | | | | | 16,388.44 |
| Urban Community Builders, LLC | 342,901.89 | | | | | | | 342,901.89 |
| US Smoke & Fire | 0.00 | | | | | | | 0.00 |
| Villascape Landscape Contractor | 0.00 | | | | | | | 0.00 |
| LK Asset Advisors | 50,000.00 | | | | | | | 50,000.00 |
| Department of Treasury-Internal Re | 0.00 | | | | | | | 0.00 |
| Franchise Tax Board | 1,600.00 | | | | | | 1,600.00 | |
| Philadelphia Insurance Company | 24,505.00 | | | | | 24,505.00 | | |
| Total | 24,323,993.09 | - | 19,353,623 | 223,765.60 | 3,385,095.20 | 24,505.00 | 1,600.00 | 1,335,404.32 |

Exhibit 2

EXHIBIT 2 - PAGE 1

**EXHIBIT 3**

**Global Premier Regency Palms Palmdale, L.P.**

| Global Premier Regency Palms Palmdale, L.P. | | |
|---|---|---|
| **Liquidation Analysis** | | |
| *Proceeds from Sale of Assets - See Exhibit 5.1* | | $0 |
| *Less Payments* | | |
| Lienholder payments | Class | |
| Shaughnessy Capital, LLC | 1 | 0 |
| Value Painting, Inc. | 2 | 0 |
| Gall Brothers, Inc. | 3.1 | 0 |
| Resource 4 Signs | 3.2 | 0 |
| SC Design, Inc./Pacific Western I | 3.3 | 0 |
| Walker Windows/SC Design Inc. | 3.4 | 0 |
| Christianbelle Electric, Inc. | 3.5 | 0 |
| California Fencing, Inc. | 3.6 | 0 |
| LM Bros &Associates, Inc. | 3.7 | 0 |
| High Desert Contractors, Inc. | 3.8 | 0 |
| RCB Equities # 7 | 4 | 0 |
| Governmental Units | 5 | 0 |
| | | |
| Chapter 7 | | |
| *Trustee Fees - See Ex. 1.4* | | -1,250 |
| *Trustee's counsel fees* | | -50,000 |
| Chapter 11 Admin Claims | | |
| *Professional Fees [1]* | | -450,000 |
| Priority claims | | |
| *Taxes* | | -1,600 |
| | | |
| **Total Available for General Unsecured Creditors** | | **0** |
| Total General Unsecured Claims (Classes 4, 6 & 8) - See Ex. 4 | | 4,745,005 |
| **% Recovery to General Unsecured Claims** | | **0.00%** |

[1] This represents an estimate of respective accrued, but unpaid fees.

[2] Excludes any deficiency claim held by the senior secured creditor

**Exhibit 3**

EXHIBIT 3 - PAGE 1

**Global Premier Regency Palms Palmdale, L.P.**

| Schedule of Sale Proceeds | | |
|---|---|---|
| | | |
| Gross Sale Proceeds | [1] | $0 |
| Less Costs of Sale | | |
| Sales Commission | 5% | 0 |
| Closing Costs, etc. | 1% | 0 |
| Liquidation Costs | | 0 |
| | | |
| Net Realizable Value | | $0 |

[1]    Based on the liquidation value of the Debtor's real estate development, there is insufficient eqiuty to defend relief from the automatic stay from Shaughnessy, the senior secured creditor, which would therefore result in Shaughnessy obtaining relief from relief from the automatic stay.  Thus, in a chapter 7, the Debtor's estate would have no interest in the Property, and thus no proceeds to be generated therefrom

**Exhibit 3.1**

EXHIBIT 3 - PAGE 2

# Global Premier Regency Palms Palmdale, L.P.

| | | | | | SCHEDULE OF SECURED CLAIMS | | | | |
|---|---|---|---|---|---|---|---|---|---|

| Creditor | Class | Claim [1] | Value of Collateral | | Allowed Secured Claim | Allowed Unsecured Claim |
|---|---|---|---|---|---|---|
| Shaughnessy Capital, LLC | 1 | $ 19,353,623 | $ 14,100,000 | [1] | $ 14,100,000 | $ 5,253,623 |
| Value Painting, Inc. | 2 | 58,563 | 0 | [1] | 0 | 58,563 |
| Gall Brothers, Inc. | 3.1 | 0 | 0 | [1] | 0 | 0 |
| Resource 4 Signs | 3.2 | 0 | 0 | [1] | 0 | 0 |
| SC Design, Inc./Pacific Western Millworks | 3.3 | 0 | 0 | [1] | 0 | 0 |
| Walker Windows/SC Design Inc. | 3.4 | 0 | 0 | [1] | 0 | 0 |
| Christianbelle Electric, Inc. | 3.5 | 0 | 0 | [1] | 0 | 0 |
| California Fencing, Inc. | 3.6 | 0 | 0 | [1] | 0 | 0 |
| LM Bros & Associates, Inc. | 3.7 | 0 | 0 | [1] | 0 | 0 |
| High Desert Contractors, Inc. | 3.8 | 0 | 0 | [1] | 0 | 0 |
| RCB Equities # 7 | 4 | 3,385,095 | 0 | [1] | 0 | 3,385,095 |
| Governmental Units | 5 | 165,203 | 0 | [1] | 0 | 165,203 |
| Total | | $ 22,962,484 | $ 14,100,000 | | $ 14,100,000 | $ 8,862,484 |

[1] This represents the the net proceeds from the sale of assets that are secured by claimant.  See Sale Proceeds at Ex. 4.1

**Exhibit 3.2**

EXHIBIT 3 - PAGE 3

# Global Premier Regency Palms Palmdale, L.P.

| Calculation of Ch. 7 Trustee Fees | | | | | |
|---|---|---|---|---|---|
| Gross Proceeds | | | | | $0 |
| $ | - | - | $ | 5,000 | 25% | 1,250 |
| $ | 5,001 | - | $ | 50,000 | 10% | - |
| $ | 50,001 | - | $ | 1,000,000 | 5% | - |
| $ | 1,000,001 | - | Unlimited | 3% | - |
| | | | | | $1,250 |

**Exhibit 3.3**

EXHIBIT 3 - PAGE 4

**EXHIBIT 4**

GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111

General Insolvency Counsel for
Debtor and Debtor-in-Possession

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### NORTHERN DIVISION

| | |
|---|---|
| In re: | Case No. 9:23-bk-10454-RC |
| GLOBAL PREMIER REGENCY PALMS PALMDALE, LP, a California limited partnership, | Chapter 11 Proceeding |
| Debtor and Debtor-in-Possession. | **DEBTOR'S JOINT CHAPTER 11 PLAN OF REORGANIZATION** |
| | DATE: June 18, 2025<br>TIME: 1:00 p.m.<br>PLACE: Courtroom 201<br>1415 State Street<br>Santa Barbara, CA 93101 |

# **TABLE OF CONTENTS**

| | | PAGE |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | DEFINITIONS AND RULES OF INTERPRETATION | 2 |
| III. | TREATMENT OF UNCLASSIFIED CLAIMS | 2 |
| | 3.1 Administrative Claims | 2 |
| | 3.1.1 Payment | 3 |
| | 3.1.2 Administrative Claims Bar Date | 3 |
| | 3.2 Priority Tax Claims | 4 |
| IV. | CLASSIFICATION OF CLAIMS | 4 |
| | 4.1 General Overview | 4 |
| | 4.2 Designation of Classes | 4 |
| V. | TREATMENT OF CLAIMS AND INTERESTS | 6 |
| | 5.1 Class 1: Allowed Secured Claim of Shaughnessy | 6 |
| | 5.1.1 Allowance of Secured Claim | 6 |
| | 5.1.2 Treatment of Allowed Secured Claim | 6 |
| | 5.1.3 Covenants | 6 |
| | 5.1.4 General Releases | 7 |
| | 5.2 Class 2: Allowed Secured Claim of Mechanics Lien Creditor | 11 |
| | 5.2.1 Allowance of Secured Claim | 11 |
| | 5.2.2 Treatment of Allowed Secured Claim(s) | 11 |
| | 5.2.3 Retained Lien and Prepayment | 11 |
| | 5.2.4 Event of Default | 12 |
| | 5.3 Classes 3.1-3.8: Disallowed Claims of Invalid Mechanics Lien Creditors | 13 |
| | 5.3.1 Disallowance of Secured Claim | 13 |
| | 5.3.2 Treatment of Allowed Secured Claim(s) | 13 |
| | 5.4 Class 4: Allowed Claim of RCB | 13 |
| | 5.4.1 Allowance of Claims(s) | 13 |
| | 5.4.2 Treatment of Allowed Claims(s) | 13 |
| | 5.4.3 Event of Default | 14 |
| | 5.4.4 Expungement/Release of Lien | 14 |
| | 5.5 Class 5: Any Allowed Secured Claim of Governmental Units | 14 |
| | 5.5.1 Allowance of Secured Claim(s) | 14 |
| | 5.5.2 Treatment of Allowed Secured Claims(s) | 15 |
| | 5.6 Class 6: Allowed Claim of Philadelphia Insurance Company | 15 |
| | 5.6.1 Allowance of Claim(s) | 15 |
| | 5.6.2 Treatment of Allowed Claim(s) | 15 |
| | 5.7 Class 7: Unsecured Non-Tax Priority Claim | 15 |
| | 5.7.1 Allowance of Unsecured Non-Tax Priority Claim | 16 |
| | 5.7.2 Treatment of Allowed Unsecured Non-Tax Priority Claim | 16 |

EXHIBIT 4 - PAGE 2

# TABLE OF CONTENTS

## (Continued)

|  | | | PAGE |
|---|---|---|---|
| 5.8 | Class 8: Allowed General Unsecured Claims | | 16 |
| | 5.8.1 | Allowance of General Unsecured Claims | 16 |
| | 5.8.2 | Treatment of Allowed General Unsecured Claim | 16 |
| | 5.8.3 | Event of Default | 16 |
| 5.9 | Class 9: Debtor's Interests | | 17 |
| | 5.9.1 | Allowance of Interests | 17 |
| | 5.9.2 | Treatment of Allowed Interests | 17 |
| VI. | MEANS FOR IMPLEMENTING THIS PLAN | | 17 |
| 6.1 | Introduction | | 17 |
| 6.2 | Exit Financing | | 18 |
| 6.3 | Funding of the Plan | | 18 |
| 6.4 | Powers of the Reorganized Debtor | | 18 |
| 6.5 | Corporate Charter | | 19 |
| 6.6 | Authority to Act | | 19 |
| 6.7 | Representative of the Estate | | 19 |
| 6.8 | Causes of Action | | 19 |
| 6.9 | Post-Effective Date Professional Fees | | 20 |
| | 6.9.1 | Reorganized Debtor's Employment of Professionals | 20 |
| | 6.9.2 | Ordinary Course Payments to Professionals | 20 |
| 6.10 | Bankruptcy Court Approval Relative to Post-Confirmation Matters | | 20 |
| 6.11 | Reporting by Reorganized Debtor | | 20 |
| 6.12 | Transfer of Estate Property to Reorganized Debtor | | 20 |
| 6.13 | Disposition of Assets | | 21 |
| 6.14 | Compromise of Controversies | | 21 |
| 6.15 | Bankruptcy Court Approval Relative to Post-Confirmation Matters | | 21 |
| 6.16 | Debtor's Right of Setoff | | 21 |
| 6.17 | Cash Payments | | 22 |
| VII. | DISTRIBUTIONS | | 22 |
| 7.1 | Distribution Agent | | 22 |
| 7.2 | Distributions | | 22 |
| 7.3 | Instruments and Securities | | 23 |
| | 7.3.1 | Rights of Persons Holding Instruments and Securities | 23 |
| | 7.3.2 | Cancellation of Liens | 23 |
| 7.4 | DeMinimis Distributions | | 23 |
| 7.5 | Delivery of Distributions | | 23 |
| 7.6 | Undeliverable Distributions | | 24 |
| 7.7 | Disposition of Unclaimed Property | | 24 |

-ii-

EXHIBIT 4 - PAGE 3

# TABLE OF CONTENTS

## (Continued)

|  |  |  |  | PAGE |
|---|---|---|---|---|
| VIII. | OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS | | | 25 |
| | 8.1 | Resolution of Objections to Claims | | 25 |
| | 8.2 | Treatment of Disputed Claims | | 25 |
| | | 8.2.1 | No Distribution Pending Allowance | 25 |
| | | 8.2.2 | Distribution After Allowance | 25 |
| | | 8.2.3 | Reserves for Disputed Claims | 25 |
| IX. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | | | 26 |
| | 9.1 | Executory Contracts Being Assumed | | 26 |
| | 9.2 | Cure Claims | | 27 |
| | 9.3 | Executory Contracts Being Rejected | | 27 |
| | 9.4 | Retention of Property Rights by Reorganized Debtor | | 28 |
| | 9.5 | Bar Date for Rejection Damages | | 28 |
| | 9.6 | Cure Claims Schedule | | 28 |
| X. | DISCHARGE AND OTHER EFFECTS OF CONFIRMATION | | | 29 |
| | 10.1 | Discharge | | 29 |
| | 10.2 | Injunction | | 29 |
| XI. | LIMITATION OF LIABILITY AND RELEASES | | | 30 |
| | 11.1 | No Liability for Solicitation or Participation | | 30 |
| | 11.2 | Limitation od Liability | | 31 |
| XII. | CONDITIONS TO CONFIRMATION AND EFFECTIVENESS | | | 31 |
| | 12.1 | Conditions Precedent to Plan Confirmation | | 31 |
| | 12.2 | Condition Precedent to Plan Effectiveness | | 31 |
| | 12.3 | Waiver of Conditions | | 32 |
| XIII. | RETENTION OF JURISDICTION | | | 32 |
| XIV. | MODIFICATION OF THIS PLAN | | | 34 |
| | 14.1 | Nonconsensual Confirmation | | 34 |
| XV. | MISCELLANEOUS | | | 34 |
| | 15.1 | Payment of Statutory Fees | | 34 |
| | 15.2 | Payment Dates | | 35 |
| | 15.3 | Other Documents and Actions | | 35 |
| | 15.4 | Notices | | 35 |
| | 15.5 | Governing Law | | 36 |
| | 15.6 | Binding Effect | | 36 |
| | 15.7 | Successors and Assigns | | 36 |
| | 15.8 | Severability of Plan Provisions | | 36 |

-iii-

EXHIBIT 4 - PAGE 4

# TABLE OF CONTENTS

## (Continued)

|  |  | **PAGE** |
|---|---|---|
| 15.9 | No Waiver | 37 |
| 15.10 | Inconsistencies | 37 |
| 15.11 | Exemption from Certain Transfer Taxes and Recording Fees | 37 |
| 15.12 | Post-Confirmation Status Report | 37 |
| 15.13 | Post-Confirmation Conversion/Dismissal | 38 |
| 15.14 | Changes in Rates Subject to Regulatory Commission Approval | 38 |

**APPENDIX**

| A. | Definitions | 39 |
|---|---|---|
| B. | Rules of Construction | 51 |
| C. | Schedules | 51 |

| Schedule 9.1 | | 52 |
|---|---|---|
| Schedule 9.3 | | 53 |

EXHIBIT 4 - PAGE 5

## TABLE OF AUTHORITIES

### STATUTES

8 C.F.R. § 204.6 .................................................................................................. 45
8 U.S.C. § 1153(b) ............................................................................................... 45
11 U.S.C. § 101 .................................................................................................... 47
11 U.S.C. § 101(27) ............................................................................................. 46
11 U.S.C. § 102 .................................................................................................... 51
11 U.S.C. § 327 .................................................................................................... 48
11 U.S.C. § 365 .................................................................................................... 26
11 U.S.C. § 365(b) ........................................................................................... 2, 27
11 U.S.C. § 501 .................................................................................................... 29
11 U.S.C. § 502 .................................................................................................... 29
11 U.S.C. § 502(g) ............................................................................................... 29
11 U.S.C. § 502(h) ............................................................................................... 29
11 U.S.C. § 502(i) ................................................................................................ 29
11 U.S.C. § 503(b) ............................................................................................... 39
11 U.S.C. § 506(a) .......................................................................................... 41, 50
11 U.S.C. § 506(b) ............................................................................................... 50
11 U.S.C. § 506(d) ............................................................................................... 45
11 U.S.C. § 507(a) ............................................................................................... 40
11 U.S.C. § 507(a)(1) .......................................................................................... 39
11 U.S.C. § 507(a)(2) ............................................................................................ 2
11 U.S.C. § 507(a)(8) ................................................................................ 4, 41, 48
11 U.S.C. § 510 .................................................................................................... 41
11 U.S.C. § 510(c)(2) ........................................................................................... 45
11 U.S.C. § 521(1) ............................................................................................... 49
11 U.S.C. § 542 .................................................................................................... 41
11 U.S.C. § 543 .................................................................................................... 41
11 U.S.C. § 544 .................................................................................................... 41
11 U.S.C. § 545 .................................................................................................... 41
11 U.S.C. § 547 .................................................................................................... 41
11 U.S.C. § 548 .................................................................................................... 41
11 U.S.C. § 549 .................................................................................................... 41
11 U.S.C. § 550 .................................................................................................... 41
11 U.S.C. § 553 .............................................................................................. 21, 41
11 U.S.C. § 1123(a)(1) .......................................................................................... 2
11 U.S.C. § 1123(a)(6) ......................................................................................... 19
11 U.S.C. § 1123(b)(3)(B) .................................................................................... 19
11 U.S.C. § 1125(e) ............................................................................................. 30
11 U.S.C. § 1129(a)(8) ......................................................................................... 34
11 U.S.C. § 1129(a)(12) ....................................................................................... 34
11 U.S.C. § 1129(b) ............................................................................................. 34
11 U.S.C. § 1141(d) ............................................................................................. 29
11 U.S.C. § 1146 .................................................................................................. 21
28 U.S.C. § 1930 .................................................................................................. 39
28 U.S.C. § 1930(a)(6) ......................................................................................... 34

EXHIBIT 4 - PAGE 6

Cal Civil Code 1542..................................................................................................................... 10
Cal Civil Code 3144..................................................................................................................... 13
Internal Revenue Code of 1986 ................................................................................................... 47

**RULES**

Rules 1007(a)(3) .......................................................................................................................... 50
Rule 3001 ..................................................................................................................................... 49

EXHIBIT 4 - PAGE 7

# I.

## INTRODUCTION

The document that you are reading is the Debtor's and Shaughnessy's joint Plan, which provides for payments to Creditors through a reorganization, involving a refinancing and/or debt and equity recapitalization and/or sale of the Debtor's Property and business. General Unsecured Creditor will receive their Pro Rata share of the Plan Fund based on each of their respective Allowed Claims. The Projections attached as **Exhibit 1** to the Disclosure Statement accompanying this Plan represent the Debtor's best estimate of distributions under the proposed reorganization at this time. Sent to you in the same envelope as this Plan is the Debtor's Disclosure Statement, which you should read in conjunction with this Plan. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if any.**

# II.

## DEFINITIONS AND RULES OF INTERPRETATION

See Appendix appended hereto.

# III.

## TREATMENT OF UNCLASSIFIED CLAIMS

As required by the Bankruptcy Code, this Plan places Claims into various Classes according to their right to priority. However, in accordance with the provisions of Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are deemed "unclassified." These Claims are not considered impaired, and they do not vote on this Plan, because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtor has not placed these Claims in a Class. The treatment of these unclassified Claims is as provided below.

**3.1** **Administrative Claims**. Administrative Claims are Claims for the expenses of administering the Debtor's Case that are allowed under Bankruptcy Code Section 507(a)(2), as well as Cure Claims arising from the assumption of executory contracts pursuant to Section 365(b), and Claims for goods or services received by the Debtor in the ordinary course of

1  business within 20 days of the Petition Date.  The Bankruptcy Code requires that all

2  Administrative Claims be paid on the effective date of a Chapter 11 plan, unless a particular

3  creditor agrees to a different treatment of its claim.  The treatment of Administrative Claims is as

4  described below.

5        3.1.1   Payment.  Except to the extent that the holder of an Allowed Administrative

6  Claim agrees to a different treatment of its Administrative Claim, and subject to the

7  General  Administrative Claims Bar Date, each Allowed Administrative Claim shall be

8  paid in full, in Cash, on the latest of (i) the Effective Date, (ii) the tenth (10th) Business

9  Day after the date upon which such Administrative Claim becomes an Allowed

10  Administrative Claim, or (iii) the date upon which such Allowed Administrative Claim

11  becomes due according to its terms.  If the Allowed Administrative Claims are not paid in

12  full on the Effective Date and the Administrative Creditors agree to defer the payment of

13  any balance that is owing, the Debtor shall grant in favor of the Administrative Creditors a

14  security interest against all Assets of the Reorganized Debtor, including the Causes of

15  Action, if any.  All Liens granted to the Administrative Creditors shall remain in full force

16  and effect until the Allowed Administrative Claims are paid in full, plus 5% interest per

17  annum.

18        3.1.2   Administrative Claims Bar Date.  Any holder of an Administrative Claim,

19  except for a Professional employed at the expense of an Estate, that does not file and

20  properly serve a request for payment of its Administrative Claim by the General

21  Administrative Claims Bar Date shall be forever barred from asserting such Administrative

22  Claim against the Debtor, the Reorganized Debtor, their Estates, or any of their property.

23  Notwithstanding anything to the contrary contained in the foregoing, (i) any Governmental

24  Unit may assert an Administrative Tax Claim or other post-petition Tax Claim pursuant to

25  the statutory requirements applicable thereto without regard to the General Administrative

26  Claims Bar Date; and (ii) holders of accrued post-petition *ad valorem* Tax Claims against

27  property owned by the Reorganized Debtor shall retain any Liens that they may have

28  pursuant to applicable law on account of such Tax Claims, and holders of such Tax Claims

shall be paid the amount of their Tax Claims in the ordinary course of the Reorganized Debtor's business without the requirement that a Proof of Claim or request for payment of such Tax Claim be filed with the Bankruptcy Court.

**3.2    Priority Tax Claims**.  Tax Claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8) priority tax claim receive the present value of such Claim in deferred cash payments, over a period not exceeding five (5) years from the Petition Date and that such treatment not be less favorable than the treatment accorded to nonpriority unsecured creditors.

At the election of the Debtor, the Holder of each Allowed Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, during a period not to exceed five (5) years after June 2, 2023, totaling the principal amount of such Claim plus simple interest on any unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of the Allowed Tax Claim and the Debtor, provided such treatment is on more favorable terms to the Debtor than the treatment set forth in clause (i) hereof, or (iii) payment of the full Allowed Tax Claim in Cash on the Effective Date.

## IV.

## CLASSIFICATION OF CLAIMS

**4.1    General Overview**.  As required by the Bankruptcy Code, this Plan places Claims into various Classes according to their right to priority and other relative rights.  The table in Section 5.2 hereof lists each Class of Claims established under this Plan and states whether each Class is impaired or is unimpaired by this Plan.  A Class is "unimpaired" if this Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.  Article VI of this Plan sets forth the treatment that each Class will receive under this Plan.

**4.2    Designation of Classes**.  This Plan provides for the establishment of the following Classes of Claims:

EXHIBIT 4 - PAGE 10

278139.3

| Class | Claimant | Collateral | Impaired |
|-------|----------|-----------|----------|
| Class 1 | Any Allowed Secured Claim of Shaughnessy | All Assets | Yes |
| Class 2 | Any Allowed Secured Claim of Mechanics' Lien Claimant Value Painting, Inc. | Real Property | Yes |
| Class 3.1 | Any Allowed Secured Claim of Mechanics' Lien Claimant Gall Brothers, Inc. | Real Property | No |
| Class 3.2 | Any Allowed Secured Claim of Mechanics' Lien Claimant Resource 4 Signs | Real Property | No |
| Class 3.3 | Any Allowed Secured Claim of Mechanics' Lien Claimant SC Design, Inc./Pacific Western Millworks | Real Property | No |
| Class 3.4 | Any Allowed Secured Claim of Mechanics' Lien Claimant Walker Windows | Real Property | No |
| Class 3.5 | Any Allowed Secured Claim of Mechanics' Lien Claimant Christianbelle Electric Inc. | Real Property | No |
| Class 3.6 | Any Allowed Secured Claim of Mechanics' Lien Claimant California Fencing, Inc. | Real Property | No |
| Class 3.7 | Any Allowed Secured Claim of Mechanics' Lien Claimant LM Bros & Associates Inc. | Real Property | No |
| Class 3.8 | Any Allowed Secured Claim of Mechanics' Lien Claimant High Desert Contractors, Inc. | Real Property | No |
| Class 4 | Any Allowed Claim of RCB | N/A | Yes |
| Class 5 | Allowed Secured Claims of Governmental Units | N/A | Yes |
| Class 6 | Allowed Surety Bond Claim of Philadelphia Insurance Company | N/A | Yes |
| Class 7 | Allowed Unsecured Priority Claims | N/A | No |
| Class 8 | Allowed General Unsecured Claims | N/A | Yes |
| Class 9 | Allowed Interests | N/A | Yes |

EXHIBIT 4 - PAGE 11

278139.3

## V.

## TREATMENT OF CLAIMS AND INTERESTS

All Claims and rights of the members of Classes and Interests shall be governed by the terms of this Plan only, and all prior agreements shall be null and void, unless otherwise preserved herein.  The Plan's treatment of Allowed Claims and Interests, as described herein, shall be in full satisfaction of all Allowed Claims and Interests:

**5.1**    **Class 1:  Allowed Secured Claim of Shaughnessy**. Class 1 consists of any Allowed Secured Claim of Shaughnessy  that is not subordinated by Court order.  Class 1 is impaired by this Plan.  The following treatment shall be in full satisfaction of the Allowed Claim of the member of this Class:

5.1.1    Allowance of Secured Claim.  The member of Class 1 shall be allowed a Secured Claim in an amount equal to $19,353,622.97 as of the Effective Date.

5.1.2    Treatment of Allowed Secured Claim.  Except to the extent that a member of this Class agrees to a less favorable treatment, the holder of an Allowed Secured Claim in Class 1 will receive on account of, and in exchange for, such Allowed Secured Claim, ninety-nine percent (99%) of the Interests in the Reorganized Debtor, which shall comprise of one hundred percent (100%) of the General Partner's equity interest in the Reorganized Debtor, with all of the rights and powers afforded to the General Partner under the ALPA attached hereto as **Exhibit 1** and incorporated herein by this reference,[1] including the dilution of the Limited Partners' Interests as provided in the ALPA and this Plan.

5.1.3    Covenants.  The member of this Class agrees that upon the Effective Date, as General Partner of the Reorganized Debtor, it shall: (a) diligently complete the development of the Facility; (b) pay all costs of developing and operating the Property, including, but not limited to, all insurance, property taxes, utilities, and all other expenses incurred in the development and completion of the Facility, as well as the EB 5 expenses

---

[1] It is expected that Shaughnessy, the member of this Class, will transfer 100% of its rights under the Loan Agreement, including the treatment provided under this Plan, to a special purpose entity, which shall assume all obligations due and arising under this Plan.

EXHIBIT 4 - PAGE 12

278139.3

1  not to exceed the amount reflected in the Projections; (c) use its best efforts, skill, and

2  judgment (or use those persons who possess such skill and judgment) to promptly

3  commence operations of the Facility, and thereafter operate the Facility in a commercially

4  reasonable manner and to take all actions necessary or advisable to maximize the

5  profitability of the business; (d) provide K-1s for all EB-5 investors, prepare and file all

6  applicable tax returns for the Reorganized Debtor and its Subsidiary, pay all resulting tax

7  obligations, and, upon reasonable written request, provide the Regional Center, on an

8  annual basis, evidence of same; (e) retain through the Holding Period 100% ownership of

9  the Property through the Reorganized Debtor, employ all employees of the Facility and

10  operate the Facility through the Subsidiary,[2] coordinate with the Regional Center all

11  communication requests and legal and United States Citizenship and Immigration Services

12  compliance requests, and otherwise use its best efforts, skill, and judgment (or use those

13  persons who possess such skill and judgment) to comply with all requirements of the EB-5

14  Program during the Holding Period,[3] and (f) refrain from selling the Property or equity

15  Interests in the Reorganized Debtor during the Holding Period.  In addition, Shaughnessy

16  shall, upon reasonable written request, provide the Regional Center for the Regional

17  Center's processing of I829 applications, the following: (a) Certificate of Occupancy, (b)

18  Department of Social Services Operating License, (c) lease and management agreements,

19  (d) actual W-2s for at least 30 full-time employees during the Holding Period, (e)

20  marketing materials (brochures, website, etc.), (f) employee human resource files, (g) local

21  business licenses, any other required licenses, (h) photos (interior and exterior) of the

22  Facility, (i) financial statements for the Reorganized Debtor and Subsidiary, and (j) any

23  other request required for EB-5 compliance applications.  Shaughnessy cannot change the

24  use of the project without EB-5 Legal approval, and cannot change the Regional Center

25  listed on the project.

26

27

28

---

[2] The Subsidiary must be the employer of record for all jobs created.
[3] The Reorganized Debtor shall retain a vendor expert in EB-5 compliance to ensure statutory compliance.

5.1.4    General Releases.

5.1.4.1 Release of Shaughnessy.  Effective as of the Effective Date, except only for the obligations imposed upon Shaughnessy by this Plan and any order of this Court, the Debtor, the Subsidiary, GPA #5, Urban Community Builders and Christine Hanna, for themselves and their predecessors, successors and assigns, and each of them, hereby absolutely, fully and forever, release, relieve, waive, relinquish and discharge Shaughnessy, and its former and current affiliates, related entities, principals, members, shareholders, directors, officers, employees, trustees, representatives, agents, attorneys, accountants, financial advisors, partners, predecessors, heirs, successors and assigns, and each of them, of and from any and all manner of actions, causes of action, suits, debts, deficiencies, liabilities, demands, claims, obligations, costs, interest charges, expenses (including attorneys' fees and costs), sums of money, controversies, damages, injuries, losses, accounts, reckonings, security interests and liens of every kind or nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, matured or unmatured, liquidated or unliquidated, legal or equitable, in tort, in contract or otherwise (including, without limitation, all punitive and exemplary damages), which relate to, or arise out of, any matter, fact, transaction, act, or inaction involving or related to in any way the Assets or Loan Documents.

5.1.4.2 Release of Debtor Parties.  Effective as of the expiration of the Holding Period, except only for the obligations imposed upon the Debtor by this Plan and any order of this Court, Shaughnessy, for itself and its predecessors, successors and assigns, and each of them, hereby absolutely, fully and forever, releases, relieves, waives, relinquishes and discharges the Debtor, the Subsidiary, GP #5, Urban Community Builders, and Christine Hanna, and each of their former and current affiliates, related entities, principals, members, shareholders, directors, officers, employees, trustees, representatives, agents, attorneys, accountants, financial advisors, partners, predecessors, heirs, successors and assigns, and each of

-8-

EXHIBIT 4 - PAGE 14

278139.3

them, of and from any and all manner of actions, causes of action, suits, debts, deficiencies, liabilities, demands, claims, obligations, costs, interest charges, expenses (including attorneys' fees and costs), sums of money, controversies, damages, injuries, losses, accounts, reckonings, security interests and liens of every kind or nature whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, matured or unmatured, liquidated or unliquidated, legal or equitable, in tort, in contract or otherwise (including, without limitation, all punitive and exemplary damages), which relate to, or arise out of, any matter, fact, transaction, act, or inaction involving or related to in any way the Assets or Loan Documents.

5.1.4.3 <u>Scope of Releases</u>.  Each of the parties to these releases acknowledges the fact that it is its intention that, as of the effective date of each release, these releases shall be effective as a full and final accord and satisfaction and settlement of and as a bar to each manner of action, cause of action, suit, debt, deficiency, liability, demand, claim, obligation, cost, expense, sum of money, controversy, damage, injury, loss, account, reckoning, security interest and lien of every kind or nature whatsoever, heretofore referred to and released. In connection with such waiver and relinquishment, each party acknowledges that it is aware that it or its attorneys may hereafter discover facts different from or in addition to the facts which it or its attorneys now know or believe to be true with respect to the subject matter of this Plan, and that it may have sustained or may yet sustain damages, costs or expenses that are presently unknown and that relate to the claims released by this Plan, but that it is its intention hereby to fully, finally, absolutely and forever settle all such claims which do now exist, may exist or heretofore have existed, in accordance with the terms of this Plan, and that, in furtherance of such intention, the releases herein given shall be and shall remain in effect for all time as full and complete releases in accordance with the terms and conditions hereof, notwithstanding the discovery of any such additional damages, costs or expenses.

EXHIBIT 4 - PAGE 15

278139.3

Therefore, each party acknowledges that it is familiar with, or has been advised of, Section 1542 of the Civil Code of the State of California, which provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

Except only for the rights expressly reserved by each party pursuant to this Plan, each party hereby waives and relinquishes fully, as of the Effective Date of this Plan, all rights and benefits which it has or may have under Section 1542 of the Civil Code of the State of California, and any comparable federal statutes, statutes of any other states in the United States, and common-law principles pertaining to the subject matter of this Plan.

The Parties further agree not to assert claims in any court or other forum against each other for any matter within the scope of the Releases contained herein.

5.1.4.4 <u>No Rescission of Releases</u>.  As a part of the foregoing releases, each party acknowledges that it understands and accepts the risk that the facts with respect to which the releases provided by this Plan are agreed to may be different from the facts now known or believed by it to be true. The releases provided by this Plan shall not be subject to termination or rescission by virtue of any such differences in fact. By agreeing to these releases, each party acknowledges that it has conducted its own independent investigation, has consulted with legal counsel of its own choice, and has not relied on any statement, representation, promise, inducement or agreement not expressly contained within this Plan.

5.1.4.5 <u>No Assignment of Released Claims</u>. Each party represents and warrants to the other parties that it has not assigned or transferred, and will not assign or transfer, to any person or entity the claims released by this Plan

-10-

EXHIBIT 4 - PAGE 16

278139.3

5.1.5    Insurance.  Shaughnessy shall provide the requisite funding to ensure the Reorganized Debtor's maintenance of insurance coverage for the property securing Shaughnessy's Claim.

**5.2    Class 2:  Allowed Secured Claim of Mechanics Lien Creditor**.  Class 2 consists of any Allowed Secured Claim held by a Mechanics Lien Creditor.  Class 2 is impaired by this Plan.

5.2.1    Allowance of Secured Claim.  The member of Class 2 shall be allowed a Secured Claim for the amount of its non-contingent liquidated Claim to the extent of the value of such Creditor's Claim against the Estate's interest in such property, which shall be based on the Fair Market Value of the property (or such other value as agreed to between the Debtor and any member of Class 2), securing such Creditor's Claim in this Class.  If the member of this Class object to the Debtor's asserted value of the property securing the Creditor's Claim or otherwise asserts a value of the property lower than that which is asserted by the Debtor, then, the Debtor may elect, in its sole discretion, to fix the amount of such objecting Creditor's Allowed Secured Claim based on the lower of the objection value(s).

5.2.2    Treatment of Allowed Secured Claim(s).  Except to the extent that a member of this Class agrees to a less favorable treatment, each member of this Class shall receive a cash payment totaling the amount of its Allowed Secured Claim, equal to the value, as of the Effective Date, of such Creditor's interest in the Estate's interest in such property, as may be modified pursuant to Section 5.2.2.  In particular, except to the extent that any member of this Class agrees to a less favorable treatment, the Debtor shall pay the member of this Class the full amount of the Allowed Secured Claim on the later of: (i) the Effective Date, or (ii) the tenth (10th) Business Day after such Secured Claim becomes an Allowed Secured Claim.

5.2.3    Retained Lien and Prepayment.  Any Allowed Secured Claim in Class 2.1 may be prepaid at any time without penalty or other charge.  The Creditor's Allowed Secured Claims of Class 2 shall continue to be secured by the respective Creditor's

EXHIBIT 4 - PAGE 17

278139.3

existing Lien on its collateral.  Upon full satisfaction of each respective Creditor's Allowed

Secured Claim in Class 2, the Creditor's Lien on its collateral shall be released and

expunged and the Reorganized Debtor shall retain title to such collateral free and clear of

the Creditor's Lien.  If the Creditor is paid in full pursuant to the terms of this Plan and

does not release its lien within five (5) days of the Reorganized Debtor's request to do so,

then this Plan hereby grants to the Reorganized Debtor a power of attorney in fact to

execute on behalf of such Creditor any and all documents necessary to effectuate the

release of any and all liens held or otherwise asserted by Creditor.  Any Allowed

Deficiency Claim of the Creditor shall be treated as an Allowed General Unsecured Claim

in the amount equal to the difference between Creditor's Allowed Claim and the value of

the assets securing Creditor's Allowed Claim.

> 5.2.4    <u>Event of Default</u>.  Failure to make a payment due under this Plan shall

constitute an Event of Default.  In the event any member of this Class contends an Event of

Default has occurred, such Creditor must provide Default Notice to the Notice Parties.  The

Debtor shall have a period of thirty (30) days after receipt of written notice of an asserted

Event of Default relating to an alleged failure by the Debtor to pay a payment required

under this Plan within which to cure such Event of Default.  If the Debtor cures such

alleged default within the Grace Period, such Creditor shall provide to the Notice Parties

written acknowledgement of the Debtor's cure.  If, however, the Debtor fails to cure the

alleged default within the Grace Period, then the Creditor must seek from the Bankruptcy

Court for a determination of an uncured Event of Default.  The Debtor and any other

Notice Party shall be entitled to oppose such relief.  If opposition to relief is filed, and the

Court finds that the Debtor did not commit an Event of Default, was excused from

committing an Event of Default, or timely cured an Event of Default, the Debtor shall

continue paying such Creditor pursuant to the terms of this Plan.  If, however, neither the

Debtor nor any Notice Parties timely oppose such relief sought by the Creditor and the

Court finds that the Debtor committed an Event of Default that was not excused or timely

EXHIBIT 4 - PAGE 18

278139.3

cured, then then the Creditor may seek to enforce its rights against the Reorganized Debtor in accordance with applicable state law remedies.

**5.3**     **Classes 3.1-3.8:  Disallowed Claims of Invalid Mechanics Lien Creditors**. Classes 3.1-3.8 consist of parties who do not have claims against the estate, but who recorded liens against the Debtor's Property without commencing litigation within ninety days of the recording. Classes 3.1-3.8 are unimpaired by this Plan.

5.3.1     <u>Disallowance of Secured Claim</u>.  The members of Classes 3.1-3.8 have no claim nor valid lien against the Debtor's estate.  The members of these Classes have no claim against the Debtor's estate because the Debtor never entered into a contract with these parties, and thus no obligation arose to the members of these classes.  Moreover, members of these classes have no valid lien because their lien was automatically void under California law (Cal Civil Code § 3144) based on their failure to timely commence a lawsuit against the Debtor within ninety days of the recording of their lien.

5.3.2     <u>Treatment of Allowed Secured Claim(s)</u>.  The members of this Class shall receive nothing from the Debtor.  Since the members of this Class have no valid lien, yet are clouding the Debtor's title, they must release their lien within five (5) days of the Effective Date.  If any member of this Class does not timely release its lien, then the Reorganized Debtor is hereby granted a power of attorney in fact to execute on behalf of such Creditor any and all documents necessary to effectuate the release and expungement of any and all liens held by such member.

**5.4**     **Class 4:  Allowed Claim of RCB**.  Class 4 consists of the Allowed Claim of RCB.  Class 4 is impaired by this Plan.  The following treatment shall be in full satisfaction of the Allowed Claim of the member of this Class against the Debtor:

5.4.1     <u>Allowance of Claim(s)</u>.  The member of Class 4 shall have an Allowed Claim in the amount of $3,385,095.

5.4.2     <u>Treatment of Allowed Claim(s)</u>.  The member of this Class shall receive a cash payment in an amount equal to its Pro Rata share of the Plan Fund, which shall be based on the total amount of its Allowed Claim relative to the total amount of Allowed

-13-

EXHIBIT 4 - PAGE 19

278139.3

Claims in Class 4 and Class 8.  Payment shall be made on or before the first Business Day of the first full month following the Effective Date.

5.4.3    Event of Default.  A failure by the Reorganized Debtor to make a payment when due to a member of this Class pursuant to the terms of the Plan shall constitute an Event of Default.  The Reorganized Debtor shall have a period of thirty (30) days after receiving written notice of an alleged Event of Default to make a payment required under this Plan within which to cure such Event of Default.  If the Reorganized Debtor is unable to cure such Event of Default, the Creditor may seek to enforce its rights against the Reorganized Debtor in accordance with applicable state law remedies.

5.4.4    Expungement/Release of Lien.  Except for the lien granted in Section 5.4.2, Creditor's asserted lien(s) against the Debtor's estate are hereby released and expunged, and Creditor shall file within five (5) days of the Effective Date a UCC-3 Termination of Lien, and any and all other documents necessary to effectuate the release of such lien.  If the Creditor does not timely release any liens reflected in the public record as of the Petition Date, then this Plan hereby grants to the Reorganized Debtor a power of attorney in fact to execute on behalf of the Creditor any and all documents necessary to effectuate the release of any and all liens in the name of Creditor as of the Petition Date.

**5.5    Class 5:  Any Allowed Secured Claim of Governmental Units**.  Class 5 consists of any Allowed Secured Claim of governmental units.  Class 5 is impaired by this Plan.  The following treatment shall be in full satisfaction of the Allowed Claims of members of this Class:

5.5.1    Allowance of Secured Claim(s).  The members of Class 5 shall be allowed a Secured Claim to the extent of the value of such Creditor's Claim and interest in the Estate's an interest in such property, which shall be based on Fair Market Value of the property (or such other value as agreed to between the Debtor and the member of Class 5), securing such Creditor's Claim in Class 5.  Based on the value of the Collateral, the Creditor in Class 5 shall have an Allowed Secured Claim in the full amount of their Allowed Secured Claim, plus all applicable costs, fees, charges, and interest, if any.

EXHIBIT 4 - PAGE 20

278139.3

5.5.2    <u>Treatment of Allowed Secured Claim(s)</u>.  Except to the extent that a member of this Class agrees to a less favorable treatment, each member of this Class shall receive a cash payments until their Allowed Claim is Paid in Full.  Any Allowed Secured Claim of Governmental Units against the Estate will receive payments from the Estate pursuant to the same timing and subject to the same interest, if any, as set forth in Section 4.2 above.  Members of this Class shall retain their Lien until their Allowed Secured Claim against the respective Estate is Paid in Full.  A failure by the Reorganized Debtor to make a payment when due to a holder of an Allowed Secured Tax Claim of a Governmental Unit pursuant to the terms of the Plan shall constitute an Event of Default. If the Reorganized Debtor fails to cure such Event of Default within thirty (30) days after receipt of written notice of default, then such taxing authority may seek to assert an uncured Event of Default to seek to enforce the balance due on its claim, plus interest accrued, if any, under state law, against the Reorganized Debtor in accordance with applicable state law remedies.

**5.6**    **Class 6:  Allowed Claim of Philadelphia Insurance Company.**  Class 6 consists of the Allowed Claim of Philadelphia Insurance Company.  Class 6 is impaired by this Plan.  The following treatment shall be in full satisfaction of the Allowed Claim of the member of this Class against the Debtor:

5.6.1    <u>Allowance of Claim(s)</u>.  The member of Class 6 shall have an Allowed Claim in the amount of $24,504.

5.6.2    <u>Treatment of Allowed Claim(s)</u>.  The member of this Class shall receive three equal monthly cash payments in the amount of $8,168, commencing on the first Business Day of the first full month following the Effective Date, and continuing each month thereafter until paid in full.

**5.7**    **Class 7:  Unsecured Non-Tax Priority Claim**. Class 7 consists of any Allowed Non-Tax Priority Claim.  Class 7 is not impaired by this Plan.  The following treatment shall be in full satisfaction of the Allowed Claims of members of this Class:

5.7.1    <u>Allowance of Unsecured Non-Tax Priority Claim</u>.  Class 7 consists of all Allowed Unsecured Non-Tax Priority Claims.  Class 7 is not impaired by this Plan.

5.7.2    <u>Treatment of Allowed Unsecured Non-Tax Priority Claim</u>.  Except to the extent that a holder of an Allowed Unsecured Non-Tax Priority Claim agrees to a less favorable treatment of its Allowed Unsecured Non-Tax Priority Claim, each holder of an Allowed Unsecured Non-Tax Priority Claim shall receive, in full satisfaction, exchange and release of its Allowed Unsecured Non-Tax Priority Claim, Cash in the full amount of the Allowed Unsecured Non-Tax Priority Claim on the <u>later</u> of (i) the Effective Date, and (ii) the tenth (10th) Business Day after such Non-Tax Priority Claim becomes an Allowed Unsecured Priority Non-Tax Claim.

**5.8**    **<u>Class 8:  Allowed General Unsecured Claims</u>.**  Class 8 consists of any Allowed General Unsecured Claim.  Class 8 is impaired by this Plan.  The following treatment shall be in full satisfaction of the Allowed Claims of members of this Class.

5.8.1    <u>Allowance of General Unsecured Claims</u>.  Class 8 consists of all Allowed General Unsecured Claims and which includes any Allowed Deficiency Claims.  Class 8 is impaired by this Plan.

5.8.2    <u>Treatment of Allowed General Unsecured Claim</u>.  Except to the extent that a member of this Class agrees to a less favorable treatment, each member of this Class shall receive its Pro Rata share of the Plan Fund based on each member's Allowed General Unsecured Claim relative to all Allowed General Unsecured Claims and the Allowed Claim of the member of Class 4.  Payment shall be made within later of (i) the first Business Day of the first full month following the Effective Date, or (ii) the tenth (10th) Business Day after such Claim becomes an Allowed Claim.

5.8.3    <u>Event of Default</u>.  Failure to timely make a payment due under this Plan shall constitute an Event of Default.  The Reorganized Debtor shall have a period of thirty (30) days after receiving written notice of an alleged Event of Default to make a payment required under this Plan within which to cure such Event of Default.  If the Reorganized

EXHIBIT 4 - PAGE 22

278139.3

Debtor is unable to cure such Event of Default, the Creditor may seek to enforce its rights against the Reorganized Debtor in accordance with applicable state law remedies.

**5.9**    **Class 9:  Debtor's Interests**

5.9.1    <u>Allowance of Interests</u>.  Class 9 is comprised of the current Interests in the Debtor, which Interests consist of one General Partner owning twenty-five and five one hundredths of a percent (25.05%) of the Debtor, and 23 Limited Partners owning seventy-four and ninety-five one hundredths of a percent (74.95%) of the Debtor.

5.9.2    <u>Treatment of Allowed Interests</u>.

5.9.2.1 <u>Limited Partners</u>.  The holders of Allowed Interests that are Limited Partners of the Debtor shall retain an Interest in the Reorganized Debtor, subject to a modification of the rights and powers of the Limited Partners and General Partner, as reflected in the revised red-lined ALPA attached hereto as **Exhibit 1** and incorporated herein by this reference; but, as reflected in the ALPA, such Limited Partnership Interests shall be diluted from seventy four and ninety-five one hundredths of a percent (74.95%) Interest in the Debtor to an aggregate of one percent (1%) Interest in the Reorganized Debtor. The capital accounts of the Limited Partners shall be reduced to $0.

5.9.2.2 <u>General Partner</u>.  The interests of GPA #5 shall be extinguished and replaced with Shaughnessy, or such other entity as determined by Shaughnessy, as the sole General Partner of the Reorganized Debtor, which General Partner shall own and control ninety-nine percent (99%) of the Reorganized Debtor, pursuant to all rights, powers and limitations set forth in the ALPA.

**VI.**

**<u>MEANS FOR IMPLEMENTING THIS PLAN</u>**

**6.1**    **<u>Introduction</u>**.  This article is intended to explain the means by which the Debtor intends to effectuate the reorganization provided for under this Plan, and how the Debtor intends to fund the obligations to Creditors undertaken in this Plan.  This article provides information

regarding prospective corporate governance of the Debtor, funding sources for Plan obligations, and other material issues bearing upon the performance of this Plan.

**6.2** **Exit Financing**. Shaughnessy shall provide Exit Financing to the Reorganized Debtor to enable the Reorganized Debtor to complete the development of the Facility on the Property, including, but not limited to, all necessary construction, improvements, and related expenses required for the establishment of the Facility. The Exit Financing shall be used to ensure the timely completion of the development and the commencement of operations for the Facility. The Reorganized Debtor shall take all reasonable steps to move forward with completion of the development of the Property and begin operations of the Facility, subject to applicable laws, regulations, and permits. The Reorganized Debtor shall be bound by and comply with all obligations arising from any loan agreements entered into with Shaughnessy and approved by the Court as part of this Plan. For sake of clarification, the Exit Financing represents new value of the Debtor and shall be construed accordingly.

**6.3** **Funding of the Plan**. The Reorganized Debtor shall make all payments due under the Plan to holders of Allowed Claims and Allowed Interests from one or more of the following: (a) funds from the Exit Financing provided by Shaughnessy; and (b) proceeds from the sale or financing of the Reorganized Debtor's business or real property.

**6.4** **Powers of the Reorganized Debtor.** The Debtor, as the Reorganized Debtor, shall continue to exist and to operate after the Effective Date of this Plan and in accordance with the terms of the confirmed Plan. The Reorganized Debtor shall have all of the powers and rights accorded to it under the laws of the state of California, and, except as set forth in this Plan expressly to the contrary, shall continue to have all powers and rights accorded to them under any partnership agreement, operating agreement, Articles of Organization, Bylaws and/or other governance documents. Once this Case is closed, subject to the terms described herein, the Reorganized Debtor shall have exclusive control over all Assets not otherwise sold or transferred. Except only as provided expressly to the contrary in this Plan, after the Effective Date, the Reorganized Debtor may operate its business and administer and dispose of assets free and clear

-18-

EXHIBIT 4 - PAGE 24

278139.3

of any limitations and restrictions that may be imposed by the Bankruptcy Code or Bankruptcy Rules, and without any need for any approval of the Bankruptcy Court or any Creditor.

6.5    **Corporate Charter**.  The Reorganized Debtor's corporate charter will include a provision prohibiting the issuance of non-voting Interests consistent with the provisions of Section 1123(a)(6) of the Bankruptcy Code.

6.6    **Authority to Act**.  On the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects (subject to the provisions of this Plan) by virtue of the entry of the Confirmation Order, in accordance with the Bankruptcy Code and applicable state law and without any requirement of further action by the Debtor or the Reorganized Debtor.  On the Effective Date, the Reorganized Debtor is authorized and directed to implement the provisions by this Plan and any other agreements, documents and instruments contemplated by this Plan. This authority includes the granting of a power of attorney in fact in favor of the Reorganized Debtor to execute on behalf of any party who has recorded a lien against the Debtor's Property, but who is no longer entitled to such lien by virtue of this Plan or applicable law, any necessary document to remove said lien.

6.7    **Representative of the Estate**.  The Reorganized Debtor shall be, and hereby is, appointed as the representative of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code for the purpose of performing the duties and exercising the rights and remedies granted to the Reorganized Debtor hereunder.  The Reorganized Debtor shall be vested exclusively with the rights, authorities and powers to carry out and to implement this Plan, including, without limitation, by managing and administering its business and using income generated by its business, to make Distributions to Creditors in accordance with the terms and conditions of this Plan.

6.8    **Causes of Action**

The Debtor shall have the exclusive right to file, litigate, prosecute, appeal, enforce, or collect Causes of Action.  However, the Debtor has completed its investigation into potential Causes of Action against third parties, and has determined that there are no such viable actions to pursue.

**6.9**     <u>Post-Effective Date Professional Fees</u>

         6.9.1     <u>Reorganized Debtor's Employment of Professionals</u>.  The Reorganized Debtor may employ, without any need to give notice to Creditors or to other parties-in-interest or to obtain any approval of the Bankruptcy Court, professionals to assist the Reorganized Debtor to perform its duties under this Plan, as the Reorganized Debtor deem appropriate in the exercise of their sole and absolute discretion, and any fees and costs incurred by such professionals shall be borne by the Reorganized Debtor.

         6.9.2     <u>Ordinary Course Payments to Professionals</u>.  Any professional employed after the Effective Date shall be entitled to obtain payment of the professional's fees and costs, in the ordinary course, without any need to give notice to Creditors or other parties-in-interest or to obtain any approval of the Bankruptcy Court.  Notwithstanding the foregoing, if the professional does not obtain payment of its post-Effective Date fees and costs within thirty (30) days after the professional's rendering of its billing statement therefor, the professional shall be entitled to seek, by application filed in accordance with the Bankruptcy Rules, an order of the Bankruptcy Court requiring prompt payment to the professional of its fees and costs.

**6.10**     <u>Bankruptcy Court Approval Relative to Post-Confirmation Matters</u>.  Nothing contained in this Plan shall be deemed to impair in any manner any right that the Reorganized Debtor, may have to seek after the Effective Date orders of the Bankruptcy Court approving actions to be taken consistent with this Plan as may be necessary or desirable to effectuate the provisions of this Plan.

**6.11**     <u>Reporting by Reorganized Debtor</u>.  The Reorganized Debtor shall provide timely to the twenty largest unsecured creditors and the secured creditors all post-confirmation reports that the Reorganized Debtor is required to file pursuant to the Confirmation Order.

**6.12**     <u>Transfer of Estate Property to Reorganized Debtor</u>.  Except as otherwise specifically provided in this Plan, on the Effective Date, all property and rights of the Estate of the Debtor shall be transferred to the Reorganized Debtor, free and clear of all Claims, Liens, and rights of Creditors.  As of the Effective Date, the Reorganized Debtor may operate its business and

EXHIBIT 4 - PAGE 26

278139.3

use, acquire, and dispose of property and settle and compromise Claims without the supervision of, or any authorization from, the Bankruptcy Court or the United States Trustee, and free of any restriction of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions specifically provided for in this Plan or the Confirmation Order.  As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims, Liens, and other rights of Creditors, except as otherwise expressly provided herein.

**6.13** **Disposition of Assets**.  From and after the Effective Date, the Reorganized Debtor shall be entitled, to sell, transfer, encumber or otherwise dispose of any interest in any of its assets, without any need for obtaining any approval of the Bankruptcy Court. Moreover, any sale of the Property by the Reorganized Debtor shall be exempt from transfer taxes pursuant to Section 1146 of the Bankruptcy Code.

**6.14** **Compromise of Controversies**.  From and after the Effective Date, the Reorganized Debtor, shall be entitled to compromise any objections to Disputed Claims, or any controversies relating to Causes of Action or other litigation pending after the Confirmation Date without any need for any notice to Creditors or any approval of the Bankruptcy Court; *provided, however*, the Debtor or the Reorganized Debtor, as the case may be, shall provide notice to Creditors of any settlement that affects a Cause of Action, and any dispute regarding such settlement may be adjudicated by the Bankruptcy Court..

**6.15** **Bankruptcy Court Approval Relative to Post-Confirmation Matters**.  Nothing contained in this Plan shall be deemed to impair in any manner the right of the Reorganized Debtor or any party-in-interest to seek at any time after the Effective Date orders of the Bankruptcy Court approving actions to be taken consistent with this Plan as may be necessary or desirable to effectuate the provisions of this Plan.

**6.16** **Debtor's Right of Setoff.**  Pursuant to Section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Debtor may set off against any Allowed Claim and Distribution to be made pursuant to this Plan on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any account stated, claim, right, or cause of action that the Debtor or the Estate, may possess against the holder of such Allowed Claim;

EXHIBIT 4 - PAGE 27

278139.3

provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim shall constitute a waiver or release by the Debtor or the Estate of any such account, claim, right, and cause of action that the Debtor or the Estate may possess against the holder of such Allowed Claim.  To the extent that the Debtor in allowing a Claim fails to effectuate a setoff with a Creditor and seeks to collect a claim from such Creditor after a Distribution to such Creditor pursuant to this Plan, the Debtors shall be entitled to full recovery on its claim against such Creditor, notwithstanding any payment of the Creditor's Allowed Claim pursuant to this Plan.

In accordance with the provisions of Section 553 of the Bankruptcy Code, the Internal Revenue Service and any other taxing authority shall be entitled to set off against any amounts that such taxing authority may owe to the Debtor on account of overpayments by the Debtor of pre-confirmation taxes any pre-confirmation tax liabilities that the Debtor may owe to such taxing authority.

**6.17    Cash Payments**.  Cash payments made pursuant to this Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Reorganized Debtor, or by wire transfer from a domestic bank, at the option of the Reorganized Debtor, but subject to the payment instructions as set forth in Section 7 of the Plan.

## VII.

## DISTRIBUTIONS

**7.1    Distribution Agent**.  The Reorganized Debtor shall serve as the Distribution Agent for Distributions to be made to holders of Allowed Claims in the Case.  The Distribution Agent may employ one or more sub-agents on such terms and conditions as it deems appropriate in the exercise of their sole and absolute discretion.  The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to this Plan.

**7.2    Distributions**.  Any Distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date.  Any Distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter but, in any event, within fifteen (15) days thereafter.

EXHIBIT 4 - PAGE 28

278139.3

**7.3**    **Instruments and Securities**

7.3.1    <u>Rights of Persons Holding Instruments and Securities</u>.  Except as otherwise provided herein, as of the Effective Date, and whether or not surrendered by the holder thereof, all Instruments and Securities evidencing or relating to any Claims shall be deemed automatically cancelled and deemed void and of no further force or effect, without any further action on the part of any person, and any Claims evidenced by or relating to such Instruments or Securities shall be deemed discharged.

7.3.2    <u>Cancellation of Liens</u>.  Except as otherwise provided herein, any Lien securing any Secured Claim shall be deemed released and discharged, and the Creditor holding such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtor (including, without limitation, any cash collateral) held by such Creditor and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including, without limitation, by the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtor.  If any Creditor fails to timely release any liens reflected in the public record, then this Plan hereby grants to the Reorganized Debtor a power of attorney in fact to execute on behalf of the Creditor any and all documents necessary to effectuate the release of any and all liens in the name of Creditor.

**7.4**    **De Minimis Distributions**.  No Cash payment of less than fifty dollars ($50) shall be made by the Reorganized Debtor to any Creditor.  Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not distributed as a consequence of this Section 7. shall, after the last Distribution on account of Allowed Claims in the applicable Class, be treated as Unclaimed Property under Section 7.7 of this Plan.

**7.5**    **Delivery of Distributions**.  Except as provided in Section 7.6 with respect to Unclaimed Property, Distributions to holders of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:  (i) with respect to each holder of an Allowed Claim that has filed a Proof of Claim, at the address for such Creditor reflected in such Proof of

EXHIBIT 4 - PAGE 29

278139.3

Claim; (ii) with respect to each holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the Schedules filed by the Reorganized Debtor; provided, however, that, if the Reorganized Debtor has received a written notice of a change of address for such Creditor, the address set forth in such notice shall be used; or (iii) with respect to each holder of an Allowed Administrative Claim, at such address as the holder thereof may specify in writing.

7.6    **Undeliverable Distributions**.  No further distribution of Unclaimed Property shall be made to a Creditor unless and until the Reorganized Debtor is notified in writing of such Creditor's then current address.  Subject to the provisions of Section 7.7 hereof, Unclaimed Property shall remain in the possession of the Reorganized Debtor, pursuant to this Section 7.6, and shall be set aside and held in the Unclaimed Property Reserve to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable.  Nothing contained in this Plan shall require the Reorganized Debtor or any other person to attempt to locate such Creditor.

7.7    **Disposition of Unclaimed Property**.  If the Creditor entitled to a Distribution of Unclaimed Property notifies the Reorganized Debtor of such Creditor's claim to the Distribution of such Unclaimed Property within nine (9) months following the Initial Distribution Date, the Unclaimed Property distributable to such Creditor shall be released from the Unclaimed Property Reserve and paid to such Creditor within fifteen (15) days thereof.  Any Holder of an Allowed Claim or Allowed Administrative Claim that does not assert a claim in writing for Unclaimed Property held by the Reorganized Debtor, within nine (9) months following the Initial Distribution Date shall no longer have any claim to or interest in such Unclaimed Property, and shall be forever barred from receiving any Distributions under this Plan or otherwise from the Reorganized Debtor.  In such cases, any such Unclaimed Property shall be retained by the Reorganized Debtor, shall not be subject to the unclaimed property or escheat laws of any state or other governmental unit, and shall be distributed on account of Allowed General Unsecured Claims at the time when the succeeding Distribution is to be paid to General Unsecured Creditors pursuant to Sections 5.8 hereof.

EXHIBIT 4 - PAGE 30

278139.3

# VIII.

## OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS

**8.1    Resolution of Objections to Claims**.  The Reorganized Debtor shall have the right to request that the Bankruptcy Court extend the Claims Objection Deadline.  If extended, the Reorganized Debtor shall have the sole and exclusive right to object to any Claims.  The Reorganized Debtor shall also have the exclusive right to resolve and settle objections to Disputed Claims, in his sole and absolute discretion, without Court hearing.

**8.2    Treatment of Disputed Claims**

8.2.1    <u>No Distribution Pending Allowance</u>.  If any portion of a Claim is a Disputed Claim, no Distribution provided for under this Plan shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim and is no longer a Disputed Claim.

8.2.2    <u>Distribution After Allowance</u>.  Within fifteen (15) days following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Creditor holding such Allowed Claim any Cash that would have been distributable to such Creditor if, at the time of the making of any Distribution to the Class of which such Creditor is a member, such Claim had been an Allowed Claim and not a Disputed Claim.  No interest shall be paid on such Claim.

8.2.3    <u>Reserves for Disputed Claims</u>.  In the event that a Disputed Claim is pending as to any Creditor, the Distribution Agent shall establish a Disputed Claims Reserve, and maintain a reasonable reserve necessary to pay such Disputed Claim in accordance with the Plan.  No disbursement of funds from the Disputed Claims Reserve shall be made on account of a Disputed Claim until such Disputed Claim has been determined by a Final Order of the Bankruptcy Court.  In the event that any Disputed Claim is ultimately disallowed by the Bankruptcy Court, the amount reserved for such Disputed Claim, which has been disallowed by the Bankruptcy Court, shall be distributed on account of Allowed General Unsecured Claims at the time when the succeeding Distribution is to be paid to General Unsecured Creditors pursuant to this Plan.

-25-

EXHIBIT 4 - PAGE 31

278139.3

# IX.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**9.1** **Executory Contracts Being Assumed**. Effective as of, and conditioned on, the occurrence of the Effective Date, the Debtor hereby assumes all of the executory contracts and unexpired leases of the Debtor, as set forth on Schedule 9.1 hereto, and if determined by the Debtor prior to the Effective Date, assumes such additional executory contracts as may be identified by the Debtor.

The Debtor may amend Schedule 9.1 to add thereto any executory contract or unexpired leases, or to delete therefrom any executory contract or lease, up to and including the Confirmation Date. However, if any amendments are made to Schedule 9.1 less than twenty-four (24) days before the Confirmation Date, the affected contract or lease parties shall have fifteen (15) days from the date of service of notice of such amendments within which to serve on the Debtor a written objection to the same. Upon receipt of any such objection, the Debtor shall promptly set a hearing on the same, and the assumption or rejection of the affected contract or lease shall be delayed until the Bankruptcy Court makes a determination on this issue (such determination may be made after the Confirmation Date, without delaying the confirmation of this Plan). To the extent that an executory contract or unexpired lease has been assumed prior to the Confirmation Date by the Debtor pursuant to an order of the Bankruptcy Court, such assumption shall not be affected by this Plan. The assumption of any contract or lease pursuant to the provisions of this Section 9.1 shall be only to the extent that such assumed contract or lease constitutes an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code. Inclusion of an agreement in Schedule 9.1 does not constitute an admission by the Debtor or the Reorganized Debtor that (i) such agreement is an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code, (ii) the Debtor must assume such agreement in order to continue to receive or retain rights, benefits, or performance thereunder or that any Claim under such agreement must be paid or default cured, or (iii) such agreement is a valid contract or lease. Any contract or lease assumed pursuant to this Plan shall be

EXHIBIT 4 - PAGE 32

278139.3

1  assumed as previously amended or otherwise modified by the parties thereto, whether before or

2  after the Petition Date.

3      **9.2     Cure Claims.**  The amount of the Cure Claims identified on Schedule 9.1 shall be

4  fixed in the amounts set forth therein, and the Debtor shall be liable and responsible for the

5  payment of all Allowed Cure Claims pursuant to Section 365(b) of the Bankruptcy Code as set

6  forth on Schedule 9.1 if an executory contract is assumed pursuant to this Plan.

7  Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule shall be

8  filed and served upon counsel for the Debtor on or before the fourteenth (14th) day prior to the

9  Confirmation Hearing.  In the event that any such objection to the amount stated for a Cure Claim

10  in the Cure Claims Schedule is not filed and served as set forth herein, the amount of the

11  Creditor's Cure Claim shall be deemed forever to be the amount set forth in the Cure Claims

12  Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims Schedule shall

13  be waived and shall be forever barred in the Case, without further notice.  If the Debtor cannot

14  resolve any such objections with the Creditor, the Debtor may either (i) elect to reject the

15  executory contract or unexpired lease at the Confirmation Hearing, or (ii) have the Bankruptcy

16  Court determine the merits of the objection on or after the Confirmation Hearing (without

17  delaying the confirmation of this Plan).  Any amount of Cure Claim payable upon the assumption

18  of an executory contract or unexpired lease shall be due and payable on or before the fifteenth

19  (15th) day after the entry of a Final Order fixing the amount of the Cure Claim and then only in the

20  amount fixed by such Final Order.

21      **9.3     Executory Contracts Being Rejected**.  Effective as of, and conditioned on, the

22  occurrence of the Effective Date, the Debtor rejects all executory contracts and unexpired leases

23  not identified on Schedule 9.1, including all executory contracts and unexpired leases listed on

24  Schedule 9.3.  If the Debtor becomes aware of any executory contracts or unexpired leases not yet

25  assumed or rejected or on Schedule 9.1, the Debtor reserves the right to file an amended Schedule

26  9.3 to identify any such contracts to be rejected.  If any amended Schedule 9.3 is filed later than

27  twenty-four (24) days before the Confirmation Date, the affected contract or lease parties shall

28  have fifteen (15) days from the date of service of notice of such amendments within which to

serve on the Debtor a written objection to the same.  Upon receipt of any such objection, the Debtor shall promptly set a hearing on the same, and the rejection of the affected contract or lease shall be delayed until the Bankruptcy Court makes a determination on this issue (such determination may be made after the Confirmation Date, without delaying the confirmation of this Plan).  To the extent that an executory contract or unexpired lease has been rejected by the Debtor prior to the Confirmation Date pursuant to an order of the Bankruptcy Court, such rejection shall not be affected by this Plan.

**9.4**     **Retention of Property Rights by Reorganized Debtor**.  To the extent that an agreement that provides the Debtor with property rights does not constitute an executory contract or unexpired lease, or the Debtor has obtained property rights under the executed portion of an executory contract or unexpired lease, rejection of such agreement shall not constitute an abandonment by the Debtor of any such property rights.

**9.5**     **Bar Date for Rejection Damages**.  Any Claim arising out of the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against the Debtor, the Reorganized Debtor, their successors, Estate, or their properties, and shall not be entitled to any Distribution under this Plan, unless a Proof of Claim for such Rejection Claim is filed and served on the Reorganized Debtor within thirty (30) days after the later of (i) the date of entry of the order of the Bankruptcy Court approving the rejection of the executory contract or unexpired lease, or (ii) the Confirmation Date.

**9.6**     **Cure Claims Schedule**.  The Cure Claims Schedule shall be filed with the Bankruptcy Court, and served on the non-debtor parties to such executory contracts and unexpired leases, on or before the twenty-fourth (24th) day prior to the Confirmation Hearing.  Any objection to the amount of any Cure Claim set forth in the Cure Claims Schedule shall be filed and served upon counsel for the Debtor on or before the fourteenth (14th) day prior to the Confirmation Hearing.  In the event that any such objection to the amount stated for a Cure Claim in the Cure Claims Schedule is not filed and served as set forth herein, the amount of the Creditor's Cure Claim shall be deemed forever to be the amount set forth in the Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims Schedule shall be waived and

EXHIBIT 4 - PAGE 34

278139.3

shall be forever barred in the Case, without further notice. If the Debtor cannot resolve any such objections with the Creditor, the Debtor may either (i) elect to reject the executory contract or unexpired lease at the Confirmation Hearing, or (ii) have the Bankruptcy Court determine the merits of the objection on or after the Confirmation Hearing (without delaying the confirmation of this Plan). Any amount of Cure Claim payable upon the assumption of an executory contract or unexpired lease shall be due and payable on or before the fifteenth (15th) day after the entry of a Final Order fixing the amount of the Cure Claim and then only in the amount fixed by such Final Order.

**X.**

**<u>DISCHARGE AND OTHER EFFECTS OF CONFIRMATION</u>**

**10.1    <u>Discharge</u>**. Except as otherwise specifically provided in this Plan or in the Confirmation Order, pursuant to Section 1141(d) of the Bankruptcy Code, the Distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of all Claims, whether known or unknown, liabilities of, Liens on, obligations of, rights against and Interests in the Debtor and the Reorganized Debtor, and any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights and Interests, including but not limited to, Claims and Interests that arose before the Confirmation Date, including all debts of the kind specified in Sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim or Proof of Interest based upon such Claim or Interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Interest is allowed under Section 502 of the Bankruptcy Code, or (iii) the holder of such Claim or Interest accepted this Plan. The Confirmation Order shall constitute a determination of the discharge of all of the Claims against and Interests in the Debtor and the Reorganized Debtor, subject to the occurrence of the Effective Date.

**10.2    <u>Injunction</u>**. Except as otherwise expressly provided in this Plan, or in the Confirmation Order, if the Debtor is granted a discharge by this Court, then on such date that the Court grants a discharge, all Creditors who have held, hold, or who may hold a Claim, or who

-29-

EXHIBIT 4 - PAGE 35

278139.3

have held, hold, or who may hold an Interest, which is discharged pursuant to the terms of this Plan (including but not limited to states and other governmental units, and any state official, employee, or other entity acting in an individual or official capacity on behalf of any state or other governmental units) shall be permanently enjoined from the following: (i) taking any of the following actions on account of any such discharged Claim or Interest: (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the Reorganized Debtor, their successors, or their property; (b) enforcing, attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, their successors, or their property; (c) creating, perfecting, or enforcing any Lien against the Debtor, the Reorganized Debtor, their successors, or their property; (d) asserting any set off, right of subrogation, or recoupment of any kind against any obligation due to the Debtor, the Reorganized Debtor, their successors, or their property and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan; and (ii) taking any actions on account of any claims or rights of action that are revested in, or transferred to, the Reorganized Debtor as of the Effective Date or under this Plan (to the extent that the Debtor's Estate first held such claim or rights of action or held the right to assert such claim or right of action after the Petition Date), including, without limitation, commencing or continuing in any manner any Avoidance Action (i.e., no party may pursue any avoidance claims, except as otherwise provided by this Plan).  Any person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.

## XI.

## LIMITATION OF LIABILITY AND RELEASES

**11.1    No Liability for Solicitation or Participation**.  As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of this Plan or that participate in the offer, issuance, sale, or purchase of securities offered or sold under this Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on

EXHIBIT 4 - PAGE 36

278139.3

account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer, issuance, sale, or purchase of securities.

**11.2    Limitation of Liability**.  Effective as of the Effective Date, neither the Debtor, Reorganized Debtor, nor any of their respective Affiliates, nor any of their respective members, officers, directors, employees, and other agents, advisors and Professionals shall have or incur any liability to any Creditor or Interest Holder or to any other person for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of this Plan, the approval of the Disclosure Statement, the consummation of this Plan, the administration of this Plan, the Case or the property to be distributed under this Plan, to the fullest extent permitted by applicable statutory and case law, except the Reorganized Debtor shall be liable for the performance of obligations assumed by them or imposed upon them under or by this Plan.

## XII.

## CONDITIONS TO CONFIRMATION AND EFFECTIVENESS

**12.1    Conditions Precedent to Plan Confirmation**.  The Bankruptcy Court shall have entered the Confirmation Order on terms and conditions satisfactory to the Debtor.

**12.2    Condition Precedent to Plan Effectiveness**.  The following are conditions precedent to the occurrence of the Effective Date:

12.2.1  Confirmation Order must become a Final Order.  In the event that an appeal, petition for certiorari or motion for reargument or rehearing or comparable post-confirmation relief is filed with respect to the Confirmation Order, and no stay of the effectiveness of the Confirmation Order is obtained, the Debtor may elect, in the exercise of its sole and absolute discretion, to proceed with the Effective Date of this Plan and consummate this Plan, by filing and serving upon the Secured Creditors, the United States Trustee and the party seeking such post-confirmation relief, notice of such election.

12.2.2  All agreements, instruments and other acts contemplated by, or to be entered into, or completed pursuant to, or in order to facilitate the implementation of, this Plan, as determined by the Debtor, including, without limitation, any and all loan

EXHIBIT 4 - PAGE 37

278139.3

agreements, purchase agreements, and related closing documents shall have been duly and validly executed and delivered by the parties thereto and completed, and all conditions to their effectiveness shall have been satisfied or waived, except only for the entry of the Confirmation Order.

**12.3** **Waiver of Conditions**. The conditions set forth in Sections 12.2.1 - 12.2.2 hereof may be waived by the Debtor without notice, leave or order of the Bankruptcy Court, and without any formal action other than proceeding to obtain the Confirmation Order and consummate this Plan.

**XIII.**

**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case and any of the proceedings arising from, or relating to, the Case pursuant to Section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including, without limitation, such jurisdiction as is necessary to ensure that the purposes and intent of this Plan are carried out.  Without limiting the generality of the foregoing, the Bankruptcy Court shall retain jurisdiction for the following purposes:

13.1    To hear and determine any and all objections to the allowance, or requests for estimation, of Claims or the establishment of reserves pending the resolution of Disputed Claims, or disputes regarding the settlement, withdrawal, or abandonment of any Cause of Action;

13.2    To consider and act on the compromise and settlement of any Claim against, or cause of action on behalf of, the Debtor or its Estate, including, without limitation, any Avoidance Action;

13.3    To hear and determine any motions pending on the Effective Date to assume, assume and assign or reject any executory contract or unexpired lease and to determine the allowance of any Claim resulting therefrom;

13.4    To enter such orders as may be necessary or appropriate in connection with the recovery of the Debtor's assets, wherever located;

-32-

EXHIBIT 4 - PAGE 38

278139.3

1    13.5    To hear and determine any and all required applications for allowance of

2    compensation and reimbursement of expenses of Professionals;

3    13.6    To hear and determine any and all controversies, suits and disputes arising under or

4    in connection with the interpretation, implementation or enforcement of this Plan and any of the

5    documents intended to implement the provisions of this Plan or any other matters to be resolved

6    by the Bankruptcy Court under the terms of this Plan;

7    13.7    To hear and determine any motions or contested matters involving Taxes, tax

8    refunds, tax attributes and tax benefits and similar and related matters with respect to the Debtor,

9    including, without limitation, matters involving federal, state and local Taxes in accordance with

10   Sections 346, 505 and 1146 of the Bankruptcy Code;

11   13.8    To hear and determine any and all applications, adversary proceedings and

12   contested matters pending on the Effective Date or that may be commenced after the Effective

13   Date as provided in this Plan;

14   13.9    To effectuate Distributions under, and performance of, the provisions of this Plan;

15   13.10    To hear and determine any motion to modify any provision of this Plan after

16   confirmation of this Plan, and, if in the best interests of the Debtor and Creditors, modification of

17   this Plan even after this Plan has been substantially consummated;

18   13.11    To correct any defect, cure any omission or reconcile any inconsistency in this

19   Plan, the exhibits to this Plan and any documents executed in connection with this Plan, or any

20   order of the Bankruptcy Court, including the Confirmation Order, as may be necessary to carry out

21   the purposes and intent of this Plan;

22   13.12    To determine such other matters as may be provided for in the Confirmation Order

23   or as may from time to time be authorized under the provisions of the Bankruptcy Code or any

24   other applicable law;

25   13.13    To enforce all orders, judgments, injunctions and exculpations issued or entered in

26   connection with the Case or this Plan;

27   13.14    To enter such orders as may be necessary or appropriate in aid of confirmation and

28   to facilitate implementation of this Plan, including, without limitation, any orders as may be

-33-

EXHIBIT 4 - PAGE 39

278139.3

1  appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified or

2  vacated;

3       13.15   To determine any other matter not inconsistent with the Bankruptcy Code; and

4       13.16   To issue a final decree closing the Case.

5  **XIV.**

6  **MODIFICATION OF THIS PLAN**

7       At any time prior to the confirmation of this Plan, the Debtor may supplement, amend or

8  modify this Plan, provided that, after the voting with respect to this Plan, the Debtor shall not

9  make any modifications to this Plan that affect materially and adversely the interests of General

10  Unsecured Creditors under this Plan.  The Debtor shall provide notice of any such modification

11  of this Plan, and an opportunity to be heard thereon as required under the Federal Rules of

12  Bankruptcy Procedure.  After confirmation of this Plan, the Reorganized Debtor may apply to the

13  Bankruptcy Court to modify this Plan in accordance with Section 1127 of the Bankruptcy Code

14  and apply to the Bankruptcy Court to remedy ministerial defects or omissions in this Plan or to

15  reconcile inconsistencies in this Plan.

16       **14.1**   **Nonconsensual Confirmation**.  In the event that any impaired Class of Claims

17  should fail to accept this Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, the

18  Debtor may request that the Bankruptcy Court confirm this Plan in accordance with

19  Section 1129(b) of the Bankruptcy Code.

20  **XV.**

21  **MISCELLANEOUS**

22       **15.1**   **Payment of Statutory Fees**.  All quarterly fees due and payable to the United

23  States Trustee pursuant to 28 U.S.C. § 1930(a)(6) shall be paid in full on or before the Effective

24  Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall be established

25  and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy

26  Code.  The Reorganized Debtor shall remain responsible for timely payment of his quarterly fees

27  due and payable after the Effective Date, until the Reorganized Debtor's Case is closed, to the

28  extent required by 28 U.S.C. § 1930(a)(6).

EXHIBIT 4 - PAGE 40

278139.3

**15.2    Payment Dates**.  Whenever any Distribution to be made under this Plan becomes due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately following Business Day.

**15.3    Other Documents and Actions**.  The Reorganized Debtor may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under this Plan.

**15.4    Notices**.  Except as expressly set forth herein to the contrary, all notices and requests in connection with this Plan shall be in writing and shall be hand delivered or sent by facsimile, with a copy sent by first-class mail, addressed to:

**TO THE DEBTOR:**

Global Premier Regency Palms Palmdale, LP
Attn:  Christine Hanna
2020 Main Street, Suite 300
Irvine, CA  92614


**WITH A COPY TO:**

Garrick A. Hollander, Esq.
Winthrop Golubow Hollander, LLP
1301 Dove Street, Fifth Floor
Newport Beach, CA 92660
Telephone:  (949) 720-4100
Facsimile:  (949) 720-4111
E-Mail:  ghollander@wghlawyers.com

**TO THE REORGANIZED DEBTOR:**

Shaughnessy Capital LLC
Attn:  Bastian Rose
333 Mamaroneck Ave., #291
White Plains, NY 10605
E-mail:  brose@mb2management.com

EXHIBIT 4 - PAGE 41

278139.3

**WITH A COPY TO:**

Donald H. Cram, Esq.
Severson & Werson
A Professional Corporation
595 Market Street, 26 Floor
San Francisco, CA 94105
Telephone:  (415) 398-3344
Facsimile:  (415) 956-0439
E-Mail:  dhc@severson.com

All notices to any Creditor or Interest Holder shall be sent to it at its last known address or to the last known address of its attorney of record.  Any such person may designate in writing any other address for purposes of this Section 15.4, which designation shall be effective on receipt thereof by the Debtor.

**15.5**    **Governing Law**.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the state of California (without reference to its conflict of law rules) shall govern the construction and implementation of this Plan and any agreements, documents, and instruments executed in connection with this Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

**15.6**    **Binding Effect**.  This Plan and all rights, duties and obligations hereunder shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, Creditors, Interest Holders and their respective successors and assigns.

**15.7**    **Successors and Assigns**.  The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

**15.8**    **Severability of Plan Provisions.**  If, prior to the Confirmation Date, any term or provision of this Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of this Plan, the Bankruptcy Court shall, with the consent of the Debtor, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid,

EXHIBIT 4 - PAGE 42

278139.3

void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted.  Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of this Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

15.9    **No Waiver**.  The failure of the Debtor or any other entity to object to any Claim for purposes of voting shall not be deemed to be a waiver of the Debtor's or other entities' right to object to or examine such Claim, in whole or in part.

15.10    **Inconsistencies**.  In the event that the terms or provisions of this Plan are inconsistent with the terms and provisions of the exhibits to this Plan, any document executed in connection with this Plan, or the Disclosure Statement, the terms of this Plan shall control.

15.11    **Exemption from Certain Transfer Taxes and Recording Fees**.  Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from the Debtor to the Reorganized Debtor and from the Reorganized Debtor to any other person or entity pursuant to, or implemented by, this Plan, or any agreement regarding the transfer of title to or ownership of the Debtor's or Reorganized Debtor's real or personal property or of any other interest in such property (including, without limitation, the granting of a security interest or sale of the Property), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or any other similar tax or governmental assessment or tax otherwise imposed as a result of the transfer of such property.  The Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the imposition and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

15.12    **Post-Confirmation Status Report**.  Within 180 days following the entry of the Confirmation Order, the Reorganized Debtor, shall file with the Bankruptcy Court a status report explaining the progress made toward consummation of this Plan.  The status report shall be served on the United States Trustee, and any parties who file a request for special notice of post-

1  confirmation matters.  Unless otherwise ordered by the Bankruptcy Court, further status reports

2  shall be filed every 180 days and served on the same entities.

3      **15.13    Post-Confirmation Conversion/Dismissal**.  A Creditor or other party-in-interest

4  may file a motion to convert or dismiss the Case under Section 1112(b), if there is a default by the

5  Reorganized Debtor in performing this Plan.  The Reorganized Debtor reserves the right to object

6  to any such motion for conversion or dismissal.

7      **15.14    Changes in Rates Subject to Regulatory Commission Approval**.  The Debtor is

8  not subject to governmental regulatory commission approval of its rates.

9  Date:   May 6, 2025                          **GLOBAL PREMIER REGENCY PALMS**
                                                **PALMDALE, LP, a California limited**
10                                              **partnership**

11                                              **GLOBAL PREMIER AMERICA #5, LLC,**
12                                              **a California limited liability company, its**
                                                **General Partner**
13
14                                              By: _____
15                                              Name: Christine Hanna
                                                Its:     Manager
16  **SUBMITTED BY:**

17  **WINTHROP GOLUBOW HOLLANDER, LLP**

18
19  By:  /s/ *Garrick A. Hollander*
             Garrick A. Hollander
20  General Insolvency Counsel to
    debtor and debtor-in-possession
21

22

23

24

25

26

27

28

# APPENDIX

## DEFINITIONS AND RULES OF INTERPRETATION

### A.    Definitions

The following defined terms are used in the Plan.  Any capitalized term that is not defined herein, but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

1.    "Administrative Claim" means a Claim for costs and expenses of the administration of a Case under Section 503(b) or 507(a)(1) of the Bankruptcy Code, including, without limitation, a Claim of a Professional employed at the expense of an Estate and any fees or charges asserted against an Estate under 28 U.S.C. § 1930.

2.    "Administrative Claim Deficit" means the unpaid balance owing to the Administrative Creditors after payments made to Administrative Creditors on account of their Allowed Administrative Claims from post-petition funds and Loan Proceeds.

3.    "Administrative Creditor" means a holder of an Allowed Administrative Claim.

4.    "Administrative Tax Claim" means a request by a Governmental Unit for payment of Administrative Claims for Taxes (and for interest or penalties related to such Taxes) for any tax year or period, all or any portion of which occurs within the period from and including the Petition Date through and including the Effective Date.

5.    "Allowed Administrative Claim" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(a)(1) and (a)(2) of the Bankruptcy Code or pursuant to 28 U.S.C. § 1930.

6.    "Allowed Claim"  means a Claim that is either (i) listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; or (ii) with respect to which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and as to which no objection was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court,

EXHIBIT 4 - PAGE 45

278139.3

or as to which any such objection has been determined by a Final Order.  The amount of an Allowed Claim shall be as follows:  (a) if the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the amount of the Creditor's Claim as listed in the Schedules as neither disputed, contingent, unliquidated or unknown; or (b) if the Creditor filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such Proof of Claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court, or (2) the amount thereof as fixed by a Final Order of the Bankruptcy Court if an objection to such Proof of Claim was filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or order of the Bankruptcy Court.  Any Claim that is not filed by the applicable Bar Date and that is listed as disputed, unliquidated, contingent or unknown, or that is not allowed under the terms of the Plan, shall be zero, and no Distribution shall be made on account of such Claim.

7. "<u>Allowed Cure Claims</u>" means an Allowed Claim for Cure Claims pursuant to the terms of the Plan and a Final Order.

8. "<u>Allowed Deficiency Claim</u>" means that portion of an Allowed Claim which is in excess of the value of any collateral that is security for the repayment of the Claim, calculated in accordance with the provisions of Section 506 of the Bankruptcy Code.  Unless the Creditor should make an election under Section 1111(b) of the Bankruptcy Code, an Allowed Deficiency Claim held by any Creditor is treated hereunder as a Class 8 Allowed General Unsecured Claim.

9. "<u>Allowed General Unsecured Claim</u>" means an unsecured Allowed Claim against the Debtor, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, a Rejection Claim.

10. "<u>Allowed Interest</u>" means an Interest to the extent, and only to the extent, of the allowed amount of such Interest.  The amount of an Allowed Interest shall be (i) the amount provided by or established in the records of the Debtor on the Confirmation Date, provided, however, that a timely filed Proof of Interest shall supersede any listing of such

EXHIBIT 4 - PAGE 46

278139.3

Interest on the records of the Debtor; (ii) the amount stated in a timely filed Proof of Interest if no objection to such Interest is filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

11.    "Allowed General Unsecured Claim" means a general unsecured claim that is Allowed.

12.    "Allowed Priority Tax Claim" means an Allowed Claim provided for by Section 507(a)(8) of the Bankruptcy Code.

13.    "Allowed Priority Wage Claim" means an Allowed Claim provided for by Section 507(a)(4)(5).

14.    "Allowed Secured Claim" means an Allowed Claim secured by a valid and unavoidable Lien against property in which an Estate has an interest, or which is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

15.    "ALPA" means the Amended Limited Partnership Agreement attached hereto as **Exhibit 1** and incorporated herein by this reference.

16.    "Assets" means all assets owned by the Debtor.

17.    "Avoidance Action" means any action or proceeding filed pursuant to the provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code, or any similar action or proceeding filed to recover property for or on behalf of an Estate or to avoid a Lien or transfer.

18.    "Bankruptcy Code" means Title 11, United States Code, as amended.  All citations in the Plan to Section numbers are to the Bankruptcy Code, unless otherwise expressly stated herein.

19.    "Bankruptcy Court" means the United States Bankruptcy Court for the Central District of California, Northern Division, which has jurisdiction over the Case and

EXHIBIT 4 - PAGE 47

the Estate of the Debtor, or such successor court or tribunal as may hereafter be confirmed

or created by lawful authority with power to confirm reorganization plans under

Chapter 11 of the Bankruptcy Code and all applicable statutes, rules and regulations

pertaining thereto.

20.    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy

Procedure, as amended, and the Local Bankruptcy Rules for use in the United States

Bankruptcy Court for the Central District of California, as amended.

21.    "Bar Date" means the last date for creditors and equity security holders

whose claims or interests are not scheduled, or are scheduled as disputed, contingent, or

unliquidated in the Debtors' Schedules to file Proofs of Claim, except for the following

Claims: (i) Administrative Claims, and (ii) Rejection Claims.  The Bar Date for the

Debtor's Case is September 29, 2023 for non-governmental entities and November 29,

2023 for governmental entities.

22.    "Business Day" means any day, other than a Saturday, a Sunday or a "legal

holiday," as defined in Rule 9006(a) of the Bankruptcy Rules.

23.    "Case" means the means the Chapter 11 case commenced by the Debtor and

pending before the Bankruptcy Court as Case No. 9:23-bk-10454-RC.

24.    "Cash" means cash and cash equivalents including, but not limited to,

checks or similar forms of payment or exchange.

25.    "Causes of Action" means any and all claims, demands, counterclaims,

setoff rights, recoupment rights, defenses, interests, rights, actions, causes of action and

suits of the Debtor or the Estate, of any kind or character whatsoever, arising prior to the

Effective Date, in contract or in tort, at law or in equity or under any other theory of law,

that the Debtor or the Debtor's Estate has or asserts, or may have or assert, against third

parties, whether or not the subject of litigation or otherwise asserted as of the Effective

Date, and which have not been settled or otherwise resolved by Final Order as of the

Effective Date, including but not limited to:  (a) Avoidance Actions; (b) claims for refunds,

rebates or returns of deposits of any nature, including, without limitation, any Tax or

insurance refunds; (c) claims to recover accounts receivable or other payables; and (d) any other claims, rights, interests or demands which may be asserted against persons or entities.

26.     "Claim" means (i) a right to payment from the Debtor, whether or not such right to payment is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

27.     "Claims Objection Deadline" means the first Business Day following the six-month anniversary of the Effective Date.

28.     "Class" means the group of Claims or Interests classified in Article V of the Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

29.     "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order.

30.     "Confirmation Hearing" means the hearing(s) scheduled by the Bankruptcy Court for the purpose of considering the confirmation of the Plan.

31.     "Confirmation Order" means the order, as entered, of the Bankruptcy Court confirming the Plan.

32.     "Creditor" means the holder of an Allowed Claim or Allowed Administrative Claim.

33.     "Cure Claims" means the amounts necessary to cure any defaults under executory contracts and unexpired leases assumed under the Plan.

34.     "Cure Claims Schedule" means the schedule of the Cure Claims, which shall be filed with the Bankruptcy Court on or before the twenty-fourth (24th) day prior to the Confirmation Hearing.

35.    "<u>Debt Discharge Amount</u>" means any amount of potential discharged indebtedness for federal income tax purposes.

36.    "<u>Debtor</u>" means Global Premier Regency Palms Palmdale, LP, a California limited partnership.  For the purpose of the Plan, reference to "Debtor" may, at times, include the Reorganized Debtor.

37.    "<u>Disclosure Statement</u>" means the Disclosure Statement in Support of Debtor's Joint Chapter 11 Plan of Reorganization, as the same may be amended or modified from time to time.

38.    "<u>Disputed Claim</u>" means all or any part of a Claim as to which any one of the following applies: (i) no Proof of Claim has been filed with respect to such Claim, and the Claim is listed in the Schedules as unliquidated, disputed, contingent or unknown, or; (ii) the Claim is the subject of a timely objection or request for estimation which is filed on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a Final Order.  In addition, prior to the earlier of (a) the Claims Objection Deadline, and (b) such date as the Bankruptcy Court allows the Claim pursuant to a Final Order, any Claim that is evidenced by a Proof of Claim shall be deemed a disputed Claim for purposes of calculating and making any Distributions under the Plan if: (1) no Claim corresponding to the Proof of Claim is listed in the Schedules, (2) the Claim corresponding to the Proof of Claim is listed in the Schedules as disputed, contingent, unliquidated or unknown, (3) the amount of the Claim as specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules as not disputed, not contingent, and liquidated, but only to such extent, or (4) the priority or classification of the Claim as specified in the Proof of Claim differs from the priority of any corresponding Claim listed in the Schedules.

39.    "<u>Disputed Claims Reserve</u>" means a segregated, interest-bearing trust account for the benefit of General Unsecured Creditors, established at a financial institution that is an authorized depository under United States Trustee's guidelines, into which the Distribution Agent will deposit the Distributions required by Section 8.2.3.

EXHIBIT 4 - PAGE 50

278139.3

40. "<u>Disputed Lien(s)</u>" means an asserted lien(s) against Assets of the Debtor that is either subject to a Disputed Claim, not duly perfected, or subject to an Avoidance Action or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

41. "<u>Distribution</u>" means the Cash and any other property sold, transferred, returned or otherwise distributed under the Plan.

42. "<u>Distribution Agent</u>" means the Reorganized Debtor or such other person as determined by the Reorganized Debtor.

43. "<u>Distribution Date</u>" means with respect to any Allowed Claim or Allowed Interest, the date on which a Distribution is required to be made under this Plan.

44. "<u>EB-5 Program</u>" shall mean the immigration program of the United States pursuant to which the United States is required to allocate a certain number of visas pursuant to Title 8 of the U.S. Code, Section 1153(b) et. Seq. and Title 8, Code of Federal Regulations Part 204.6 et. Seq.

45. "<u>Effective Date</u>" means a date that is the later of: (i) the tenth (10th) day after: (i) the satisfaction or waiver of the conditions set forth in Sections 12.1 and 12.2 of the Plan; or (ii) the order confirming the Plan becomes final and non-appealable.

46. "<u>Estate</u>" means the Debtor's bankruptcy estate created under Section 541 of the Bankruptcy Code in the Case.

47. "<u>Event of Default</u>" means the Debtor's failure to cure within the Grace Period a payment required to be made to member(s) of any Class under this Plan pursuant to the terms herein.

48. "<u>Exit Financing</u>" means the post-confirmation financing provided by Shaughnessy to enable the Reorganized Debtor to complete the development of its Property, including, the Facility, and otherwise facilitate the effectuation of the terms of the Plan.

49. "<u>Facility</u>" means the assisted living facility being developed by the Debtor and to be completed by the Reorganized Debtor.

-45-

EXHIBIT 4 - PAGE 51

278139.3

50.     "<u>Fair Market Value</u>" means the current "as is" value of the Property, which, for purposes of this Plan, shall be an amount equal to fifteen million dollars.

51.     "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, or of any court of competent jurisdiction where there is pending an action in which a Debtor or a Reorganized Debtor is a party, as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, move to reargue, or to rehear shall have been waived in writing in form and substance satisfactory to the Debtor or to the Reorganized Debtor.

52.     "<u>General Administrative Claims Bar Date</u>" means the date by which all requests for payment of Administrative Claims, except for a request for payment of a Claim of a Professional employed at the expense of an Estate, shall be filed with the Bankruptcy Court and served upon the Debtor, which shall be the date that is fourteen (14) days prior to the Confirmation Hearing.

53.     "<u>General Partner</u>" means the person or entity holding the general partnership interest in the Debtor or Reorganized Debtor.

54.     "<u>General Unsecured Claim</u>" means a Claim against the Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim, or (d) a Priority Claim.

55.     "<u>General Unsecured Creditor</u>" means the holder of an Allowed General Unsecured Claim.

56.     "<u>Governmental Unit</u>" shall have the meaning provided in Section 101(27) of the Bankruptcy Code.

57.     "<u>GPA</u>" means Global Premier America, LLC, which is owned fifty percent (50%) by Christine Hanna, and fifty percent (50%) by her brother Andrew Hanna.

58.     "<u>GPA #5</u>" means Global Premier America #5, LLC, which is owned 87.5% by GPA, and 12.5% by Yangfang Chen.

EXHIBIT 4 - PAGE 52

278139.3

59.    "Grace Period" means a period of thirty (30) days after receipt of written notice of an asserted Event of Default.

60.    "Holding Period" means the period of time that is not less than the earlier of: (i) the date that all EB-5 investors holding limited partnership interests in the Debtor/Reorganized Debtor obtain approval, denial or dismissal of their I-526 petition; or (ii) three (3) years after the Effective Date

61.    "Initial Distribution Date" means the date on which the first Distribution is made to a Class.

62.    "Insider" means any person that is defined as an "insider" pursuant to Section 101 of the Bankruptcy Code and all applicable case law interpreting same.

63.    "Interest" means any equity security in the Reorganized Debtor, including, without limitation, any common stock interest, preferred stock interest, stock option, warrant, partnership interest, or membership interest.

64.    "Interest Holder" means the holder of an Interest in the Debtor. In particular, these Interests consist of: (i) GPA #5 as the general partner, which holds a 25.05% Interest in the Debtor (12.5% of which is owned by Yangfang Chen, and 87.5% of which is owned by GPA #5), and (ii) twenty-three Limited Partners, who hold a collective 74.95% Interest in the Debtor.

65.    "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

66.    "Lien" means any lien, encumbrance, pledge or other charge against property.

67.    "Limited Partner" means the person or entity holding the limited partnership interests in the Debtor or Reorganized Debtor

68.    "Loan Documents" means all loan documents entered into by and between Shaughnessy and the Debtor that give rise to the Shaughnessy Claim, including, without limitation, the Promissory Note dated October 28, 2021, as well as that certain

EXHIBIT 4 - PAGE 53

278139.3

Construction Deed of Trust, Assignment of Rents and Leases, Security Agreement, and Fixture Filing dated October 29, 2021.

69. "<u>Mechanics Lien Creditor(s)</u>" means those creditor(s) who hold an Allowed Secured Claim against the Property based on a valid, non-avoidable mechanics Lien.

70. "<u>Paid in Full</u>" means that the Debtor's payment obligations created by the Plan that are due to a particular Class of Creditor have been fully satisfied.

71. "<u>Petition Date</u>" means June 2, 2023, the date on which the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code.

72. "<u>Plan</u>" means the Debtor's Joint Chapter 11 Plan of Reorganization proposed by the Debtor and Shaughnessy, together with the exhibits and schedules hereto, as the same may be amended or modified from time to time.

73. "<u>Plan Fund</u>" means a fund equal to $225,000 cash to be used to pay Classes 4 and 8, which shall be sourced from the Shaughnessy.

74. "<u>Priority Claim</u>" means any Allowed Priority Tax Claim or Allowed Priority Wage Claim.

75. "<u>Priority Creditor</u>" means a holder of any Allowed Priority Tax Claim or Allowed Priority Wage Claim.

76. "<u>Priority Tax Claim</u>" means any Claim provided for by Section 507(a)(8) of the Bankruptcy Code.

77. "<u>Priority Tax Creditor</u>" means a holder of an Allowed Priority Tax Claim.

78. "<u>Professional</u>" means a person or entity employed by the Debtors pursuant to a Final Order in accordance with Section 327 of the Bankruptcy Code, or any attorney, accountant, appraiser, investment banker, broker, financial consultant, expert or other professional person employed by the Debtors post-confirmation.

79. "<u>Projections</u>" means the plan projections prepared by the Debtor reflecting Debtor's projected receipts and disbursements, including the assumptions on which such projections are based (**Exhibit 1** to the Disclosure Statement).

80.    "Proof of Claim" means a written statement filed in a Case by a Creditor in which the Creditor sets forth the amount of its Claim, in accordance with Rule 3001 of the Bankruptcy Rules.

81.    "Proof of Interest" means a written statement filed in a Case by an Interest Holder in which the Interest Holder sets forth the amount of its Interest.

82.    "Pro Rata" means the proportionate share of an Allowed Claim held by a member of Classes 4 or 8 relative to the total Allowed Claims held by members of Classes 4 and 8.   The Pro Rata formula is calculated as follows:

$$\frac{\text{Allowed Claim of a member of Class 4 or 8}}{\text{Total Allowed Claims of all members of Classes 4 and 8}}$$

83.    "Property" means the real property located at 38722 Orchid View Place, Palmdale, California, including all improvements made thereon.

84.    "RCB" means RCB Equities #7.

85.    "Regional Center" means the project sponsor for the EB-5 investments through whom the Debtor's EB5 program is managed.  GPA is the Regional Center for the Debtor's EB-5 investments.

86.    "Rejection Claim" means any Claim based upon, or arising from, the rejection of any executory contract or unexpired lease pursuant to order of the Bankruptcy Court or pursuant to the Plan.

87.    "Reorganized Debtor" means the Debtor, as reorganized under the terms of this Plan on and after the Effective Date, and any successors thereto by merger, consolidation, acquisition, or otherwise.

88.    "Required Notice Compromise" means the compromise of any cause of action where the amount of controversy exceeds $50,000.

89.    "Representatives" means a party's employees, offices, directors, shareholders, agents, members, representations, and professionals.

90.    "Schedules" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtor in the Case, as required by Section 521(1) of the

-49-

EXHIBIT 4 - PAGE 55

278139.3

Bankruptcy Code, Rules 1007(a)(3) and (b)(1) of the Bankruptcy Rules, and Official

Bankruptcy Form No. 6, as the Schedules may be amended from time to time.

91.    "<u>Secured Claim</u>" means any Claim, including interest, reasonable attorneys'

fees, costs, and charges, to the extent allowable pursuant to Section 506(b) of the

Bankruptcy Code and the Plan, that is secured by a Lien on property in which a Debtor has

an interest or that is subject to recoupment or setoff under Section 553 of the Bankruptcy

Code, to the extent of the value of the interest of the holder of such Secured Claim in the

Debtor's interest in the property, determined pursuant to Section 506(a) of the Bankruptcy

Code.

92.    "<u>Secured Creditor</u>" means the holder of an Allowed Secured Claim.

93.    "<u>Shaughnessy</u>" means Shaughnessy Capital LLC, a Delaware limited

liability company, the Debtor's pre-petition senior secured creditor and provider of Exit

Financing.

94.    "<u>Subsidiary</u>" means Global Regency Palmdale Senior Care Services, LLC.

95.    "<u>Tax</u>" means any tax, charge, fee, levy, or other assessment by any federal,

state, local or foreign taxing authority, including, without limitation, income, excise,

property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem,

estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any

interest or additions attributable to, or imposed on or with respect to, such assessments.

96.    "<u>Tax Claims</u>" means any Claim, pre-petition or post-petition, relating to a

Tax.

97.    "<u>Unclaimed Property</u>" means any Distribution of Cash or other property to

a Creditor that is returned to the Reorganized Debtors as undeliverable.

98.    "<u>Unclaimed Property Reserve</u>" means an interest-bearing segregated

account in which Unclaimed Property shall be set aside and held as provided in Section 8.7

of the Plan.

99.    "<u>Uncured Default Determination</u>" means a final non-appealable order by the Bankruptcy Court determining that an Event of Default occurred, was not excused or timely cured by the Debtor.

100.    "<u>United States Trustee</u>" means the Office of the United States Trustee.

**B.**    **<u>Rules of Construction</u>**

For the purpose of this Plan, unless otherwise provided in this Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter; (iii) any reference in this Plan to an existing document, Exhibit or schedule filed or to be filed means such document or schedule as it may have been or may be amended, modified or supplemented pursuant to this Plan; (iv) any reference to an entity as a holder of a Claim includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in this Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to this Plan; (vi) the words "herein," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (vii) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of this Plan or any other provision in this Section.

**C.**    **<u>Schedules</u>**

All exhibits to this Plan are incorporated into and are a part of this Plan as if set forth in full herein.

EXHIBIT 4 - PAGE 57

278139.3

### Schedule 9.1

## Schedule of Assumed Contracts

| Non-Debtor Contracting Party | Type | Cure Claim |
|---|---|---|
| Overland, Pacific & Cutler | Construction | $0.00 |
| Palmdale Recycled Water Authority | Utility | $0.00 |
| High Desert Contractors, Inc. | Construction | $0.00 |
| NESF Fund Services Corp/JTC USA | Vendor | $6,067.04 |

**Schedule 9.3**

## Schedule of Rejected Contracts

| Non-Debtor Contracting Party | Type |
|---|---|
| WDA, Inc., dba Warner Design Assoc, aka Red Pen Procurement | Design |
| Urban Community Builders, LLC | Construction |
| Global Regency Palmdale Senior Care Services, LLC | Lease |
| Advance Exercise | Vendor |

EXHIBIT 4 - PAGE 59

278139.3

# EXHIBIT 1

EXHIBIT 4 - PAGE 60

AMENDED LIMITED PARTNERSHIP AGREEMENT

OF

**GLOBAL PREMIER REGENCY PALMS PALMDALE, LP**

_____

THE LIMITED PARTNERSHIP INTERESTS EVIDENCED BY THIS AMENDED LIMITED PARTNERSHIP AGREEMENT (THE "**AGREEMENT**") HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933 (THE "**1933 ACT**") OR PURSUANT TO APPLICABLE STATE SECURITIES LAWS ("**BLUE SKY LAWS**").  ACCORDINGLY, THE LIMITED PARTNERSHIP INTERESTS CANNOT BE RESOLD OR TRANSFERRED BY ANY PURCHASER THEREOF WITHOUT REGISTRATION OF THE SAME UNDER THE 1933 ACT AND THE BLUE SKY LAWS OF SUCH STATE(S) AS MAY BE APPLICABLE, EXCEPT IN A TRANSACTION WHICH IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND THE BLUE SKY LAWS OR WHICH IS OTHERWISE IN COMPLIANCE THEREWITH.  IN ADDITION, THE SALE OR TRANSFER OF SUCH LIMITED PARTNERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

_____

**THIS AMENDED LIMITED PARTNERSHIP AGREEMENT OF GLOBAL PREMIER REGENCY PALMS PALMDALE, LP** (the "Agreement") is made as of September 8, 2014, by and among Global Premier America #5, LLC, a California limited liability company (the "General Partner"), and the Limited Partners.

**NOW, THEREFORE,** the parties hereto hereby agree as follows:

1.    **FORMATION.**  A Certificate of Limited Partnership for the formation of GLOBAL PREMIER REGENCY PALMS PALMDALE, LP (the "Partnership") pursuant to the Act was filed with the Secretary of State of California on September 8, 2014 evidencing the formation of the Partnership.

2.    **NAME AND PLACE OF BUSINESS.** The business of the Partnership shall be conducted under the name of GLOBAL PREMIER REGENCY PALMS PALMDALE, LP; provided, however, that the General Partner may, in its sole discretion, change the name of the Partnership at any time and from time to time, except that in no event shall the name of the Partnership include the name or initials of any Limited Partner or any name or initials which are substantially similar thereto. The principal place of business of the Partnership shall be 38780 12th Place East, Palmdale, California 93550.  The initial office of the Partnership shall be at 2010 Main Street, Suite 1250, Irvine, California 92614; provided, however, that the General Partner may change such address in its sole discretion. The General Partner shall deliver written notice to the Limited Partners of any change in location.

EXHIBIT 1 PAGE 61

3.      <u>**PURPOSE.**</u>  The principal purpose of the Partnership is to develop, construct, own, and manage an assisted living and memory care facility that will include a private and semi-private senior residential units (the "Assisted Living Memory Care Facility"), resident food services (the "Food Services"), and home health care services (the "HHC Business").  The Partnership will organize three subsidiary limited liability companies (the "Subsidiary Companies") that will conduct the operations of the Assisted Living Memory Care Facility, the Food Services, and the HHC Business (hereinafter collectively referred to as the "Facilities") and will conduct the business of the Partnership through these Subsidiary Companies:

- Global Regency Palmdale Senior Care Services, LLC will operate the Assisted Living Memory Care Facility, a residential facility for seniors with a mixture of 80 private and semi-private rooms for a proposed occupancy of 104 beds;

- Global Regency Palmdale Food Services, LLC will operate the Food Services providing resident food services in the Facilities; and

- Global Regency Palmdale Home Health, LLC will operate the HHC Business, a separate portion of the Facilities providing office space for the administration of the HHC Business operating as a franchisee of Interim HealthCare Inc. and including a broad array of in-home care and in-home health care services including permanent and temporary placement of nursing and other health care personnel, non-medical support and companion care services, and health care-related home medical equipment, products, and supplies.

The Partnership may engage in any and all general business activities related or incidental to its business purpose as described herein.  The Partnership may also engage in such other activities as may be reasonably incident or appropriate to furthering the business purpose of the Partnership.

4.      <u>TERM OF PARTNERSHIP; FILINGS: AGENT FOR SERVICE OF PROCESS.</u>

(a)      <u>Term.</u> The Partnership commenced on September 8, 2014, and shall continue until December 31, 2035, unless sooner terminated as herein provided or by operation of law.

(b)      <u>Certificate of Limited Partnership.</u> A Certificate of Limited Partnership has been filed with the Secretary of State of California in accordance with the Act. The General Partner shall amend the Certificate of Limited Partnership from time to time, as required by the Act. The General Partner shall also qualify the Partnership to do business in any other jurisdiction as may be required under the laws of such jurisdiction.

(c)      <u>Agent for Service of Process.</u> The registered agent for the Partnership may be changed from time to time by the General Partner in its sole and absolute discretion, subject to applicable law.

5.      <u>**DEFINITIONS.**</u> The following terms shall have the meanings set forth below:

(a)      "Act" shall mean the provisions of the Uniform Limited Partnership Act of 2008, as amended from time to time, as set forth in California Corporations Code Section 15900 et seq.

EXHIBIT 1 PAGE 52

(b)      "Adjusted Capital Account Deficit" shall mean, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after crediting to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations and debiting to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.   The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c)      "Adjusted Capital Contribution" of a Partner shall mean the Capital Contributions of a Partner, reduced (but not below zero) by (i) distributions to such Partner pursuant to Section 9(a) hereof, (ii) allocations of tax credits, if any, to such Partner, and (iii) Net Losses allocated to such Partner.

(d)      "Affiliate" shall mean any Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with another designated Person.

(e)      "Available Cash Flow" shall mean funds provided from the Partnership's operations without deductions for depreciation, but after deducting funds used to pay all expenses and debts, including payments to service Secured Debt, if any, of the Partnership, administrative operational expenses, debt payments, capital improvements, and less the amount set aside by the General Partner, in the exercise of its sole discretion, for reserves.

(f)      "Bankruptcy" shall mean:

1.      The commencement of any voluntary proceedings under the United States bankruptcy laws which is not vacated or dismissed within 60 days following the commencement thereof;

2.      The failure to terminate any involuntary proceeding under said laws within 60 days following the commencement thereof;

3.      A general assignment for the benefit of creditors; or

4.      The issuance of a charging order against the interest of any person without the removal thereof within 60 days following said issuance.

(g)      "Capital Account" shall mean an account established for each Partner and determined in accordance with Section 1.704-1(b) of the Regulations.   The Capital Accounts shall be adjusted in order to reflect allocations of Depreciation and gain and loss as computed for book purposes. Upon the transfer of any Partner's Unit(s), the Capital Account of the transferor Partner shall carry over to the transferee Partner.

(h)      "Capital Contribution" shall mean cash a Partner contributes to the Partnership as capital in that Partner's capacity as a Partner pursuant to an agreement between the Partners.

EXHIBIT 1 - PAGE 63

(i)      "Capital Event" means the finance, refinance, sale, exchange or other disposition of the Project or any other portion thereof, including conversion or condemnation of the real property or any portion thereof.

(j)      "Closing" shall mean the closing of the sale of 20 Units pursuant to the Offering.

(k)      "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(l)      "Depreciation" with respect to the Partnership's indirect interest in any property shall mean the Partnership's allocable share of depreciation, amortization, and other cost recovery deductions taken into account in computing the taxable income and loss of the Partnership.

(m)      "Distributions" shall mean that portion from Available Cash Flow and the Net Proceeds from a Capital Event, or that the General Partner determines should be paid to the Partners.

(n)      "EB-5 Program" shall mean Title 8 of the U.S. Code, Section 1153(b) et. seq. and Title 8, Code of Federal Regulations Part 204.6 et. Seq.

(o)      "Early Release Amount" shall mean that portion of a Limited Partner's Capital Contribution that a Limited Partner agrees to have the Escrow Agent release to the Partnership prior to the approval of such Limited Partner's I-526 Petition to allow the business of the Partnership to go forward.

(p)      "Economic Interest" shall have the meaning set forth in Section 10(h)(i).

(q)      "Escrow Agent" shall mean Granite Escrow Services, Inc., 1400 Newport Center Drive, Suite 250, Newport Beach, California 92660.

(r)      "Fiscal Year" shall mean the fiscal year of the Partnership, determined in accordance with Section 706(b) of the Code.

(s)      "General Partner" shall mean Global Premier America #5, LLC, a California limited liability company, as well as any other person or entity who has been admitted to the Partnership as a General Partner in accordance with this Agreement, or a person or entity who has been admitted as a General Partner pursuant to applicable law.

(t)      "Gross Income" shall mean the Partnership's distributive share of items of income and gain only, unreduced by the Partnership's distributive share of items of deduction and loss from the Partnership, and any other items of income and gain generated by the Partnership.

(u)      "Limited Partners" shall mean collectively those individuals and entities admitted to the Partnership as a limited partner in accordance with this Agreement, or an assignee of a Partnership interest in the Partnership who has become a Limited Partner pursuant to applicable law. "Limited Partner" shall mean any of the Limited Partners.

EXHIBIT 1 - PAGE 64

(v)    "Majority in Interest of the Limited Partners" shall mean those Limited Partners owning more than 50% of the outstanding Units in the Partnership.

(w)    "Net Proceeds" means net proceeds derived by the Partnership from a Capital Event or dissolution after payment or allowance for the expenses incurred in connection with such Capital Event or dissolution and after payment or allowance for existing indebtedness (but not including any outstanding Secured Debt), the discharge of any other expenses or liabilities of the Partnership and the establishment of appropriate reserves, all as determined by the General Partner, in its sole discretion.

(x)    "Net Profits" and "Net Losses" shall mean the net profits or net losses, respectively, of the Partnership as determined on the basis of the accrual accounting method at the close of the Fiscal Year by the Partnership's accountants in accordance with consistently applied Federal income tax principles, and as set forth on the information return filed by the Partnership for Federal income tax purposes.

(y)    "Nonrecourse Deductions" shall mean the Partnership deductions that are characterized as "nonrecourse deductions" pursuant to Regulations Section 1.704-2(c).

(z)    "Offering" shall mean the initial offering of Units to investors as described in Section 6(a) made in accordance with the terms of a Confidential Private Offering Circular of the Partnership to be prepared by the General Partner or any amendment thereto (the "Offering Circular").

(aa)    "Participation Percentage" shall mean for each Limited Partner his pro rata share of 70% (based on percentage ownership of Units) and 30% to the General Partner.

(bb)    "Partner" shall mean a General Partner or a Limited Partner. The term "Partners" shall refer collectively to the General Partner and to the Limited Partners.

(cc)    "Partner Nonrecourse Deductions" shall mean the Partnership deductions that are characterized as "partner nonrecourse deductions" pursuant to Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

(dd)    "Partnership Property" means that certain parcel of real property located at 38780 12th Place East, Palmdale, California 93550, as improved in accordance with the Partnership's business plan.

(ee)    "Person" shall mean any individual, partnership, corporation, trust, limited liability company or other entity.

(ff)    "Project" or "Facilities" shall mean the development, improvement, construction, ownership, and operation of an assisted living and memory care facility that will include the Assisted Living Memory Care Facility, the Food Services operations, and offices for the HHC Business on the Partnership Property.

EXHIBIT 1 - PAGE 85

(gg)    "Regulations" shall mean the Income Tax Regulations promulgated under the Code, including Temporary and Proposed Regulations, as such Regulations may be amended from time to time, including corresponding provisions of succeeding Regulations.

(hh)    "Secured Debt" shall mean the debt that may arise from loan proceeds using the Project or the Partnership Property as security for the loan.

(ii)    "Termination Date" shall mean the date on which the Offering terminates.

(jj)    "Transfer" shall mean any encumbrance, gift, assignment, pledge, hypothecation, sale or other transfer of all or any portion of a Partnership interest.

(kk)    "Units" shall mean collectively the Limited Partner Interests in the Partnership and "Unit" shall mean one Limited Partner Interest.  The Partnership shall offer 20 Units to the Limited Partners.

(ll)    "USCIS" shall mean the U.S. Citizenship and Immigration Services.

6.    **OFFERING OF UNITS.**

(a)    **Initial Offering of Limited Partnership Interests.** The Partnership initially intends to offer and sell 20 Units for a cash purchase price of US $500,000 per Unit for a total of US $10,000,000 in Units, and to admit as Limited Partners the persons whose subscriptions for a minimum of one Unit (US $500,000) are accepted by the General Partner (who may refuse to admit any person or persons as Limited Partners for any reason whatsoever).  Each subscriber for Units shall be admitted as a Limited Partner upon the General Partner's execution of the Subscription Agreement.

(b)    **Admission of Additional Limited Partners.** The General Partner may in its discretion from time to time following the Offering, and upon such terms as the General Partner deems appropriate, offer and sell Units, without further consent of the Limited Partners, including but not limited to the admission of a new Limited Partner to replace a Limited Partner who ceases to participate in the EB-5 Program as described in Section 12(i) below.  Without limiting the generality of the foregoing, any such Units may be issued in one or more classes, or in one or more series of any of such classes, with designations, preferences and relative participating, option or other special rights, powers and duties, including rights, powers and duties senior to units previously issued to our Partners, all as shall be determined by the General Partner in its sole discretion and without the approval of any Limited Partner.

7.    **PARTNERSHIP CAPITAL CONTRIBUTIONS.**

(a)    **Capital Contribution of the General Partner.** The General Partner, as its capital contribution, will assign to the Partnership (i) its rights under the Purchase Agreement dated September 8, 2014 for the Property, and (ii) its rights to the US $1,000,000 purchase price for the Property originally due to Desert Senior Apartments, an affiliate of the General Partner of the Partnership, which rights have been assigned to the General Partner.  The General Partner will be credited with an initial Capital Account of US $1,000,000.  The General Partner may also make Capital Contributions in connection with the purchase of Units at its sole discretion.  The General Partner will be treated as a Limited Partner with respect to all Units purchased and owned by the General Partner.

EXHIBIT 1 - PAGE 56

(b)    Capital Contribution of the Limited Partners. The Limited Partners shall make initial Capital Contributions to the Partnership of US $500,000 (one Unit) in connection with the Offering.  No Limited Partner shall be required to make further contributions to the Partnership.

(c)    Interest on Contributions. No interest shall be paid by the Partnership on any Capital Contribution made by any Partner to the Partnership.

(d)    Use of Capital Contributions. Capital Contributions shall be used as determined by the General Partner exclusively for the Partnership Property and the Project and no other purposes, including but not limited to the acquisition, development, and improvement of the Partnership Property and the operation of the Project as described in the Offering Circular.

(e)    Limited Liability of Limited Partners. Except as may otherwise be provided under applicable law, no Limited Partner shall be bound by, or personally liable for, the expenses, liabilities or obligations of the Partnership.

(f)    Return of Capital. Except as provided in this Section 7(f), no Partner shall have the right to withdraw or reduce such Partner's Capital Contribution or to receive any distributions, except as a result of dissolution. No Partner shall have the right to demand or receive property other than cash in return for such Partner's Capital Contributions.  Limited Partners may withdraw as a Limited Partner and have his or her Capital Contribution returned only under the following circumstances:

(i)    If a Limited Partner fails to file the I-526 petition with the USCIS within 90 days of the date the Limited Partner is approved for admission to the Partnership by the General Partner, such Limited Partner shall have the right to a return of his or her Capital Contribution.   Upon written notice to the General Partner of his or her desire to withdraw as a Limited Partner, the General Partner will cause the Escrow Agent to return the denied Limited Partner's Capital Contribution within 90 days of the written notice from the Limited Partner to the General Partner.

(ii)    If a Limited Partner's I-526 petition is denied by the USCIS, the General Partner will cause the Escrow Agent to return the denied Limited Partner's Capital Contribution within 90 days of the written notice from the Limited Partner to the General Partner.

(iii)    If a Limited Partner's I-485 application or immigrant visa application is denied after the I-526 petition is approved, the Partnership will use its best efforts to return the Capital Contribution.  If there are insufficient funds available in the Partnership's general operating account to refund the Capital Contribution to the denied Limited Partner, then such refund may be delayed until there are funds in the Partnership's general operating account to enable the Partnership to pay the refund. The Partnership must use its best efforts to substitute the denied Limited Partner with a new Limited Partner in accordance with the provisions of Section 6(b) below and return the denied Limited Partner's Capital Contribution when such new Limited Partner's I-526 Petition is approved by the USCIS.

(iv)    If a Limited Partner has agreed with the Partnership to allow the Early Release Amount to be released by the Escrow Agent to the Partnership and such Limited Partner's I-526 petition is subsequently denied by the USCIS, the General Partner will cause the Escrow Agent to return

EXHIBIT 1 - PAGE 57

that portion of the denied Limited Partner's Capital Contribution still being held by the Escrow Agent for the benefit of the denied Limited Partner within 90 days of written notice from the Limited Partner to the General Partner.   The Partnership will return the balance of the Capital Contribution as set forth in subsection (iii) above.

(v)    The Partners agree that the Escrow Agent shall not be liable to the denied Limited Partner or be responsible for refunding any portion of the Capital Contribution not in the Capital Contribution Escrow Account following the release of the Capital Contribution after the approval of a Limited Partner's I-526 petition or as a result of an Early Release.

(vi)    Upon the full return of a Limited Partner's Capital Contribution he or she will cease to be a Limited Partner of the Partnership.

(vii)    In the circumstance set forth in this Section 7(f), no interest will be paid on the Capital Contribution being returned to a Limited Partner.

(g)    <u>Number of Limited Partners.</u> There shall be no more than 99 Limited Partners of the Partnership, in accordance with the requirements for an exemption under Section 3(c)(1) from the registration requirements of the Investment Company Act of 1940.   Further, the number of Limited Partners must be within the limitations of the EB-5 Program administered by the U.S. Citizenship and Immigration Services ("USCIS").

8.    <u>ALLOCATIONS.</u>

(a)    <u>Allocation of Net Profits.</u> For each Fiscal Year, Net Profits shall be allocated as follows:

~~(i)    First, in the event that any class of partners has an aggregate negative capital account balance and another class of partners has an aggregate positive capital account balance, to the class of partners with the negative balance, pro rata in accordance with their negative Capital Accounts, up to the amount necessary to cause the aggregate capital account balance of that class to equal zero;~~

~~(iii)    Second, in the event that any one or more individual partners has a negative capital account balance, to those individual partners with the negative balances, pro rata in accordance with their negative Capital Accounts, up to the amount necessary to cause their individual capital account balances to equal zero;~~

~~(v)    Third, in such a manner and amount as is necessary to cause the positive Capital Account balances of the Partners to be equal to their deemed liquidation distributions (taking into account all prior Distributions), determined as if the Partnership were dissolved and liquidated and (A) the Partnership's assets were sold for their fair market value; (B) the Partnership's liabilities were paid; and (C) the Partnership's remaining cash were distributed in accordance with the provisions applicable; and~~

EXHIBIT 1 - PAGE 58

(vii)    Thereafter, 170% to the Limited Partners (pro rata, in accordance with their respective ownership of Units) and 9930% to the General Partner.

(b)    **Allocation of Net Losses.** For each Fiscal Year, Net Losses shall be allocated 170% to the Limited Partners (pro rata, in accordance with their respective ownership of Units) and 3099% to the General Partner.

(c)    **Qualified Income Offset.** In the event any Limited Partner unexpectedly receives an adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(4)(4), (1) or (6), items of income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, any deficit in said Limited Partner's Capital Account as quickly as possible. For purposes of this Section 8(d), the Limited Partner's Capital Account, as of the end of the relevant Fiscal Year, shall take into account the adjustments described in Regulations Sections 1.704- 1(b)(2)(ii)(c1)(4), (5) and (6), any amount of any deficit Capital Account balance which the Limited Partner is obligated to restore, and any amount of any deficit Capital Account balance which the Limited Partner is deemed obligated to restore pursuant to the Regulations promulgated under Section 704(b) of the Code.

(d)    **Special Allocation of Interest Expense.** Notwithstanding anything contained herein to the contrary, any item of interest expense attributable to a loan by the General Partner to the Partnership shall be allocated solely to the General Partner.

(e)    **Allocations of Book Items.** All items of book income, gain, loss and deduction shall be allocated among the Partners in the same percentage that Net Profits and Net Losses are allocated for the same Fiscal Year, or as otherwise provided by the Regulations promulgated under Section 704(b) of the Code.

(f)    **Tax Restrictions.** In order to preserve and protect the determinations and allocations provided for in this Section 8, the General Partner shall have the authority to allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Section 8 to the extent that, upon advice of tax counsel, allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in this Section 8 would cause the determinations and allocations of each Partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) not to be permitted by Section 704(b) of the Code and regulations promulgated thereunder.   Any allocation made pursuant to this Section 8(g) shall be deemed to be a complete substitute for any allocation otherwise provided for in Section 8, and no amendment of this Agreement or approval of any Partner shall be required.

(g)    **Allocation of Nonrecourse Deductions.**  Nonrecourse Deductions for each Fiscal Year shall be allocated among the Partners in accordance with their respective Participation Percentages.

(h)    **Allocation of Partner Nonrecourse Deductions.**  Partner Nonrecourse Deductions for each Fiscal Year shall be allocated among the Partners as required by Regulations Section 1.704-2.

(i)    **Gross Income Allocation.  In the event any Partner has an Adjusted Capital Account Deficit at the end of any Fiscal Year, items of Gross Income shall be specially allocated to each such Partner**

EXHIBIT 1 PAGE 59

~~in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this Paragraph shall be made if and only to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for herein have been tentatively made as if this Paragraph were not in this Agreement.~~

(j)    <u>Minimum Gain Chargeback</u>.  Prior to any allocation hereunder and subject to the exceptions set forth in Regulations Section 1.704-2(f), in the event that there is a net decrease in the partnership minimum gain during a Partnership Fiscal Year, each Partner shall be allocated items of Gross Income for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease (which share of such decrease shall be determined in accordance with Regulations Section 1.704-2(g)).  It is intended that this subsection shall constitute a "minimum gain chargeback" as provided by Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(k)    <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>.  Prior to any allocation hereunder (other than Section 8(k)) and subject to the exceptions set forth in Regulations Section 1.704-2(i)(4), in the event that there is a net decrease in the Partner nonrecourse debt minimum gain during a Partnership Fiscal Year, each Partner with a share of such Partner nonrecourse debt minimum gain (determined in accordance with Regulations Section 1.704-2(i)(5)) shall be allocated items of Gross Income for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease (which share of such decrease shall be determined in accordance with Regulations Section 1.704-2(i)(4)).  It is intended that this subsection shall constitute a "chargeback of partner nonrecourse debt minimum gain" as provided by Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(l)    <u>Depreciation</u>.  Subject to Section 8(n), Depreciation of the Partnership for any Fiscal Year (to the extent such Depreciation does not constitute a Nonrecourse Deduction or Partner Nonrecourse Deduction in such Fiscal Year) shall be specially allocated to the Partners in accordance with their respective Participation Percentages.

(m)    <u>Loss Limitation</u>.  Subject to Section 8(o) hereof, the Net Losses and Depreciation allocated pursuant to Section 8(b) and 8(l) shall not exceed the maximum amount of such items that can be allocated without causing any Limited Partner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year taking into account the special allocations of Section 8(d) and 8(j) for such Fiscal Year.

(n)    <u>Interest Income</u>.  Any interest income recognized by the Partnership in connection with the payment of a Capital Contribution will be allocated to the Limited Partner making such payment.

9.    <u>**DISTRIBUTIONS.**</u>

(a)    <u>Distribution of Available Cash Flow.</u> Available Cash Flow shall be distributed ~~1~~70% to the Limited Partners, pro rata in accordance with their respective ownership of Units, and ~~30~~99% to the General Partner.  Distributions of Available Cash Flow will generally be made once annually. ~~Distributions of Available Cash Flow shall not be taken out of Capital Contributions made by Limited Partners.~~

EXHIBIT 4 - PAGE 7~~0~~

(b)    Distribution of Net Proceeds from a Capital Event. ~~Net Proceeds from a Capital Event shall be distributed 100% to the Limited Partners up to their Adjusted Capital Contributions; thereafter,~~ Net Proceeds from ~~such~~ a Capital Event shall be distributed ~~70~~1% to the Limited Partners, pro rata in accordance with their respective ownership of Units, and ~~30~~99% to the General Partner. Distributions from a Capital Event will generally be made on a one-time basis in the event of a financing or sale of Partnership Property. ~~Distributions of Net Proceeds from a Capital Event shall not be taken out of Capital Contributions made by Limited Partners.~~

(c)    To Whom Distributions Are Made. Unless named in this Agreement or unless admitted as a Substitute Limited Partner as provided herein, no person or entity shall be considered a Partner in the Partnership. All Transfers of interests by the Limited Partners shall be subject to Article 12 hereof, and, until admitted as a Substitute Limited Partner thereunder, no assignee shall have any right as a Limited Partner herein, including, but not limited to, the right to acquire any information regarding the Partnership, or to inspect the Partnership books, or to vote on any matter presented to the vote of Limited Partners, whether or not such assignee is otherwise entitled to distributions as assignee. Any payment by the Partnership to the person shown on the Partnership records as a Limited Partner, or to such Limited Partner's legal representatives, or to a named assignee of the right to receive distributions, shall acquit the Partnership and the General Partner of all liability to any other person who may be interested in such payment by reason of an assignment by a Limited Partner or for any other reason.

(d)    Distributions Not Guaranteed.  Distributions are not guaranteed, but will be made in accordance with the foregoing paragraphs of this Section 9 and the discretion of the General Partner.

10.    POWERS AND DUTIES OF THE PARTNERS.

(a)    Powers of the General Partner. The General Partner and its management shall devote such time to the Partnership as shall be necessary to conduct the Partnership business. Subject to the remaining provisions of this Agreement, the General Partner shall be solely responsible for the day-to-day operations of the Partnership business and shall have all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith, or in connection with accomplishing the purposes of the Partnership as set forth in Section 3.  The General Partner may employ consultants and other third parties to assist it in the management of the Partnership's business.

(b)    Management Decisions. ~~Subject to the rights to formulate policy and to vote of the Limited Partners set forth herein, w~~With respect to the day-to-day management, conduct and operation of the Partnership business, the decisions of the General Partner shall prevail.

(c)    Independent Activities of Partners. Except as provided elsewhere herein, any of the Partners, General or Limited, may engage in or possess an interest in other business ventures of every nature and description, including businesses that compete with the Partnership, independently or with others.

(d)    Tax Matters Partner. The Manager of the General Partner shall be the designated "Tax Matters Partner" of the Partnership, as that term is defined in the Code.

EXHIBIT 4 - PAGE 71

(e)    <u>Execution of Documents.</u> Except as otherwise authorized by the General Partner, each check, contract, deed, lease, promissory note, deed of trust, escrow instruction, bond, release or any other documents of any nature whatsoever, in any way pertaining to this Partnership or on behalf of the Partnership, shall be signed by the General Partner.

(f)    <u>Liability; Indemnification.</u>   Neither the General Partner nor any of its members, officers, agents, employees, successors and assigns shall be liable, responsible or accountable in damages or otherwise to the Partnership or to the Limited Partners for any acts performed or omitted to be performed by the General Partner in connection with the Partnership, except to the extent that such acts or omissions constitute actual fraud, gross negligence or willful misconduct.   The Partnership shall indemnify and hold harmless the General Partner and its members, officers, agents, attorneys, employees, successors and assigns from and against all losses, liabilities, damages, judgments, settlements and expenses (including legal fees) (collectively, "Damages") incurred as a result of actions against the General Partner in its capacity as general partner of the Partnership, except to the extent a court of competent jurisdiction determines that the actions of the General Partner constituted actual fraud, gross negligence or willful misconduct. Notwithstanding the foregoing, the Partnership shall not indemnify the General Partner with respect to any Damages for which the General Partner receives insurance proceeds carried for the benefit of the Partnership or the General Partner. The indemnification provided herein is in addition to and not a limit on any other right of contribution or indemnity which otherwise exists under any contract or under applicable law in favor of the General Partner.

(g)    <u>Reimbursement of Expenses; Management Fee.</u> The Partnership shall reimburse the General Partner for reasonable expenses incurred by it in managing the business of the Partnership. The General Partner will endeavor to have Partnership expenses billed directly to the Partnership whenever feasible.  The General Partner will be entitled to receive a management fee, in addition to its interest in the Net Profits and Distributions of the Partnership, equal to 5% of the gross revenues of the Partnership.

(h)    <u>Transfer of Economic Interest.</u>

(i)    Without the consent of any Limited Partner, the General Partner may Transfer all or any portion of the economic rights associated with its General Partner interest (including, without limitation, rights to distributions and allocations of income, gain, loss, deduction, credit or similar items) (collectively, the "Economic Interest"); provided, however, any such Transfer shall be on the condition that upon the removal and replacement of the General Partner in accordance with Section 13, such Economic Interest shall be deemed transferred to the replacement General Partner. Any other Transfer by the General Partner of its interest in the Partnership following the date of this Agreement shall be effective only~~: (A) upon the consent of a Majority in Interest of the Limited Partners, and (B)~~ if applicable, upon the admission of a successor or additional General Partner, as the case may be.  Except as provided otherwise in this Agreement, the General Partner may not, without the consent of a Majority in Interest of the Limited Partners, Transfer or delegate its obligations under this Agreement and shall continue to be responsible for those obligations. The transferee or other person receiving a disposition shall have only the rights of an assignee of an Economic Interest.

(ii)    The Transfer of all or any part of the General Partner's Economic Interest in accordance with the provisions of this Agreement will not: (A) cause the dissolution of the Partnership,

EXHIBIT 4 - PAGE 72

(B) cause the General Partner to cease being the General Partner of the Partnership, or (C~~B~~) provide the Limited Partners with the right to remove the General Partner as general partner.

(iii)    The provisions of this Section 10(h) apply notwithstanding any other provision in this Agreement to the contrary, and are in addition to any rights of the General Partner set forth in this Agreement.

(i)    <u>Insurance Policies and Expenses</u>.    The General Partner shall purchase such insurance on behalf and as an expense of the Partnership in such amounts as it deems reasonable, including but not limited to commercial property, general liability, professional liability or errors and omissions, and workers' compensation insurance.

11.    <u>RIGHTS OF LIMITED PARTNERS</u>.

(a)    <u>Powers of Limited Partners</u>.  Limited Partners shall ~~participate in policy formulation activities and~~ have the following rights, duties and powers normally granted to limited partners under the Act.

~~(b)    Voting Rights.    The following shall require the vote or written consent of the General Partner and a Majority in Interest of the Limited Partners:~~

~~(i)    Merger or combination of the Partnership with any other entity; and~~

~~(ii)    Sale of all or substantially all of the assets of the Partnership.~~

(b~~c~~)    <u>No Authority to Act on Behalf of Partnership.</u> Except as may otherwise be provided in this Agreement, no Limited Partner shall, in the capacity of a Limited Partner, take part in or interfere in any manner with the conduct or control of the business of the Partnership, or have any right or authority to act for or on behalf of the Partnership.

(c~~d~~)    <u>Right to Inspect the Partnership's Books and Reports.</u>  The Partnership's books and records shall be open to the inspection and examination of the Limited Partners or their duly authorized representatives at all reasonable times after reasonable advance notice has been given to the General Partner of an intention to inspect the books and records.  Upon request, a Limited Partner will, at the Partnership's expense, be provided with (i) a current list of the full name and last known business or residence address of each Limited Partner set forth in alphabetical order together with the Capital Contribution and the number of Units owned by each Limited Partner; (ii) a copy of the Certificate of Limited Partnership and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been issued, (iii) copies of the original Partnership agreement and all amendments thereto; and (iv) a copy of such other records as the Partnership, by law, is required to maintain.

12.    <u>RESTRICTIONS ON TRANSFER BY LIMITED PARTNERS; GENERAL PARTNER'S RIGHT TO PURCHASE LIMITED PARTNERS' INTEREST.</u>

EXHIBIT 4 - PAGE 73

(a)    General. No transfer of, or offer to transfer, a Limited Partner interest, in whole or in part, shall be made: (i) which could cause a termination of the Partnership for Federal income tax purposes; (ii) which alone or in conjunction with the transfer of other Limited Partner interests, might adversely affect, or tend to affect adversely, the characterization of the Partnership as a partnership for Federal income tax purposes; (iii) which could result in the assets of the Partnership being considered by law to be assets of employee benefit plans and therefore subjecting those assets to the fiduciary standards of the Employee Retirement Income Security Act of 1974, as amended; (iv) which violates the Securities Act of 1933, as amended, and any rules promulgated thereunder and any similar state "Blue Sky" laws; or (v) without the written consent of the General Partner, which may be withheld in its sole discretion. Notwithstanding the foregoing, a Limited Partner may, without the General Partner's consent, transfer all or a portion of such Limited Partner's Units to a member of that limited partner's immediate family or a trust or other entity created or controlled by that limited partner or a member of that limited partner's immediate family; provided, however, that in no event may any sale, assignment or transfer be made if it would violate any of clauses (i) through (iv) of this Section or violate Section 7(h), or which would violate the EB-5 Program requirements.  Specifically, a Limited Partner under the EB-5 Program may not transfer his/her interest unless he/she ceases to participate in the EB-5 Program.

(b)    Assignee. Subject to Section 12(a), a transferee of the Partner's interest shall become a mere assignee if all of the following conditions are satisfied:

(i)    If the General Partner shall so request, the transferor shall deliver to the General Partner an opinion of counsel in form and substance satisfactory to the General Partner and counsel for the Partnership to the effect that each of the conditions set forth in Section 12(a) have been satisfied.

(ii)    The transferee shall have paid the Partnership a reasonable fee set by the General Partner for processing transfers. A fee of no more than US $3,000 plus out of pocket costs for legal and other expenses shall be deemed reasonable.  Notwithstanding the foregoing, no fee shall be payable for a transfer to an heir of a Limited Partner upon the death of the Limited Partner.

(iii)    The transferor and any transferee shall have executed, acknowledged and delivered to the General Partner an instrument of assignment satisfactory to the General Partner and its counsel.

(c)    Substitute Partners. Subject to Section 12(a), a transferee of any Limited Partner's interest may become a "Substitute Limited Partner" in place of the transferor of such interest if, in addition to satisfying all of the applicable requirements set forth herein for an assignee, all of the following conditions are satisfied:

(i)    The transferor and any transferee shall have executed, acknowledged and delivered to the General Partner such instruments of transfer, assignment and agreement to be bound by the terms of this Agreement as are satisfactory to the General Partner and its counsel.

(ii)    The General Partner has determined, in its sole discretion, that the Limited Partner meets the requirements for an investment in the Partnership, as determined by the General Partner.

EXHIBIT 4 - PAGE 74

(d)      Rights of Assignee. An assignee who does not become a Substitute Limited Partner has no right to request any information or account of the Partnership, to inspect the Partnership books, or to vote on any of the matters as to which a Limited Partner would be entitled to vote pursuant to this Agreement. A mere assignee shall be entitled only to receive the allocations of Net Profits, Net Losses and other items and share of cash distributions to which his transferor would otherwise be entitled.

(e)      Division of Allocations and Distributions.    If any Partnership interest, or part thereof, is transferred during any accounting period in compliance with the provisions of this Agreement, Net Profits, Net Losses, each item thereof and all other items attributable to such interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any convention permitted by law selected by the General Partner. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, the Partnership shall recognize such Transfer not later than the end of the calendar month during which the provisions of Section 12(a), (b) and/or (c) are satisfied, provided that if the Partnership does not receive (a) a notice stating the date such interest was transferred, and (b) such other information as the General Partner may reasonably require, within 30 days after the end of the accounting period during which the Transfer occurs, then all of such items shall be allocated and all distributions shall be made to the person who according to the books and records of the Partnership on the last day of the accounting period during which the Transfer occurred was the owner of the Partnership interest. Neither the Partnership nor the General Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section, whether the General Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership interest.

(f)      Agreement Applies to Transferred Interest. Each Partner agrees that notwithstanding the provisions for the Transfer of any interest contained herein, the interest, when and if transferred, shall remain subject to all of the terms and conditions of this Agreement.

(g)      Heirs, Devisees and Legatees. The heirs, devisees and legatees of a deceased Limited Partner shall have the rights of a transferee of a Limited Partner, subject to administration of such deceased Limited Partner's estate, and may become Substitute Limited Partners in lieu of the deceased Limited Partner upon compliance with all of the conditions of this Agreement required for such substitution.

(h)      No Dissolution. If a Limited Partner Transfers all or any part of his interest without complying with the provisions of this Agreement, such action shall not cause or constitute a dissolution of the Partnership.

(i)      General Partner's Right to Purchase.  The General Partner shall have the right to purchase the Units of Limited Partnership Interest from the Limited Partners if a Limited Partner desires to sell his or her Unit(s) or upon the earlier of when a Limited Partner has ceased to participate in the EB-5 Program or the granting of a Limited Partner's I-829 petition for removal of conditions.  The General Partner will determine whether and for what amount to acquire any or all of the Limited Partnership

EXHIBIT 4 - PAGE 75

Interests based on the fair market value of the Limited Partnership Interests as determined by the General Partner in its sole discretion.

13.    **WITHDRAWAL AND ADDITION OF A GENERAL PARTNER.**

(a)    **Withdrawal of a General Partner.** The withdrawal of the General Partner ~~shall require the consent of a Majority in Interest of the Limited Partners, and~~ shall not be permitted, unless a replacement or successor General Partner is added, prior to the removal of conditions on residence for each Limited Partner under the EB-5 Program, except those Limited Partners who cease to participate in the EB-5 Program.

(b)    **Addition of a General Partner.** The addition of an additional General Partner shall only require the consent of ~~a Majority in Interest of~~ the ~~Limited~~ General Partner~~s~~. Notwithstanding the foregoing, the General Partner may admit additional General Partner(s) without the vote or consent of the ~~Limited~~ General Partners (i) if required to assure the continued classification of the Partnership as a limited partnership for Federal income tax purposes or (ii) if such additional General Partner is a not for profit entity admitted to obtain a real estate tax exemption for the Partnership.

14.    **DISSOLUTION AND WINDING UP OF THE PARTNERSHIP.**

(a)    **Dissolution of Partnership.** The Partnership shall be dissolved upon the occurrence of any of the following events, but in no event prior to the removal of conditions on permanent residence for Limited Partners admitted under the EB-5 Program, except for those Limited Partners who ceased to participate in the EB-5 Program:

1.    The vote or written consent of ~~a Majority in Interest of the Limited Partners together with the written consent of~~ the General Partner;

2.    The date of receipt in cash by the Partnership of the entire proceeds from a sale or other disposition by the Partnership of all, or substantially all, of the Partnership's property, provided that if such a sale is made for consideration payable in whole or part over a period of time, such date shall be the date upon which all payments therefor shall have been received;

3.    The removal, Bankruptcy, dissolution or other cessation to exist as a legal entity of the last General Partner, unless, within 60 days after the occurrence of any such event, a Majority in Interest of Limited Partners elects to continue the business of the Partnership and elect a successor General Partner; or

4.    Expiration of the term of the Partnership as set forth in Section 4(a) hereof.

(b)    **Continuation of Partnership.** If a Majority in Interest of Limited Partners elect to continue the business of the Partnership and elect a successor General Partner in accordance with Section 14(a)(3), the successor General Partner shall assume the obligations of the former General Partner and shall indemnify the former General Partners and hold them harmless from and against any and all loss, damage, liability and expense, including costs and reasonable attorneys' fees, which the former General

EXHIBIT 4 - PAGE 76

Partners may be incur by reason of or in connection with any of the debts, obligations or liabilities of the Partnership theretofore or thereafter made, incurred or created.

(c)    Winding Up of the Partnership. Upon dissolution of the Partnership, the General Partner shall wind up the affairs and liquidate the assets of the Partnership in accordance with the provisions of this Section.  Net Profits and Net Losses and all other Partnership items shall be allocated until the liquidation is completed in the same ratio as such items were allocated prior thereto. The proceeds from liquidation of the Partnership when and as received by the Partnership shall be utilized, paid and distributed in the following order:

1.    First, to pay expenses of liquidation and the debts of the Partnership to third parties other than the Partners;

2.    Next, to pay the debts of the Partnership owing to Partners;

3.    Next, to the establishment of any Cash Reserves; and

4.    Finally, to the Partners in accordance with the provisions of Section 9.

(d)    Right To Receive Partnership Property. The Limited Partners shall have no right to demand or receive any Partnership Property other than cash in return for their Capital Contributions to the Partnership, and each Limited Partner agrees to and shall look solely to the assets of the Partnership for the return of such Limited Partner's Capital Contributions. If the assets of the Partnership remaining after discharge of the debts and liabilities of the Partnership are insufficient to return the then unreimbursed Capital Contributions of a Limited Partner, such Limited Partner shall not have, and hereby waives, any recourse against the General Partner. The winding-up of the affairs of the Partnership and the distribution of its assets shall be conducted exclusively by the General Partner, who is hereby authorized to do any and all acts and things authorized by law for such purposes at the expense of the Partnership. If there is no General Partner, the winding-up of the affairs of the Partnership shall be conducted as otherwise provided by law.

15.    BOOKS AND RECORDS.

(a)    Books of Account. The General Partner shall, at the Partnership's sole cost and expense, keep adequate books of account of the Partnership wherein shall be recorded and reflected, in accordance with a method of accounting determined by the General Partner, all of the Capital Contributions and all of the income, expenses and transactions of the Partnership and a list of the names and addresses, and interests in the Partnership held by the Partners in alphabetical order.

EXHIBIT 4 - PAGE 77

(b)    <u>Accounting and Reports.</u>

1.    The General Partner shall, at the Partnership's sole cost and expense, cause Federal and state returns for the Partnership to be prepared and filed with the appropriate authorities, and shall furnish to the Limited Partners, within 60 days after the close of each Fiscal Year of the Partnership, such financial information with respect to each Fiscal Year as shall be reportable for Federal and state income tax purposes.

2.    Unless required by applicable law, the Partnership will not file quarterly or annual reports with any governmental authorities. Within 120 days after the close of each Fiscal Year, the General Partner will provide to Limited Partners audited financial statements prepared by the Partnership's accountants in accordance with generally accepted accounting principles.

(c)    <u>Banking.</u> All funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partner. All withdrawals therefrom shall be made upon checks signed by the General Partner.

(d)    <u>Accountants.</u> The General Partner shall select the accountants for the Partnership.

16.    <u>WAIVER OF ACTION FOR PARTITION.</u> Each of the Partners hereby irrevocably waives, during the term of the Partnership, any right such Partner may have to maintain any action for partition with respect to any property of the Partnership.

17.    <u>AMENDMENTS.</u> This Agreement may be modified or amended at any time in writing by the General Partner at its sole discretion to, among other things~~and a Majority in Interest of the Limited Partners.  Notwithstanding anything contained herein to the contrary the General Partner shall have the authority to amend this Agreement without any vote or other action by the Limited Partners~~: (1) ~~to~~ modify the allocation provisions of this Agreement to comply with Section 704(b) of the Code; (2) ~~to~~ add to the representations, duties, services or obligations of the General Partner or its Affiliates for the benefit of the Partners; (3) ~~to~~ cure any ambiguity or mistake, correct or supplement any provision in this Agreement that may be inconsistent with any other provision, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the existing provisions of this Agreement; (4) ~~to~~ delete or add any provision of this Agreement required to be so deleted or added by the staff of the Securities and Exchange Commission or by a state "Blue Sky" Commissioner or similar official, which addition or deletion is deemed by such commission or official to be for the benefit or protection of the Limited Partners or is required to cause the Partnership not to be classified as a "publicly traded partnership"; (5) ~~to~~ reflect the addition or substitution of Limited Partners or the reduction of the Capital Accounts upon the return of capital to the Partners; (6) ~~to~~ reconstitute the Partnership under the laws of another state if beneficial; or (7) ~~to~~ change the name and/or principal place of business of the Partnership.  In addition, notwithstanding anything contained herein to the contrary the General Partner shall have the authority to amend this Agreement without any vote or other action by the Limited Partners; (x) to decrease the rights and powers of the General Partner (so long as such decrease does not impair the ability of the General Partner to manage the Partnership and conduct its business affairs); or (y) to make any changes requested by a lender that are requested or required to obtain financing or add or delete any such provisions after repayment of any such loans provided that the adoption of such amendment (i) is for the benefit of and not adverse to the interests of the Limited Partners; (ii) is not

EXHIBIT 4 - PAGE 78

inconsistent with provisions of this Agreement pertaining to the management and administration of the Partnership by the General Partner; and (iii) does not affect the limited liability of the Limited Partners or the status of the Partnership as a partnership for Federal income tax purposes. Notwithstanding anything to the contrary contained herein, no amendment under which any of the following occurs shall be effective unless such amendment is approved by the vote or written consent of all Limited Partners:

(a)       Converts a Limited Partner into a general partner; or

(b)       Modifies the limited liability of a Limited Partner.

The General Partner shall have the authority to execute, acknowledge, and deliver any and all instruments to effectuate the provisions of this Section, including the execution, acknowledgment and delivery of any such instrument by the attorney-in-fact for the General Partner under a special or limited power of attorney, and to take all such actions in connection therewith as the General Partner shall deem necessary or appropriate with the signature of the General Partner acting alone.  The General Partner shall provide written notice of any amendment to all Limited Partners.

18.       **EQUITABLE RELIEF.** It is agreed that the rights granted to the parties hereunder are of a special and unique kind and character and that, if there is a breach by any party of any material provision of this Agreement, the other parties would not have an adequate remedy at law. It is expressly agreed, therefore, that the rights of the parties hereunder may be enforced by equitable relief as is provided under the laws of the State of California.

19.       **NOTICES.** Any and all notices, demands or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another party only if served either personally, ~~or~~ by ~~facsimile transmission~~electronic mail, or if deposited in the United States first class mail, certified or registered, postage prepaid. If such notice, demand or other communication is served personally, service shall be conclusively deemed made at the time of such personal service. If such notice is sent by ~~facsimile transmission~~electronic mail, service shall be conclusively deemed made at the time of ~~written confirmation of receipt~~transmission. If such notice, demand or other communication is given by mail, such shall be conclusively deemed given 72 hours after the deposit thereof in the United States mail addressed to the party to whom such notice, demand or other communication is to be given at the address set forth in the records of the Partnership. Any party hereto may change its address for the purpose of receiving notices, demands and other communications as herein provided by a written notice given in the manner aforesaid to the other party or parties hereto.

20.       **PARTNERSHIP MEETINGS.**

(a)       <u>Annual Meeting</u>.  Shall be held for record-keeping purposes.

(b)       <u>Call and Place of Meetings.</u> Meetings of the Partners may be called at the principal executive office of the Partnership or at any place designated by the General Partner at the call and pursuant to the written request of any General Partner or of Limited Partners representing more than 10% of the outstanding Units of the Partnership for consideration of any of the matters as to which Limited Partners are entitled to vote pursuant to the terms of this Agreement.  This subsection shall not apply to a meeting to remove or replace the General Partner.

EXHIBIT 4 - PAGE ~~7~~9

(c)      Notice of Meeting. Immediately upon receipt of a written request to the General Partner requesting a meeting pursuant to Section 21(a) on a specific date (which date shall not be less than 15 nor more than 60 days after the receipt of the request by the General Partner), the General Partner shall immediately give notice to all Partners entitled to vote. Valid notice shall be given not less than 10 nor more than 60 days prior to the date of the meeting, and shall state the place, date and hour of the meeting and the general nature of the business to be transacted. No business other than the business stated in the notice of the meeting may be transacted at the meeting. Notice shall be given in accordance with the provisions of Article 20 hereof.

(d)      Quorum. At any duly held or called meeting of Partners, a Majority in Interest of Limited the General Partners represented in person shall constitute a quorum. The Partners present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough Limited Partners to leave less than a quorum, if any action taken, other than adjournment, is approved by the owners of the requisite number of Units.

(e)      Adjournment of Meetings. A meeting at which a quorum is present may be adjourned to another time or place and any business that might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, that meeting may be adjourned by the vote of a Majority In Interest of the Limited General Partners represented in person.  Notice of the adjourned meeting need not be given to Partners entitled to notice if the time and place thereof are announced at the meeting at which the adjournment is taken, unless the adjournment is for more than 45 days or if, after the adjournment, a new record date is fixed for the adjourned meeting, in which case notice of the adjourned meeting shall be given to each Partner of record entitled to vote at the adjourned meeting.

(f)      Meetings Not Duly Called, Noticed or Held. The transactions of any meeting of Partners, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice, if a quorum is present at that meeting, in person, and if, either before or after the meeting, each of the persons entitled to vote, not present in person, signs either a written waiver of notice, a consent to the holding of the meeting or an approval of the minutes of the meeting.

(g)      Waiver of Notice. Attendance of a Partner at a meeting shall constitute waiver of notice, except when that Partner objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting.

(h)      Consent to Action Without Meeting. Any action that may be taken at any meeting of the Partners may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Partners having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Partners entitled to vote thereon were present and voted; provided, however removal and replacement of the General Partner may not be taken without a meeting of the Limited Partners.

EXHIBIT 4 - PAGE 80

(i)    Conduct of Meeting. The General Partner shall have full power and authority concerning the manner of conducting any meeting of Partners, including, without limitation, the determination of Limited Partners entitled to vote at the meeting, the existence of a quorum, the conduct of voting, and the determination of any controversies, votes or challenges arising in connection with or during the meeting. The General Partner shall designate a person to serve as chairman of the meeting and shall further designate a person to take the minutes of the meeting, in either case including, without limitation, an officer of the General Partner.  All minutes shall be kept with the records of the Partnership maintained by the General Partner.

21.    **UNIT CERTIFICATES.**

(a)    Form of Unit Certificates. If the General Partner deems it necessary or appropriate for the Units of the Partnership to be evidenced by a physical instrument, it may adopt a form of Unit Certificate to represent the Units. Each Unit Certificate shall be signed in the name of the Partnership by the General Partner and shall certify the number of Units owned by the Limited Partner. Any or all of the signatures on a Unit Certificate may be facsimile. There shall also appear conspicuously on the Unit Certificates (i) a statement to the effect that the Units are subject to restrictions upon Transfer; and (ii) any required Federal or state securities legends. The Units shall be issued only in registered form.

(b)    Issuance of Unit Certificates. If a form of Unit Certificate has been adopted by the General Partner, each Limited Partner shall be entitled to be issued a Unit Certificate certifying the number of Units owned by the Limited Partner. The Unit Certificates shall be deemed issued when signed by the General Partner on behalf of the Partnership and delivered to the Limited Partners or their designees. If the General Partner elects to adopt Unit Certificates, Limited Partners may transfer their Units only be endorsing and delivering to assignees the Unit Certificate relating to their Units, subject to the additional requirements of Article 12 hereof. If the endorsement is on a separate document, Limited Partners must deliver to assignees both the document and the Unit Certificates relating to their Units.

(c)    Lost, Stolen or Destroyed Unit Certificates. The Partnership may issue a new Unit Certificate in place of any previously issued Unit Certificate alleged to have been lost, stolen or destroyed, and the General Partner may require the Limited Partner owning the lost, stolen or destroyed Unit Certificate (or the Limited Partner's legal representative) to give the Partnership a bond (or other adequate security) sufficient to indemnify it against any claim that may be made against it (including any expense or liability) on account of the alleged loss, theft or destruction of any Unit Certificate or the issuance of such new certificate.

(d)    Surrender and Cancellation of Unit Certificates. When this Agreement is amended in any way affecting the statements contained in any Unit Certificate representing outstanding Units, or it otherwise becomes desirable for any reason, in the discretion of the General Partner, to cancel any outstanding Unit Certificate and to issue a new Unit Certificate conforming to the rights of the Limited Partner holding the Unit Certificate, the General Partner may order any Limited Partners holding an outstanding Unit Certificate to surrender and exchange them within a reasonable time to be fixed by the general Partner. The order may provide that a Limited Partner holding any Unit Certificates so ordered to be surrendered is not entitled to vote or to receive cash distributions or exercise any of the other rights of a Limited Partner until the Limited Partner has complied with the order, but such order shall operate

EXHIBIT 4 - PAGE 81

to suspend such rights only after notice and until compliance. The duty of a Limited Partner to surrender any outstanding Unit Certificate shall also be enforceable by civil action.

22.     **POWER OF ATTORNEY**.

(a)     Grant of Power.  Each Limited Partner hereby makes, constitutes, and appoints the General Partner, any successor individual general partner or president of a successor corporate general partner, and Global Premier America, LLC, d.b.a. Global Premier America Regional Center (the "Subscriber Representative"), with full power of substitution and re-substitution, his agent and attorney-in-fact for him and in his name, place, and stead and for his use and benefit, to certify, acknowledge, swear to, file, and/or record this Agreement or a certificate thereof and to sign, execute, certify, acknowledge, swear to, file, and/or record any other instruments that may be required in connection with the formation of the Partnership, any amendment of this Agreement, the day-to-day conduct of the Partnership's business or the dissolution and winding up of the Partnership under the laws of the State of California or any other jurisdiction, including without limitation instruments (1) to reflect the exercise by the General Partner of any of the powers, authorizations, or rights granted to him under this Agreement or the taking by the General Partner of any action that it is required, authorized, or permitted to take hereunder; (2) to reflect any amendments made to this Agreement or the cancellation of this Agreement upon the dissolution of the Partnership; (3) to make filings under fictitious-name statutes or other filings required by the Partnership; (4) to reflect the admission to the Partnership of any additional or substituted limited partners, in the manner prescribed in this Agreement; (5) to complete, execute, and file on behalf of a Limited Partner a UCC-1 to perfect a security interest in the Limited Partner's interest in the Partnership; (6) to fill in any missing information on any subscription document executed by the Limited Partners, including but not limited to, amending any nonmonetary term or filling the date on any promissory note or any other subscription documents, in order to conform same to the terms of this Agreement; (7) to cause the Partnership to be qualified to do business in or, if required, to exist as a partnership under the laws of any jurisdiction in which it may conduct business; and (8) any other instruments that may be required of the Partnership or of the Partners or deemed desirable by the General Partner.  Each Limited Partner authorizes such attorney-in-fact to take any further actions that such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such attorney-in-fact full power and authority to do and perform each and every acts or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Limited Partner might or could do if personally present and hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof.  Each of the Limited Partners waives any and all defense that may be available to the Limited Partners to contest, negate, or disaffirm the actions of the General Partner under the power of attorney herein granted.

EXHIBIT 4 - PAGE 82

(b)    <u>Nature of Power</u>.  The power of attorney granted pursuant to Section 22(a):

(1)    is a special power of attorney coupled with an interest and is irrevocable;

(2)    may be exercised by such attorney-in-fact by listing the names of all of the Limited Partners who are to be parties to any agreement, certificate, instrument, or document, with the single signature of such attorney-in-fact together with the recital that it acts as attorney-in-fact for all of them; and

(3)    shall survive the death, bankruptcy, or mental incapacity of any Limited Partner, to the extent he or she may legally contract for such survival, or the transfer or assignment by such Partner of any Unit(s), except that where such transfer or assignment is of the last remaining Unit(s) held by such Partner and the transferee or assignee thereof has the right to be and with the consent of the General Partner is admitted as a substituted Limited Partner, the power of attorney given by the transferor shall survive such transfer or assignment for the sole purpose of enabling such attorney-in-fact to execute, acknowledge, swear to, and file any agreement, certificate, instrument, or document necessary to effect such substitution.

(c)    <u>Execution of Additional Documents</u>.  Upon request of the General Partner, each Limited Partner shall promptly execute all certificates and other documents necessary or desirable for the General Partner to accomplish all such filings, recordings, publications, and other acts as the General Partner determines may be appropriate to comply with (1) the requirements for the formation, operation, amendment, or dissolution, as the case may be, of a limited partnership under the laws of the State of California; and (2) similar requirements of applicable law in all other jurisdictions with the Partnership may conduct business.

23.    <u>**MISCELLANEOUS.**</u>

(a)    <u>Applicable Law.</u> This Agreement shall, in all respects, be governed by the laws of the State of California applicable to agreements executed and to be wholly performed within the State of California.

(b)    <u>Severability.</u> Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provisions contained herein and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail; but the provision of this Agreement which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law. If any provision of this Agreement shall be held to be invalid, the same shall not affect the validity, legality or enforceability of the remainder of this Agreement.

(c)    <u>Further Assurances.</u> Each of the parties hereto shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

EXHIBIT 4 - PAGE 83

(d)      <u>Successors and Assigns.</u> All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns.

(e)      <u>Number and Gender.</u> In this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so requires.

(f)      <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)      <u>Non-Waiver: Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)      <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)      <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)      <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

*(The remainder of this page is intentionally blank; the signature page follows.)*

EXHIBIT 4 - PAGE 84

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #5, LLC

By: _____
      Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

EXHIBIT 4 - PAGE 85

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled: **DEBTOR'S JOINT CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **<u>May 6, 2025</u>**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Simon Aron** - saron@wrslawyers.com, moster@wrslawyers.com;jlee@wrslawyers.com
- **Donald H Cram, III** - dhc@severson.com, cas@severson.com
- **Brian David Fittipaldi** - brian.fittipaldi@usdoj.gov
- **James A Flanagan** -email@flanaganlaw.com, flanaganlaw@ecf.courtdrive.com, 4571468420@filings.docketbird.com
- **Garrick A Hollander** - ghollander@wghlawyers.com, jmartinez@wghlawyers.com; svillegas@wghlawyers.com
- **Peter W Lianides** - plianides@wghlawyers.com, jmartinez@wghlawyers.com; svillegas@wghlawyers.com
- **Matthew J Stockl** - matthew.stockl@dinsmore.com, katrice.ortiz@dinsmore.com
- **United States Trustee (ND) -** ustpregion16.nd.ecf@usdoj.gov
- **Johnny White** - JWhite@wrslawyers.com, jlee@wrslawyers.com

☐  Service information continued on attached page

**2. <u>SERVED BY UNITED STATES MAIL</u>**: On **_____, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3. <u>SERVED BY EMAIL</u>** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **_____, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| May 6, 2025 | Silvia Villegas | /s/ Silvia Villegas |
|---|---|---|
| Date | Printed Name | Signature |

EXHIBIT 4 - PAGE 86

278139.3

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled: **DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S JOINT CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **May 6, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Simon Aron** - saron@wrslawyers.com, moster@wrslawyers.com;jlee@wrslawyers.com
- **Donald H Cram, III** - dhc@severson.com, cas@severson.com
- **Brian David Fittipaldi** - brian.fittipaldi@usdoj.gov
- **James A Flanagan** -email@flanaganlaw.com, flanaganlaw@ecf.courtdrive.com, 4571468420@filings.docketbird.com
- **Garrick A Hollander** - ghollander@wghlawyers.com, jmartinez@wghlawyers.com; svillegas@wghlawyers.com
- **Peter W Lianides** - plianides@wghlawyers.com, jmartinez@wghlawyers.com; svillegas@wghlawyers.com
- **Matthew J Stockl** - matthew.stockl@dinsmore.com, katrice.ortiz@dinsmore.com
- **United States Trustee (ND) -** ustpregion16.nd.ecf@usdoj.gov
- **Johnny White** - JWhite@wrslawyers.com, jlee@wrslawyers.com

**2.  SERVED BY UNITED STATES MAIL**:  On _____, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2025 I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| May 6, 2025 | Silvia Villegas | /s/ Silvia Villegas |
| *Date* | *Printed Name* | *Signature* |

-30-